**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| Keira M., minor, by next friend STACIE ODENEAL, *et al.*, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | |
| | ) | Civil No. 3:25-cv-00566 |
| MARGIE QUIN, Commissioner, Tennessee | ) | Judge Trauger |
| Department of Children's Services, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................... i

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................. 2

STANDARD OF REVIEW ............................................................................. 6

ARGUMENT .................................................................................................. 6

I.      The Court Should Dismiss the Claims Under Rule 12(b)(1). ............................................. 6

        A.      The Named Plaintiffs Lack Standing. ...................................................... 6

        B.      Five of the Named Plaintiffs' Claims Are Moot. ...................................... 15

        C.      The Court Should Abstain Under *Younger*. ............................................ 17

        D.      The Court Should Abstain Under *O'Shea*. ............................................. 21

II.     Alternatively, the Court Should Dismiss the Claims Under Rule 12(b)(6). .................... 22

        A.      The Claims Under the Spending Clause Statutes Fail as a Matter of Law
                (Third and Fifth Causes of Action). ...................................................... 22

        B.      The Substantive Due Process Claims Fail as a Matter of Law (First Cause of
                Action). .............................................................................................. 29

        C.      The Familial Association Claims Fail as a Matter of Law (Second Cause of
                Action). .............................................................................................. 35

        D.      The ADA and Rehabilitation Act Claims Fail as a Matter of Law (Fourth
                Cause of Action). ................................................................................ 35

        E.      Plaintiffs Do Not Allege They Exhausted Their Claims Through the
                Individuals with Disabilities Education Act's (IDEA) Administrative Process
                (First and Fourth Causes of Action). ..................................................... 44

CONCLUSION ............................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**

*31 Foster Children v. Bush*,
    329 F.3d 1255 (11th Cir. 2003) ................................................................. 16, 18, 24

*A.M.H. v. Hayes*,
    No. C2-03-778, 2004 WL 7076544 (S.D. Ohio Sept. 30, 2004) ........................................... 25

*Ability Center of Greater Toledo v. City of Sandusky*,
    385 F.3d 901 (6th Cir. 2004) ........................................................................ 40

*Alexander v. Choate*,
    469 U.S. 287 (1985) ................................................................................ 40, 41

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ................................................................................. 40

*Ali v. Adamson*,
    No. 1:21-cv-71, 2023 WL 9382485 (W.D. Mich. Dec. 12, 2023) .......................................... 12

*Allen v. Wright*,
    468 U.S. 737 (1984) ................................................................................. 1, 12

*Alvarez v. Smith*,
    558 U.S. 87 (2009) .................................................................................. 16

*Ashley W. v. Holcomb*,
    34 F.4th 588 (7th Cir. 2022) ......................................................................... 18

*B.H. v. Johnson*,
    715 F. Supp. 1387 (N.D. Ill. 1989) .................................................................. 33

*Baby Neal v. Casey*,
    821 F. Supp. 320 (E.D. Pa. 1993) .................................................................... 33

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 35

*Binno v. American Bar Association*,
    826 F.3d 338 (6th Cir. 2016) ......................................................................... 9

*Bowman v. United States*,
    564 F.3d 765 (6th Cir. 2008) ...................................................................... 39, 40

*Brawner v. Scott County*,
    14 F.4th 585 (6th Cir. 2021) ......................................................................... 34

*Brian A. v. Sundquist*,
    149 F. Supp. 2d 941 (M.D. Tenn. 2000) ............................................................. 20, 24

*Brown v. Tennessee Department of Finance & Administration*,
    561 F.3d 542 (6th Cir. 2009) ......................................................................... 28

ii

*California v. Texas,*
593 U.S. 659 (2021) ............................................................................ 7

*Carson P. v. Heineman,*
240 F.R.D. 456 (D. Neb. 2007) .................................................. 16, 24

*Caswell v. City of Detroit Housing Commission,*
418 F.3d 615 (6th Cir. 2005) ............................................................ 40

*Chambers v. Sanders,*
63 F.4th 1092 (6th Cir. 2023) .......................................................... 30

*Charlie H. v. Whitman,*
83 F. Supp. 2d 476 (D.N.J. 2000) .................................................... 33

*Clapper v. Amnesty International USA,*
568 U.S. 398 (2013) .......................................................................... 15

*Clark v. Jackson,*
2023 WL 2787325 (6th Cir. 2023) ................................................... 30

*Collins v. City of Harker Heights,*
503 U.S. 115 (1992) .................................................................... 30, 34

*Connor B. ex rel. Vigurs v. Patrick,*
774 F.3d 45 (1st Cir. 2014) .............................................................. 31

*County of Sacramento v. Lewis,*
523 U.S. 833 (1998) .......................................................................... 33

*D.G. ex rel. Stricklin v. Henry,*
594 F. Supp. 2d 1273 (N.D. Okla. 2009) ........................................ 24

*DeShaney v. Winnebago County Department of Social Services,*
489 U.S. 189 (1989) .......................................................................... 31

*Disability Rights N.Y. v. New York,*
916 F.3d 129 (2d Cir. 2019) ............................................................ 21

*Dobbs v. Jackson Women's Health Organization,*
597 U.S. 215 (2022) ........................................................ 29, 30, 31, 32

*Doe by K.M. v. Knox County Board of Education,*
56 F.4th 1076 (6th Cir. 2023) .......................................................... 44

*Doe v. Lee,*
752 F. Supp. 3d 884 (M.D. Tenn. 2024) ............................................ 6

*Doe v. University of Kentucky,*
860 F.3d 365 (6th Cir. 2017) .............................................. 17, 19, 21

*E.T. v. Cantil-Sakauye,*
682 F.3d 1121 (9th Cir. 2012) ......................................................... 21

*Eidson v. Tennessee Department of Children's Services,*
510 F.3d 631 (6th Cir. 2007) ........................................................... 33

iii

*Elisa W. v. City of New York*,
No. 15-cv-05273, 2017 WL 3841868 (S.D.N.Y. Sept. 1, 2017) .............................................. 16

*Eric L. ex rel. Schierberl v. Bird*,
848 F. Supp. 303 (D.N.H. 1994) ................................................................................................ 33

*Gary B. v. Whitmer*,
957 F.3d 616 (6th Cir. 2020) ..................................................................................................... 33

*Gary G. v. Newsom*,
No. 5:23-cv-00947, 2024 WL 4354697 (C.D. Cal. Sept. 30, 2024) .......................................... 35

*Gonzaga University v. Doe*,
536 U.S. 273 (2009) .................................................................................................................... 23

*Hanna v. Toner*,
630 F.2d 442 (6th Cir. 1980) ................................................................................................ 20, 21

*Health & Hospital Corp. of Marion County v. Talevski*,
599 U.S. 166 (2023) ......................................................................................................... 23, 24, 25

*Henry A. v. Willden*,
678 F.3d 991 (9th Cir. 2012) ..................................................................................................... 24

*Hensley Manufacturing v. ProPride, Inc.*,
579 F.3d 603 (6th Cir. 2009) ....................................................................................................... 6

*Heyne v. Metropolitan Nashville Public School*,
686 F. Supp. 2d 724 (M.D. Tenn. 2009) .................................................................................. 33

*In re Neveah W.*,
470 S.W.3d 807 (Tenn. Ct. App. 2015) ..................................................................................... 19

*J.B. v. Valdez*,
186 F.3d 1280 (10th Cir. 1999) ................................................................................................. 16

*J.P. v. DeSanti*,
653 F.2d 1080 (6th Cir. 1981) ................................................................................................... 21

*John B. v. Goetz*,
626 F.3d 356 (6th Cir. 2010) ................................................................................................ 24, 27

*Johnson v. Becerra*,
111 F.4th 1237 (D.C. Cir. 2024) ................................................................... 10, 11, 12, 13

*Johnson v. City of Detroit*,
446 F.3d 614 (6th Cir. 2006) ..................................................................................................... 40

*Jonathan R. by Dixon v. Justice*,
41 F.4th 316 (4th Cir. 2022) ...................................................................................................... 18

*Jonathan R. v. Justice*,
No. 3:19-CV-00710, 2023 WL 184960 (S.D.W. Va. Jan. 13, 2023) .................................. 33, 35

*Jonathan R. v. Morrisey*,
768 F. Supp. 3d 756 (S.D.W. Va. 2025) ............................................................................... 12, 13

iv

*Jones v. Metzger*,
   456 F.2d 854 (6th Cir. 1972) ................................................................. 21

*Joseph A. ex rel. Wolfe v. Ingram*,
   275 F.3d 1253 (10th Cir. 2002) .............................................................. 18

*K.B. ex rel. T.B. v. Michigan Department of Health & Human Services*,
   367 F. Supp. 3d 647 (E.D. Mich. 2019) .................................................. 28

*K.H. ex rel. Murphy v. Morgan*,
   914 F.2d 846 (7th Cir. 1990) ................................................................. 33

*Kelm v. Hyatt*,
   44 F.3d 415 (6th Cir. 1995) ................................................................... 20

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) .............................................................................. 39

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2025) ............................................................ 30, 31

*Laurie Q. v. Contra Costa County*,
   304 F. Supp. 2d 1185 (N.D. Cal. 2004) ................................................. 16

*Lawler ex rel. Lawler v. Hardeman County*,
   93 F.4th 919 (6th Cir. 2024) ................................................................. 34

*Lewis v. Casey*,
   518 U.S. 343 (1996) .............................................................................. 13

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024) ........................................................................ 37, 39

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................ 7

*M.R. v. Dreyfus*,
   663 F.3d 1100 (9th Cir. 2011) ............................................................... 36

*Manship v. Brothers*,
   No. 1:11-cv-1003, 2011 WL 6779315 (E.D. Va. Dec. 27, 2011) .............. 16

*Mark G. v. Sabol*,
   717 N.E.2d 1067 (N.Y. 1999) ................................................................ 33

*Mark v. Borough of Hatboro*,
   51 F.3d 1137 (3d Cir. 1995) .................................................................. 34

*McNeese v. Board of Education*,
   373 U.S. 668 (1963) .............................................................................. 21

*Meador v. Cabinet for Human Resources*,
   902 F.2d 474 (6th Cir. 1990) ................................................................. 33

*Medina v. Planned Parenthood South Atlantic*,
   606 U.S. ---, 145 S. Ct. 2219 (June 26, 2025) ........................ 2, 23, 24, 25, 26

v

*Memphis A. Philip Randolph Inst. v. Hargett*,
   978 F.3d 378 (6th Cir. 2020) ........................................................................ 15

*Michael H. v. Gerald D.*,
   491 U.S. 110 (1989) ................................................................................. 30, 31

*Middlesex County Ethics Committee v. Garden State Bar Association*,
   457 U.S. 423 (1982) ................................................................................. 19, 20

*Mikel v. Quin*,
   58 F.4th 252 (6th Cir. 2023) ........................................................................... 7

*Moir v. Greater Cleveland Regional Transit Authority*,
   895 F.2d 266 (6th Cir. 1990) ........................................................................... 6

*Moore v. Sims*,
   442 U.S. 415 (1979) ................................................................................. 17, 18

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ............................................................................... 7, 9, 14

*National Federation of Independent Business v. Sebelius*,
   567 U.S. 519 (2012) ..................................................................................... 14

*Nored v. Tennessee Department of Intellectual & Developmental Disabilities*,
   No. 3:19-CV-00214-DCLC, 2021 WL 3729617 (E.D. Tenn. Aug. 23, 2021) .................. 27, 28

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ................................................................................. 21, 22

*Ocean S. v. Los Angeles County*,
   2024 WL 3973047 (C.D. Cal. June 11, 2024) ........................................................ 35

*Oglala Sioux Tribe v. Fleming*,
   904 F.3d 603 (8th Cir. 2018) ....................................................................... 18, 21

*Ohio National Life Insurance Co. v. United States*,
   922 F.2d 320 (6th Cir. 1990) ........................................................................... 6

*Olivia Y. v. Barbour*,
   351 F. Supp. 2d 543 (S.D. Miss. 2004) .............................................................. 24

*Olmstead v. L.C.*, 527 U.S. 581 (1999) ............................................. 36, 39, 41, 42

*Parents' League for Effective Autism Services v. Jones-Kelley*,
   339 F. App'x 542 (6th Cir. 2009) ..................................................................... 28

*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2013) ......................................................................... 36

*Pennzoil Co. v. Texaco, Inc.*,
   481 U.S. 1 (1987) ......................................................................................... 20

*Pethtel v. Tennessee Department of Children Services*,
   No. 3:10-cv-469, 2011 WL 5592853 (E.D. Tenn. Nov. 16, 2011) .......................... 19, 20

vi

*Powell v. McCormack*,
   395 U.S. 486 (1969) ........................................................................... 16

*R. K. ex rel. J. K. v. Lee*,
   53 F.4th 995 (6th Cir. 2022) ................................................................ 1

*Reno v. Flores*,
   507 U.S. 292 (1993) ...................................................................... 29, 32

*Rios v. City of Del Rio*,
   444 F.3d 417 (5th Cir. 2006) .............................................................. 34

*Robinson v. Purkey*,
   326 F.R.D. 105 (M.D. Tenn. 2018) ...................................................... 6

*Sam M. v. Chafee*,
   800 F. Supp. 2d 363 (D.R.I. 2001) .................................................... 16

*San Antonio Independent School District v. Rodriguez*,
   411 U.S. 1 (1973) ............................................................................... 33

*Santosky v. Kramer*,
   455 U.S. 745(1982) ........................................................................... 19

*Serna v. Colorado Department of Corrections*,
   455 F.3d 1146 (10th Cir. 2006) ......................................................... 34

*Shakman v. Pritzker*,
   43 F.4th 723(7th Cir. 2022) .............................................................. 13

*Shelby Advocates for Valid Elections v. Hargett*,
   947 F.3d 977 (6th Cir. 2020) ............................................................ 15

*Sheppheard v. Morrisey*,
   143 F.4th 232 (4th Cir. 2025) ........................................................... 14

*Siefert v. Hamilton County*,
   951 F.3d 753 (6th Cir. 2020) ....................................................... 2, 33

*Simon v. East Kentucky Welfare Rights Organization*,
   426 U.S. (1976) ................................................................................... 7

*Sprint Communications, Inc. v. Jacobs*,
   571 U.S. 69 (2013) ...................................................................... 2, 17

*Stanford v. Northmont City School District*,
   No. 3:19-CV-399, 2023 WL 1819117 (S.D. Ohio Feb. 8, 2023) ........... 33

*T.M., ex rel. H.C. v. DeWine*, 49 F.4th 1082 (6th Cir. 2022) ...................... 26

*Tennessee Conference of National Association for the Advancement of Colored People v. Lee*,
   139 F.4th 557 (6th Cir. 2025) ..................................................... 15, 29

*Thompson v. Williamson County*,
   219 F.3d 555 (6th Cir. 2000) ............................................................ 35

vii

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ........................................................................ 7

*United States v. Elbe,*
774 F.3d 885 (6th Cir. 2014) ........................................................ 37

*United States v. Mississippi,*
82 F.4th 387 (5th Cir. 2023) .................................................... 38, 39

*Washington v. Glucksberg,*
521 U. S. 702 (1997) ..................................................................... 30

*Waskul v. Washtenaw County Community Mental Health,*
979 F.3d 426 (6th Cir. 2020) ........................................ 25, 26, 36, 37

*Weiser v. Benson,*
48 F.4th 617 (6th Cir. 2022) ......................................................... 3

*Westside Mothers v. Haveman,*
289 F.3d 852 (6th Cir. 2002) ........................................................ 26

*Westside Mothers v. Olszewski* (*Westside Mothers II*),
454 F.3d 532 (6th Cir. 2006) .................................................. 26, 27

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021) ........................................................................ 13

*Wyser-Pratte Management Co., Inc. v. Telxon Corp.,*
413 F.3d 553 (6th Cir. 2005) ......................................................... 3

*Younger v. Harris,*
401 U.S. 37 (1971) .................................................................. 17, 21

*Zola H. v. Snyder,*
No. 12-cv-14073, 2013 WL 4718343 (E.D. Mich. Sept. 3, 2013) ......... 16

**Statutes**

20 U.S.C. § 1415 ................................................................................ 44

29 U.S.C. § 794 ................................................................................. 38

42 U.S.C. § 12132 ......................................................................... 35, 38

42 U.S.C. § 1396 ............................................................................... 22

42 U.S.C. § 1396a ........................................... 23, 24, 25, 26, 27, 28

42 U.S.C. § 1396d ................................................. 24, 25, 26, 27, 28

42 U.S.C. § 5101 ................................................................................. 4

42 U.S.C. § 629b ................................................................................. 4

42 U.S.C. § 670 ................................................................................. 22

42 U.S.C. § 671 ............................................................... 23, 24, 26

42 U.S.C. § 672 ................................................................................. 26

viii

42 U.S.C. § 675 ........................................................................................................... 23

Tenn. Code Ann. § 36-1-116 ......................................................................................... 3

Tenn. Code Ann. § 36-1-119 ....................................................................................... 16

Tenn. Code Ann. § 36-1-121 ....................................................................................... 16

Tenn. Code Ann. § 37-1-101 ....................................................................................... 20

Tenn. Code Ann. § 37-1-103 ......................................................................................... 3

Tenn. Code Ann. § 37-1-113 ......................................................................................... 3

Tenn. Code Ann. § 37-1-114 ......................................................................................... 3

Tenn. Code Ann. § 37-1-126 ....................................................................................... 20

Tenn. Code Ann. § 37-1-129 ....................................................................................... 19

Tenn. Code Ann. § 37-1-130 ......................................................................................... 3

Tenn. Code Ann. § 37-1-131 ......................................................................................... 3

Tenn. Code Ann. § 37-1-132 ......................................................................................... 3

Tenn. Code Ann. § 37-1-149 ....................................................................................... 20

Tenn. Code Ann. § 37-2-403 ....................................................................... 11, 18, 19, 22

Tenn. Code Ann. § 37-2-404 ................................................................................. 18, 22

Tenn. Code Ann. § 37-2-405 ....................................................................................... 18

Tenn. Code Ann. § 37-2-406 ....................................................................................... 18

Tenn. Code Ann. § 37-2-407 ....................................................................................... 18

Tenn. Code Ann. § 37-2-408 ....................................................................................... 18

Tenn. Code Ann. § 37-2-409 ............................................................................. 18, 19, 22

Tenn. Code Ann. § 4-29-104 ......................................................................................... 4

Tenn. Code Ann. § 4-29-105 ......................................................................................... 4

Tenn. Code Ann. § 4-29-109 ......................................................................................... 4

Tenn. Code Ann. § 4-29-111 ......................................................................................... 4

**Rules**

Fed. R. Civ. P. 12 .......................................................................................................... 6

Fed. R. Civ. P. 65 ........................................................................................................ 14

Fed. R. Evid. 201 .......................................................................................................... 3

Tenn. R. Juv. P. 302 .................................................................................................... 20

Tenn. R. Juv. P. 401 .................................................................................................... 19

Tenn. R. Juv. P. 402 ............................................................................................... 19, 22

ix

Tenn. R. Juv. P. 403 .................................................................................................... 22

**Regulations**

28 C.F.R. § 35.130 .................................................................................................... 38

45 C.F.R. § 1355.20 ................................................................................................... 4

45 C.F.R. § 1355.41 ................................................................................................... 4

45 C.F.R. § 1355.42 ................................................................................................... 4

45 C.F.R. § 1355.43 ................................................................................................... 4

45 C.F.R. § 1355.44 ................................................................................................... 4

45 C.F.R. § 1357.10 ................................................................................................... 4

45 C.F.R. § 1357.16 ................................................................................................... 4

45 C.F.R. § 84.76 ...................................................................................................... 39

88 Fed. Reg. 63392 (Sept. 14, 2023) ....................................................................... 39

**Constitutional Provisions**

U.S. Const. Amend. XIV, § 1 .................................................................................. 29

## INTRODUCTION

Pursuant to a settlement in a previous case, *Brian A. v. Haslam*, this Court oversaw nearly every aspect of Tennessee's child welfare system from 2001 to 2019. ECF 25 ¶¶ 4–6. In the years since *Brian A.*, Defendants have continued to improve Tennessee's child welfare system. For example, Tennessee has invested hundreds of millions of dollars in increasing compensation and support for Case Managers; expanding placements for foster children; expanding prevention services to minimize the extent to which children are removed from their homes; and delivering comprehensive health care services for foster children. While Tennessee faces challenges that all child welfare systems face nationwide, Defendants devote enormous resources to transparently addressing those challenges, in collaboration with their state, local, and federal partners.

Plaintiffs now seek to re-impose federal court oversight over Defendants. However, federal courts are not "continuing monitors of the wisdom and soundness of [e]xecutive action." *Allen v. Wright*, 468 U.S. 737, 752, 760 (1984), *abrogated on other grounds by Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Rather, federal courts only have jurisdiction to hear claims when the relief sought is "likely" to redress a concrete injury suffered by the plaintiffs. *See, e.g.*, *R. K. ex rel. J. K. v. Lee*, 53 F.4th 995, 1001 (6th Cir. 2022).

In this case, this Court lacks jurisdiction—and Plaintiffs lack standing—because the relief Plaintiffs seek is not "likely" to redress the alleged injuries of any of the Named Plaintiffs. While that relief would require this Court to oversee nearly every aspect of the State's child welfare system, it is purely speculative that it would redress any of the Named Plaintiffs' alleged injuries. Further, the systemic monitoring and oversight of child welfare decisions will interfere with ongoing Tennessee juvenile court proceedings, and therefore principles of federalism and comity preclude this Court from ordering much of the relief that Plaintiffs seek. Finally, Plaintiffs fail to

1

state a claim for which relief can be granted: The Spending Clause statutes on which Plaintiffs rely are not privately enforceable because they do not "unambiguous[ly] use rights-creating language," *see, e.g.*, *Medina v. Planned Parenthood South Atlantic*, 606 U.S. ---, 145 S. Ct. 2219, 2235–36 (June 26, 2025), and Plaintiffs have not alleged facts to support any ongoing Americans with Disabilities Act (ADA), Rehabilitation Act, or constitutional violations with respect to any Named Plaintiff. In *Brian A.*, this Court denied in part the motion to dismiss, which raised some of the arguments Defendants raise here. However, *Brian A.* was a different case with different allegations, and the law relevant to child welfare litigation has evolved significantly since 2000, *see, e.g.*, *Medina*, 145 S. Ct. 2219; *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013); *Siefert v. Hamilton Cnty.*, 951 F.3d 753 (6th Cir. 2020).

Administering any child welfare program is challenging, complex, and dynamic, requiring Defendants to work closely with the legislature, other executive agencies, state courts, the federal government, and a host of other partners, all of which are already working together to achieve many of the results that Plaintiffs now ask this Court to order, oversee, and monitor. The Court does not have jurisdiction to do so, nor do Plaintiffs make a legally cognizable claim for the relief they seek. The First Amended Complaint should be dismissed.

## BACKGROUND

The Department of Children's Services (DCS) administers the child welfare system in Tennessee. DCS investigates allegations of abuse and neglect and provides services to thousands of children and their families, including: children in foster care because of dependency and neglect; children in DCS custody through a "delinquency" or "unruly" proceeding; non-custodial children at risk of further child welfare system involvement; and children placed on state probation and

supervision by the juvenile courts.[1]  DCS employs Case Managers to provide case work to these children and families.  *See SFY 2024 Annual Report*, at 4–7, 9, 17.

The allegations and claims in this case relate to the subset of children served by DCS who have been removed from their homes and placed into DCS custody.  This includes both children in DCS custody because of dependency and neglect proceedings and children in DCS custody through juvenile justice proceedings.  Tenn. Code Ann. §§ 37-1-113, 37-1-114, 37-1-130 to -132. All children in DCS custody have an open juvenile court case with regular permanency hearings, and all matters relating to that child's dependency and neglect or juvenile justice proceeding are under the "exclusive original jurisdiction" of juvenile courts.  Tenn. Code Ann. § 37-1-103.[2]

All eligible children in DCS custody are enrolled in Medicaid through a statewide health plan serving specialized populations.[3]  This health plan has developed a "Best Practice Network" of providers to serve children in DCS custody, composed of primary care practitioners, dentists,

---

[1] *See* DCS, *Department of Children's Services Annual Report State Fiscal Year 2024*, at 4–7, 9 (n.d.) http://bit.ly/45DLZjG [hereinafter, "*SFY 2024 Annual Report*"].  On a motion to dismiss, the Court can consider documents "appropriate for the taking of judicial notice."  *Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp*., 413 F.3d 553, 560 (6th Cir. 2005).  The documents cited by Defendants are publicly available and their content "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and thus "not subject to reasonable dispute."  Fed. R. Evid. 201(b); *cf., e.g.*, *Weiser v. Benson*, 48 F.4th 617, 620 n.3 (6th Cir. 2022) (taking judicial notice of a publicly available document from a state agency).

[2] Once an adoption petition is filed in chancery or circuit court, the juvenile court shares jurisdiction with the adoption court.  *See* Tenn. Code Ann. §§ 37-1-103(c), 36-1-116(f).

[3] For the small number of children in DCS custody who are not eligible for Medicaid, DCS covers the same services available through Medicaid.  *Cf.* DCS, *Protocol for Health Services for Children/Youth in DCS Custody*, at 7 (eff. Feb. 2025), http://bit.ly/41utCLx [hereinafter, "*Protocol for Health Servs.*"]; DCS, *Health Services Authorization for Non-TennCare Eligible*, Form CS-0533 (rev. Jan. 2019), http://bit.ly/4oUwDyZ.

3

and behavioral health providers.[4]  These primary care practitioners also serve as "medical homes" by coordinating physical and behavioral care for the child.  *DCS Health Care Plan*, at 2.

DCS is subject to oversight by the Tennessee General Assembly.  For example, the Joint Government Operations Committee reviews DCS to "determine the quality, efficiency, and success" of DCS.  Tenn. Code Ann. § 4-29-105; *see also* § 4-29-109.  As part of this review, the Committee holds public hearings and receives testimony about DCS, and the Comptroller of the Treasury undertakes periodic program review audits.  §§ 4-29-104(a), 4-29-111(b).

DCS also works closely with, and is subject to oversight from, the federal Administration for Children and Families (ACF).  For example, ACF reviews and approves DCS's Child and Family Service Plans (CFSPs).  *See* 42 U.S.C. § 629b; 45 C.F.R. § 1357.10.  As part of the CFSP process, DCS must submit to ACF interim Annual Progress and Services Reports (APSR) assessing progress and describing forthcoming activities and services to further advance implementation of the CFSP.  45 C.F.R. § 1357.16.  DCS also reports reams of data to ACF each year, including Adoption and Foster Care Analysis and Reporting System (AFCARS) data and National Child Abuse and Neglect System (NCANDS) data.  42 U.S.C. § 5101 *et seq*.; 45 C.F.R. §§ 1355.20, 1355.41, 1355.42, 1355.43, 1355.44.

In *Brian A. v. Haslam*,[5] this Court oversaw nearly every aspect of the child welfare system from 2001 to 2019.  No. 3:00-cv-0045 (M.D. Tenn.).  Plaintiffs allege that, during this period, "the State made substantial changes to its child welfare system, which resulted in a significant improvement in the lives of children in the State's custody."  ECF 25 ¶¶ 5–6.

---

[4] DCS, *Coordination of Health Care Oversight and Coordination Plan*, at 2 (2024), http://bit.ly/41WA26k [hereinafter "*DCS Health Care Plan*"].

[5] *Brian A. v. Haslam* was the caption for the case at the time it was dismissed.

4

In the years following the dismissal of *Brian A.*, DCS continued to improve the child welfare system, in partnership with the General Assembly, other executive agencies, the state judiciary, community partners, and the federal government. For example, DCS increased the average starting salary for entry-level Case Managers from $43,992 to $50,600;[6] capped first-year caseloads at 10 cases per Case Manager, *CAP Quarterly Report*, at 6; from 2021 to 2024, decreased Case Manager turnover from 29 percent to 17 percent and decreased the Case Manager vacancy rate from 24 percent to 8 percent, *see SFY 2024 Annual Report*, at 1; and implemented an ongoing utilization review process to reduce lengths of stay in residential treatment.[7] In addition, in 2023, the legislature appropriated over $60 million for rate increases for foster family homes and residential treatment providers and $107 million to expand placement capacity for children entering DCS custody, including by constructing intake and assessment centers.[8]

As a result of these and other efforts, the overwhelming majority of children in DCS custody are well-served by the system. While any maltreatment is unacceptable to Defendants, maltreatment-in-care in Tennessee is exceedingly rare: the most recent data released by ACF shows Tennessee's rate was 8.72 incidents per 100,000 days in DCS custody.[9] As of September

---

[6] DCS, *Corrective Action Plan on Audit Recommendations Quarterly Report*, at 6 (June 13, 2023) http://bit.ly/4g2DKkT [hereinafter, "*CAP Quarterly Report*"].

[7] *See* DCS, *Tennessee Placement System Orientation & Training Guide*, at 7, 15–16, 22–23 (Dec. 2023), http://bit.ly/46eCMys.

[8] *CAP Quarterly Report*, at 9–10; DCS, *Department of Children's Services Annual Report State Fiscal Year 2023*, at 10 (n.d.) http://bit.ly/4oYxSgr [hereinafter, "*SFY 2023 Annual Report*"].

[9] ACF, *CFSR Round 4 Statewide Data Indicators Workbook*, at 8–9 (Oct. 2024) https://perma.cc/FKK9-2TJC (attached as Ex. 1).

5

30, 2023, 80 percent of children in DCS custody—inclusive of children in custody through juvenile justice proceedings—were placed in family homes or are on a trial home visit.[10]

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(1), the plaintiff must allege facts to establish subject matter jurisdiction. *See, e.g.*, *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). In addition, when defendants contest jurisdiction as a factual matter, "the court must weigh the evidence . . . , without presuming the challenged allegations in the complaint to be true." *Doe v. Lee*, 752 F. Supp. 3d 884, 896 (M.D. Tenn. 2024). *See Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *Robinson v. Purkey*, 326 F.R.D. 105, 127–28 (M.D. Tenn. 2018). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must plead facts to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering such a motion, the court "must accept all well-pleaded factual allegations . . . as true." *See Hensley Mfg. v. ProPride*, *Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

## ARGUMENT

### I. The Court Should Dismiss the Claims Under Rule 12(b)(1).

Plaintiffs' claims should be dismissed because the Named Plaintiffs lack standing and because principles of comity and federalism require this Court to abstain from exercising jurisdiction.

#### A. The Named Plaintiffs Lack Standing.

To establish standing, the plaintiffs must allege facts to establish that they have suffered an injury-in-fact that is "fairly traceable to the challenged action of the defendant" and "likely" to be

---

[10] ACF, *The AFCARS Dashboard, All Children in Care Living Arrangement: Tennessee, 2023* (last visited, August 29, 2025) http://bit.ly/4lPrTYo (attached as Ex. 2).

6

redressed by the relief sought. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). In putative class actions, the <u>named plaintiffs</u> must have standing. *See, e.g.*, *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) (cleaned up).

### 1. Plaintiffs Fail to Allege Facts to Establish Redressability.

The redressability inquiry focuses on whether the relief requested is "likely" to redress the alleged injury, which requires the court to "consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (quoting *California v. Texas*, 593 U.S. 659, 671 (2021)). Where, as here, the plaintiffs seek prospective, injunctive relief, they must establish that the relief is "likely" to redress an ongoing injury or a "substantial" risk of "imminent" future injuries. *Mikel v. Quin*, 58 F.4th 252, 258–59 (6th Cir. 2023), *cert. denied sub nom. Mikel v. Nichols*, 143 S. Ct. 2660 (2023). In addition, the plaintiffs must establish redressability "for . . . each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

In this case, Plaintiffs do not allege facts to establish that the relief they seek is "likely" to redress any of the alleged injuries of any of the Named Plaintiffs. As they must in a Rule 23(b)(2) putative class action, Plaintiffs do not seek relief specific to any of the Named Plaintiffs, but instead seek class-wide relief. ECF 25, at 75–80. However, in this case, it is purely speculative that this class-wide relief will redress any of the Named Plaintiffs' alleged injuries.[11]

For example, Plaintiffs allege that several of the Named Plaintiffs are experiencing, or are at risk of experiencing, inappropriate or unsafe placements. *See, e.g.*, ECF 25 ¶¶ 41, 47, 69, 87,

---

[11] For the Court's convenience, Appendix A lists the relief sought by Plaintiffs in the First Amended Complaint, with short explanations (and cross-references to Defendants' arguments in this Memorandum) about whether each part of the relief would redress the alleged injuries of any Named Plaintiff and whether this Court has the authority to order the relief.

117, 125.  Plaintiffs do not ask this Court to order different placements for any of those Named Plaintiffs, but instead ask the Court to order Defendants to implement a set of broad and vague program improvements, such as "recruiting, training, [and] supporting an array of appropriate foster placements"; "restricting Defendants from placing any child in a congregate care setting based on the unavailability of foster home resources"; "recruit[ing] and retain[ing] enough qualified and appropriately trained workers providing direct supervision and planning for children"; and "conducting a workload analysis . . . to determine manageable caseloads, and implementing the recommendations of that analysis."  ECF 25, at 75–79.

Putting aside that DCS already expends enormous resources on recruiting, training, and supporting foster families and Case Managers,[12] Plaintiffs do not allege any facts that establish that additional training or support of foster families is "likely" to result in a different placement for any Named Plaintiff.  Similarly, Plaintiffs do not allege any facts to establish that recruiting and retaining more "qualified and appropriately trained" Case Managers, or implementing recommendations from a "workload analysis," will result in a more appropriate placement for any Named Plaintiff.  Nor do Plaintiffs allege facts to establish that prohibiting placement "in a congregate care setting based on the unavailability of foster home resources" will cause any Named Plaintiff to be placed in a family home.  The availability of an appropriate foster family depends on the willingness of private individuals to become foster parents and accept the Named Plaintiffs in their home.  Unfortunately, as Plaintiffs acknowledge, many foster homes "are unwilling to accept high-needs children," ECF 25 ¶ 194.  If this Court enjoins Defendants "from placing any

---

[12] *See DCS Policy 16.4* (rev. Apr. 11, 2024), http://bit.ly/4lN2uyN (attached as Ex. 3); *DCS Policy 16.9* (rev. Mar. 7, 2024), http://bit.ly/3HOhzlK (attached as Ex. 4); DCS, *16.9 Attachment: Required Training Chart for Foster Parents* (eff. Mar. 7, 2024), http://bit.ly/3JY4BlO (attached as Ex. 5); DCS, *Foster Parent Handbook* (May 2023), http://bit.ly/45SyWtu (attached as Ex. 6).

8

child in a congregate care setting based on the unavailability of foster home resources," and no family chooses to accept the child, DCS would be required to supervise that child in an office or transitional setting, which Plaintiffs allege are always "unsuitable," ECF 25 ¶ 49.

Plaintiffs also allege that several Named Plaintiffs were maltreated while in care, *see* ECF 25 ¶¶ 73, 82, 111, 112, and ask this Court to order Defendants to "thoroughly investigat[e] complaints of maltreatment in care" and "eliminat[e] the practice of allowing foster children to be shackled while in placement." ECF 25, at 77–78. However, DCS already "thoroughly investigates" complaints of maltreatment, and Plaintiffs do not allege that any Named Plaintiffs (other than Thomas H.) are currently subject to maltreatment or face a substantial risk of imminent maltreatment, and therefore implementing policy changes to minimize maltreatment in care cannot plausibly redress any ongoing injury of any Named Plaintiff (other than Thomas H.). Moreover, while Defendants agree it is critically important to "thoroughly investigat[e]" complaints of maltreatment, ordering this class-wide relief is not "likely" to redress any alleged injury of any particular Named Plaintiff. Similarly, Plaintiffs have not alleged that any of the Named Plaintiffs are being "shackled" or face an imminent risk of such "shackling," presumably because DCS policy authorizes "mechanical restraints" only in limited circumstances.[13] Accordingly, prohibiting "shackling" would not redress any alleged ongoing injury of any Named Plaintiff.

As the foregoing shows, redressing Named Plaintiffs' alleged injuries depends on the actions of private third parties, such as private families who choose whether to foster a Named Plaintiff. However, redressability is much harder—and often impossible—to establish if remedying the alleged injury depends on the action of third parties who are not defendants in the case. *See, e.g.*, *Murthy*, 603 U.S. at 74; *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345 (6th Cir. 2016).

---

[13] *See DCS Policy 31.19* (rev. Sept. 8, 2023), http://bit.ly/4n9Z8Hd (attached as Ex. 7).

9

For example, in *Johnson v. Becerra*, the plaintiffs alleged that the Secretary of Health and Human Services' (HHS) administration of Medicare resulted in an insufficient supply of private home health providers, which allegedly deprived the plaintiffs of home health services. 111 F.4th 1237, 1241–42 (D.C. Cir. 2024). As relief, the plaintiffs requested an injunction requiring (1) "the Secretary to make systemic reforms to his administration of the home health benefit," such as "chang[ing] his 'payment methods and criteria' and reform[ing] 'quality measurement and/or rating criteria'" to "'[e]nsure that'" the plaintiffs have "reasonable access" to home health services, and (2) "the Secretary to focus more auditing and enforcement resources on" home health providers. *Id.* at 1245–46. The D.C. Circuit held that plaintiffs lacked standing because they did not allege facts sufficient to establish that this relief was "likely" to redress their alleged injuries. *Id.* Even though increasing payments to providers presumably would expand access to services for some people, the court rejected plaintiffs' argument that the relief was "likely" to result in plaintiffs securing Medicare-covered home health services, in part because such providers "are free to choose whether to accept a patient," *id.* In addition, the plaintiffs "offer[ed] no reason . . . to infer that greater enforcement . . . would cause [private home health agencies] already serving Medicare beneficiaries to expand their services or would result in other [home health agencies] undertaking to serve Medicare beneficiaries." *Id.*

*Johnson* also held that the relief relating to payments to home health providers was "woefully underspecified" in that the plaintiffs "never identif[ied] what reforms are necessary to fix the problem." *Id.* at 1246. The broad requested relief amounted to "an injunction instructing the Secretary to better administer the law" and was not sufficiently "connect[ed] to their injuries." *Id.* at 1246–47. Even if different HHS oversight could, "in theory," "influence [provider]

10

behavior," "a quest for ill-defined 'better odds' is not" sufficient to prove redressability. *Id.* at 1247.

As in *Johnson*, Plaintiffs in this case allege that several of the Named Plaintiffs are not receiving adequate health care from private health care providers paid by Medicaid, and they seek broad, vague relief that they speculate will generally improve the program. *See, e.g.*, ECF 25, ¶¶ 35, 54, 77, 79, 101, 128, 157. For example, Plaintiffs seek an order to require Defendants to provide foster children "with an adequate and individualized written case plan within 60 days of entering care"; "ensure" all foster children "timely receive" the "services and/or treatments" specified in their case plan; "conduct[] a comprehensive evaluation" of foster children within 30 days of entering care; and "ensure an adequate array of community-based therapeutic services are available to children with disabilities." ECF 25, at 75–76.

However, Plaintiffs do not allege any facts establishing that this relief will "likely" cause any Named Plaintiff to receive any additional health care beyond what they are currently receiving. To begin with, existing state law or policy already requires much of the relief Plaintiffs seek. For example, DCS must create the case plan within 30 days of the child entering care, Tenn. Code Ann. § 37-2-403; the juvenile court must approve the case plan within 60 days of the child entering care, *id.*; and Tennessee already pays for all medically necessary, Medicaid-covered services delivered to foster children, *see DCS Policy 20.7*; *Protocol for Health Servs.*, at 7. Further, as in *Johnson*, redressing the alleged injuries requires action from independent third parties. In Tennessee, as in all states, private health care providers deliver medically necessary physical and behavioral health services to foster children, *see DCS Policy 20.7*, at 1; *Protocol for Health Servs.*, at 7, and Plaintiffs allege that providers in Tennessee lack the capacity to serve all foster children, ECF 25 ¶ 257. Ordering Defendants to ensure that all children receive services specified in their

11

case plan, or to ensure an "adequate array of community-based therapeutic services," will not magically produce private providers willing to serve the Named Plaintiffs, ECF 25 at 76. As in *Johnson*, those private providers "are free to choose whether to accept a patient," 111 F.4th at 1245–46, and Defendants cannot force a private provider to serve a particular Named Plaintiff, *see Ali v. Adamson*, No. 1:21-cv-71, 2023 WL 9382485, at *6 (W.D. Mich. Dec. 12, 2023) (unpublished) (explaining that a plaintiff "must bring an action against an individual who has the power to provide the relief sought" (cleaned up)). Similarly, Plaintiffs do not allege any facts to establish that completing more frequent "adequate and individualized written case plan[s]" or "comprehensive evaluations" of needs are "likely" to result in any Named Plaintiff receiving any health care services that the child is not already receiving.

Further, even if Plaintiffs had alleged facts to establish that the relief would remedy Named Plaintiffs' alleged injuries (which they have not), Plaintiffs' claims would not be redressable because the relief would violate principles of federalism and separation of powers. *See Johnson*, 111 F.4th at 1244–47; *Jonathan R. v. Morrisey*, 768 F. Supp. 3d 756 (S.D.W. Va. 2025). Article III standing "is built on a single basic idea—the idea of separation of powers," and federal courts are not "continuing monitors of the wisdom and soundness of [e]xecutive action." *Allen*, 468 U.S. at 752, 760 (cleaned up).

Here, Plaintiffs seek an injunction requiring Defendants to, among many other things: "establish and enforce mandatory performance metrics"; "recruit and retain enough qualified and appropriately trained workers providing direct supervision and planning for children in accordance with reasonable professional standards"; "implement[] the recommendations of" a "workload analysis"; hire a third party "to determine additional resource needs for services" and "implement the recommendations of that assessment"; and "ensur[e] that children receive timely permanence,

placement stability and a rate of maltreatment in care that is within national standards."  ECF 25, at 75–79.  Ordering this relief would transform this Court into a "monitor[] of the wisdom and soundness of" child welfare policy and practice, in contravention of Article III standing and separation of powers principles.

Plaintiffs "do not seek to enjoin a particular unlawful action" by Defendants, but instead "request a court order instructing [Defendants] to make systemic reforms to [their] administration of" the child welfare system.  *See Johnson*, 111 F.4th at 1246.  That relief would wrest control of the child welfare system from Tennessee's democratically accountable leaders and put it in the hands of this Court.  But this Court cannot "hire state employees," "oversee child welfare administration," or "move state funds and shift local priorities to enact statewide reform," and Article III judges do not have an "amorphous power to supervise the operations of government and reimagine [them] from the ground up."  *See Jonathan R.*, 768 F. Supp. 3d at 761–63 (alteration in original) (quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 40 (2021)).  Plaintiffs' requested relief risks this Court, "'in the name of the Constitution, becoming enmeshed in the minutiae of state operations' and depriving local officials of their own . . . executive responsibilities."  *See Shakman v. Pritzker*, 43 F.4th 723, 731 (7th Cir. 2022) (quoting *Lewis v. Casey*, 518 U.S. 343, 361 (1996)).  For example, Plaintiffs ask this Court to oversee the "determin[ation]" and "implement[ation]" of appropriate caseload and resource levels and to "ensure" that placements, services, and case plans are "timely," "appropriate," "in the most integrated setting," and in accordance with "reasonable professional standards."  *See* ECF 25, at 75–79.  But a federal court may not "craft . . . policy that defines 'adequate,' 'appropriate,' 'sufficient,' 'unnecessary,' and 'unreasonable' as the Plaintiffs ask."  *See Jonathan R.*, 768 F. Supp. 3d at 763.  Courts "possess neither the expertise nor the prerogative to make policy

13

judgments," as their constitutional role is to "interpret the law." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

This Court also lacks the authority to grant much of the relief sought because it is outside the control of Defendants. In *Sheppheard v. Morrisey*, the plaintiffs alleged "overcrowding, understaffing, and deferred maintenance" of detention facilities and sought an injunction requiring the defendants to, among other things, improve facility infrastructure and obtain funds to improve the facilities and increase staffing levels. 143 F.4th 232, 239–40 (4th Cir. 2025). The Fourth Circuit held that the plaintiffs' injuries were "not redressable" because the plaintiffs "ha[d] not clearly alleged facts to show" that the defendants had the power to allocate funds or otherwise implement the relief sought, and a federal court is "largely powerless" to order relief that is beyond the control of the defendants. *Id.* at 244–46, 248 (cleaned up).

In this case, Plaintiffs ask this Court to, for example: "ensure an adequate array of community-based therapeutic services are available"; ensure that there are "enough qualified and appropriately trained workers providing direct supervision and planning for children"; "enforce caseload standards"; and ensure "an array of appropriate foster placements that meet the particular behavioral, cultural, and mental health needs of children." ECF 25, at 78–79. However, compliance with this relief would depend upon the actions of third parties, *e.g.*, foster families and prospective foster families deciding to accept children, private individuals deciding to work as Case Managers, and private providers deciding to provide health care services needed by foster children. As the court held in *Sheppheard*, a court cannot issue an injunction that requires the defendants to take action beyond their control. 143 F.4th at 244–48; *see* Fed. R. Civ. P. 65(d)(2); *Murthy*, 603 U.S. at 73 (holding that plaintiffs could not satisfy redressability because third parties

14

"remain free to enforce" the policies allegedly causing the harm, even though those policies may have been initially "tainted" by defendants' actions).

### 2. Plaintiffs Have Failed to Allege that Dewayne W. is Experiencing an Ongoing Injury or Imminent Risk of Injury.

As explained above, in a case seeking declaratory or injunctive relief, "a plaintiff must show actual present harm," *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020) (citation and quotation omitted), or a substantial risk of "'imminent,'" "'certainly impending'" future harm. *Tenn. Conf. of NAACP v. Lee*, 139 F.4th 557, 562 (6th Cir. 2025) (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)).

In this case, the First Amended Complaint fails to allege facts showing that Dewayne W. faces ongoing harm or an "imminent," "certainly impending" risk of future harm. Plaintiffs allege that DCS harmed Dewayne by placing him in "inappropriate" and "unsafe" placements in the past, and by "depriving him of his right to an appropriate education." ECF 25 ¶ 119. However, Dewayne is on a trial home visit with his biological mother, *see id.* ¶ 127, and the First Amended Complaint does not allege facts showing that Dewayne continues to experience any injury or faces imminent risk of future injury. "Past may be precedent. But the Supreme Court has not been sympathetic to claims that past occurrences of unlawful conduct create standing to obtain an injunction against the risk of future unlawful conduct." *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (citation omitted). Accordingly, Dewayne lacks standing.

### B. Five of the Named Plaintiffs' Claims Are Moot.

At the time the First Amended Complaint in this case was filed on June 16, 2025, Named Plaintiffs Aaron C., Arielle C., Ava C., Andrew H., and Adrian H. (hereinafter, "C/H Siblings") were living with foster parents who were in the process of adopting them. *See* Tenn. Code Ann.

15

§ 36-1-119 (children must live with prospective adoptive parents for at least three months prior to adoption). The First Amended Complaint did not mention this material fact. *See* ECF 25 ¶¶ 93–106. In July 2025, the C/H Siblings' adoption was finalized and they were released from DCS custody. *See* Ex. 8 (unredacted version filed under seal).

A plaintiff's claim is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). As the Supreme Court has explained, because the Constitution permits courts to "decide legal questions only in the context of actual 'Cases' or 'Controversies,' . . . [a]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (cleaned up). Several courts have found that adoption or release from state custody moots the claims of a child who is a named plaintiff in a suit against a state child welfare agency.[14]

In this case, because the C/H Siblings are no longer in DCS custody, Tenn. Code Ann. § 36-1-121(a), none of the injunctive relief that Plaintiffs seek would impact them and they "lack a legally cognizable interest in the outcome" of this case, *see Powell*, 395 U.S. at 496. Accordingly, their claims are moot.

---

[14] *See, e.g.*, *Sam M. v. Chafee*, 800 F. Supp. 2d 363, 372–73 (D.R.I. 2001); *31 Foster Child. v. Bush*, 329 F.3d 1255, 1263 (11th Cir. 2003); *Zola H. v. Snyder*, No. 12-cv-14073, 2013 WL 4718343, at *3–*5 (E.D. Mich. Sept. 3, 2013) (unpublished); *Manship v. Bros.*, No. 1:11-cv-1003, 2011 WL 6779315, at *8–*9 (E.D. Va. Dec. 27, 2011) (unpublished) (same); *Laurie Q. v. Contra Costa Cnty.*, 304 F. Supp. 2d 1185, 1208 (N.D. Cal. 2004) (same); *see also Carson P. v. Heineman*, 240 F.R.D. 456, 511–12 (D. Neb. 2007); *J.B. v. Valdez*, 186 F.3d 1280, 1290 (10th Cir. 1999). *But see, e.g.*, *Elisa W. v. City of N.Y.*, No. 15-cv-05273, 2017 WL 3841868, at *2 (S.D.N.Y. Sept. 1, 2017) (unpublished).

16

### C. The Court Should Abstain Under *Younger*.

Under *Younger v. Harris*, 401 U.S. 37 (1971) and its progeny, principles of comity and federalism require federal courts to abstain from exercising jurisdiction when there are underlying state court proceedings that: (1) are one of the types of proceedings to which *Younger* applies; and (2) are "pending," "involve an important state interest," and "provide the federal plaintiff with an adequate opportunity to raise his constitutional claims." *Doe v. Univ. of Ky.*, 860 F.3d 365, 369 (6th Cir. 2017). In this case, both steps of the *Younger* inquiry are satisfied for nearly all of Plaintiffs' claims, and therefore this Court should abstain from hearing those claims.

As to the first step of the inquiry, "*Younger* permits abstention" where the underlying state court proceedings are: criminal proceedings, "certain civil enforcement proceedings," or civil proceedings involving orders "uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* (cleaned up); *Sprint Commc'ns, Inc.*, 571 U.S. at 72. "Civil enforcement proceedings" are proceedings initiated by a government entity that generally involve a "complaint, an investigation, notice of the charge, and the opportunity to introduce witnesses and evidence." *Doe*, 860 F.3d at 370. As an example of a civil enforcement proceeding to which *Younger* applies, the Supreme Court in *Sprint* cited its previous holding in *Moore v. Sims*. *See Sprint Commc'ns, Inc.*, 571 U.S. at 579. In *Moore*, three children and two parents, who were parties to a state court abuse-and-neglect proceeding, brought a constitutional to a state statute governing those proceedings. 442 U.S. 415, 418 (1979). The Supreme Court held that the district court should have abstained because the state was a party to the underlying state court proceeding, and that proceeding involved the removal of a child "in aid of and closely related to criminal statutes" relating to child abuse. *Id.* at 423 (internal quotation marks omitted).

17

In this case, Tennessee's juvenile court proceedings are "civil enforcement proceedings." Like the proceeding in *Moore*, Tennessee's dependency and neglect proceedings and juvenile justice proceedings are generally initiated by the government, which generally remains a party, and are "in aid of and closely related to criminal statutes" relating to either child abuse or juvenile crime. *See, e.g.*, *Ashley W. v. Holcomb*, 34 F.4th 588, 591 (7th Cir. 2022) (holding that *Moore* concluded that "state-initiated child-welfare litigation" is a state civil proceeding to which *Younger* applies); *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 610 (8th Cir. 2018) (relying on *Moore* and holding that state abuse and neglect proceedings are "civil enforcement" proceedings). Plaintiffs' claims would interfere with these ongoing juvenile court proceedings because juvenile courts oversee and issue orders relating to nearly all aspects of a child's experience in care, including case planning and the provision of physical and behavioral health services, *see* Tenn. Code Ann. §§ 37-2-403 to -409. *See Oglala Sioux Tribe*, 904 F.3d at 610–11; *31 Foster Child. v. Bush*, 329 F.3d 1255, 1278 (11th Cir. 2003); *Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1272 (10th Cir. 2002); *Ashley W.*, 34 F.4th at 591.

One circuit has held that child welfare proceedings are not "civil enforcement" proceedings, *see Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 329 (4th Cir. 2022), but that case was wrongly decided. *Jonathan R.* misinterpreted *Moore* as applying only to initial removal proceedings, not ongoing hearings in the same case, and distinguished cases brought by plaintiff children from the case brought by "the abusive parents in *Moore*." *See id.* at 329–30. However, nothing in *Moore* suggests a distinction between different stages of the same state court proceeding, and the claims in *Moore* were brought by both the parents <u>and</u> the allegedly abused children, *see Moore*, 442 U.S. at 418.

18

As explained above, the second step in the *Younger* inquiry asks whether the state proceedings are "pending," "involve an important state interest," and "will provide the federal plaintiff with an adequate opportunity to raise his constitutional claims." *Doe*, 860 F.3d at 369 (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432–34 (1982)).

In this case, juvenile court proceedings are pending for all the Named Plaintiffs that remain in DCS custody,[15] and those proceedings "implicate important state interests."[16] In addition, Tennessee juvenile courts provide Named Plaintiffs with an "adequate opportunity" to raise nearly all the federal issues they bring in this case. In both dependency and neglect and juvenile justice proceedings, Tennessee courts oversee and issue orders approving (or modifying or rejecting) the appropriateness of permanency plans, which set forth the services that each child will receive and the long-term planning for each child. *See* Tenn. Code Ann. § 37-2-403; Tenn. R. Juv. P. 401; *see also* Advisory Commission Comments to Tenn. R. Juv. P. 401. While juvenile courts do not have the authority to order specific placements, Tenn. Code Ann. § 37-1-129(c); *In re Neveah W.*, 470 S.W.3d 807, 808 (Tenn. Ct. App. 2015), they remain integrally involved in overseeing DCS placement decisions as part of their authority to make reasonable effort determinations and to oversee permanency plans, which includes making findings regarding the appropriateness of the child's placement. *See* Tenn. R. Juv. P. 401, 402.

---

[15] *See* Advisory Commission Comments to Tenn. R. Juv. P. 401; Tenn. Code Ann. § 37-2-409; *see, e.g.*, ECF 25 ¶¶ 60, 83, 91, 121, 122, 142, 160.

[16] *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 766 (1982) ("[T]he State has an urgent interest in the welfare of the child . . . the State's goal is to provide the child with a permanent home." (cleaned up)); *Pethtel v. Tenn. Dep't of Child. Servs.*, No. 3:10-cv-469, 2011 WL 5592853, at *5 (E.D. Tenn. Nov. 16, 2011) (unpublished) ("State juvenile court proceedings concerning custody and dependency issues implicate important state interests relating to matters of domestic relations and the welfare of children in state custody.").

19

"Where vital state interests are involved, a federal court should abstain unless state law clearly bars the interposition of the" federal claims, *Middlesex*, 457 U.S. at 432 (cleaned up) , and "federal courts must presume that 'the state courts are able to protect the interests of the federal plaintiff,'" *Pethtel*, 2011 WL 5592853, at *5 (quoting *Kelm v. Hyatt*, 44 F.3d 415, 419 (6th Cir. 1995)). In Tennessee, the juvenile courts are competent to hear questions of federal and constitutional law, and each child is represented by a court-appointed attorney or a guardian ad litem, or both, depending on the type of case. *See* Tenn. Code Ann. §§ 37-1-101(a)(4), 37-1-126(a)(1), 37-1-149; Tenn. R. Juv. P. 302(d)(1). In addition, the First Amended Complaint does not allege that any of the Named Plaintiffs ever raised any of the alleged violations of federal law in their juvenile court proceedings, and when a litigant has not attempted to raise alleged federal violations in state court, "a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary," *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987).

In sum, the Named Plaintiffs are party to ongoing state juvenile court proceedings that are "civil enforcement" proceedings, and those proceedings are pending, implicate important state interests, and provide the Named Plaintiffs an adequate opportunity to raise the violations of federal law that they raise in this case. Accordingly, *Younger* requires this Court to abstain from hearing most of the Named Plaintiffs' claims.

In *Brian A.*, this Court declined to abstain under *Younger*, citing *Hanna v. Toner* for the proposition that "'abstention from hearing claims of institutional violation of rights guaranteed by the U.S. Constitution is inappropriate and federal courts must hear federal constitutional claims.'" *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 957 (M.D. Tenn. 2000) (quoting *Hanna v. Toner*, 630 F.2d 442, 444 (6th Cir. 1980)). However, this quote from *Hanna* is dicta. *Hanna* did not hold that

20

*Younger* was inapplicable to constitutional claims, but rather declined to abstain because the "case represents no interference or intervention in state judicial processes." 630 F.2d at 446. Moreover, the dicta in *Hanna* was referring to the Sixth Circuit's earlier decision in *Jones v. Metzger*, which did not even mention *Younger* and simply stated that courts should "hesitate" to abstain "when fundamental civil rights are at issue." 456 F.2d 854, 856 (6th Cir. 1972) (citing *McNeese v. Bd. of Educ.,* 373 U.S. 668 (1963)). In fact, *Younger* itself involved a constitutional claim, 401 U.S. at 41, 49, and the Sixth Circuit has held that abstention may be appropriate in cases involving constitutional claims, *see J.P. v. DeSanti*, 653 F.2d 1080, 1085 (6th Cir. 1981); *Doe*, 860 F.3d at 368.

### D. The Court Should Abstain Under *O'Shea*.

Under *O'Shea v. Littleton*, federal courts should abstain from hearing any claim when the plaintiff seeks "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of" ongoing or future state court proceedings, such that the relief the plaintiff seeks is effectively an "ongoing federal audit" of the state proceedings. *See* 414 U.S. 488, 500 (1974); *see, e.g.*, *Oglala Sioux Tribe*, 904 F.3d at 611–12 (citing *O'Shea*, 414 U.S. at 500); *E.T. v. Cantil-Sakauye*, 682 F.3d 1121, 1123 (9th Cir. 2012). Unlike *Younger* abstention, the application of *O'Shea* is not limited to certain categories of state court proceedings. *Disability Rights N.Y. v. New York*, 916 F.3d 129, 134–35 & n.3 (2d Cir. 2019).

Here, Plaintiffs ask the Court to issue an injunction that would control future decisions made by juvenile courts, including decisions relating to case planning and services. If issued, the injunction would "place the district court in the position of conducting an ongoing 'federal audit' of" juvenile courts to ensure their orders complied with the injunctive relief Plaintiffs request. *See Oglala Sioux Tribe*, 904 F.3d at 612; *see also E.T.*, 682 F.3d at 1124 (abstaining under *O'Shea*

21

because "potential remediation might involve examination of the administration of a substantial number of individual cases"). For example, Plaintiffs seek an injunction requiring Defendants to: "ensure" all foster children "timely receive" all "services and/or treatments" in the case plan; "conduct[] reevaluations as the child's circumstances change"; "timely" implement the case plan; and ensure all foster children receive "an adequate and individualized written case plan within 60 days of entering care." ECF 25, at 75–79. However, juvenile courts are charged with overseeing the contents and implementation of a child's case plan and the provision of services to foster children. *See* Tenn. Code Ann. §§ 37-2-403, 37-2-404, 37-2-406, 37-2-409; Tenn. R. Juv. P. 402, 403; *see also* Advisory Commission Comments to Tenn. R. Juv. P. 401. Accordingly, to ensure compliance with the injunction Plaintiffs seek, this Court would need to review the thousands of case planning and service-related decisions issued annually by juvenile courts, which would amount to an "ongoing federal audit" of the state proceedings, *see O'Shea*, 414 U.S. at 500.

## II. Alternatively, the Court Should Dismiss the Claims Under Rule 12(b)(6).

Even if it is not dismissed for lack of jurisdiction, the First Amended Complaint should be dismissed under Rule 12(b)(6).

### A. The Claims Under the Spending Clause Statutes Fail as a Matter of Law (Third and Fifth Causes of Action).

Plaintiffs bring claims under the Adoption Assistance and Child Welfare Act of 1980 (AACWA), 42 U.S.C. § 670 *et seq*., and the Medicaid Act, 42 U.S.C. § 1396 *et seq*. These claims should be dismissed because the statutory provisions are not privately enforceable and, in any event, Plaintiffs have failed to plead facts sufficient to show a violation of those provisions.

#### 1. The AACWA and the Medicaid Act Provisions Are Not Privately Enforceable.

As the Supreme Court has explained, "the typical remedy for state noncompliance with federally imposed conditions [in a Spending Clause statute] is not a private cause of action for

22

noncompliance but rather action by the Federal Government to terminate funds to the State." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (cleaned up). Earlier this year, in *Medina v. Planned Parenthood South Atlantic*, the Court held that a Spending Clause statute must "'clear[ly] and unambiguous[ly]' use[] 'rights-creating terms'" to be privately enforceable, 145 S. Ct. at 2229 (alteration in original) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2009)), which is a "stringent standard." *Talevski*, 599 U.S. at 180, 184, 186.

In *Medina*, the plaintiffs brought claims under the "any-qualified-provider" provision of the Medicaid Act, which provides that the state Medicaid "plan" "must" "provide that . . . any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23)(A). The Court held that, even though this statutory provision was mandatory and focused on the "individual," it was not privately enforceable because it did not contain the necessary "rights-creating language." *Medina*, 145 S. Ct. at 2235–36. The Court recognized that a less demanding standard was suggested in its previous decisions in *Wilder v. Virginia Hospital Association*, *Blessing v. Freestone*, and *Wright v. Roanoke Redevelop and Housing Authority*. *Id.* at 2233–34. The Court rejected the reasoning of these previous decisions and expressly instructed lower courts not to follow the reasoning in those cases. *Id.* at 2234.

In this case, the AACWA provisions on which Plaintiffs rely—42 U.S.C. §§ 671(a)(10), (a)(16), (a)(22), 675(1), (5)—are not privately enforceable because they do not "clearly and unambiguously use[] rights-creating terms," *Medina*, 145 S. Ct. at 2244. Like the Medicaid Act's "any-qualified-provider" provision, these AACWA provisions simply set forth requirements for what a state must include in its "plan" to be eligible for federal funding. 42 U.S.C. § 671(a).

Specifically, Section 671(a)(10) requires the "plan approved by the Secretary" to "provide[]" "for the establishment or designation of a State authority or authorities that shall be responsible for establishing and maintaining" certain "standards" for foster care placements; Section 671(a)(16) requires the "plan" to "provide[]" for the development of a "case plan" defined in Section 675(1) and "for a case review system which meets the requirements described in sections 675(5) and 675a" for each child receiving federal funding; and Section 671(a)(22) requires the "plan" to "provide[]" that "the State shall develop and implement standards to ensure that children in foster care placements . . . are provided quality services that protect the safety and health of the children." *Id*. §§ 671(a)(10), (a)(16), (a)(22).

While these provisions "speak[] to what a State must do" to receive federal funding for foster care maintenance payments, and may seek to "benefit" foster children, "missing from [these provisions] is . . . clear and unambiguous 'rights-creating language.'" *Medina*, 145 S. Ct. at 2235 (quoting *Talevski*, 599 U.S. at 186). In fact, even before *Medina*, the Sixth Circuit "easily conclude[d]" that Sections 671(a)(16), 675(1), and 675(5) "do[] not create enforceable rights." *John B. v. Goetz*, 626 F.3d 356, 363 (6th Cir. 2010).[17] *Brian A.* held that certain provisions of AACWA are privately enforceable, but it was decided before *John B.* and *Medina*, and *Brian A.* applied the reasoning from *Blessing*, *see Brian A.*, 149 F. Supp. 2d at 946–49, which the Supreme Court expressly rejected in *Medina*.

Similarly, the Medicaid Act provisions on which Plaintiffs rely—42 U.S.C. §§ 1396a(a)(8), (a)(10), (a)(43)(B)–(C), 1396d(a), (r)—are not privately enforceable because they do not "clearly

---

[17] Many other courts reached similar conclusions even before *Talevski* and *Medina*. *See, e.g.*, *31 Foster Child.*, 329 F.3d at 1274; *D.G. ex rel. Stricklin v. Henry*, 594 F. Supp. 2d 1273, 1280 (N.D. Okla. 2009); *Carson P.*, 240 F.R.D. at 544; *Olivia Y. v. Barbour*, 351 F. Supp. 2d 543, 562 (S.D. Miss. 2004). *But see, e.g.*, *Henry A. v. Willden*, 678 F.3d 991, 1006–07 (9th Cir. 2012).

24

and unambiguously use[] rights-creating terms," *Medina*, 145 S. Ct. at 2244.  Sections 1396a(a)(8), (a)(10), (a)(43)(B)–(C) provide that, to receive federal Medicaid funding: the "State plan . . . must" "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals"; the "plan" "must" "provide" that certain groups of individuals are eligible for Medicaid services; and the "plan" "must," for certain individuals under age 21, "provide for . . . (B) providing or arranging for the provision of such screening services in all cases where they are requested, [and] (C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services."  42 U.S.C. §§ 1396a(a)(8), (a)(10), (a)(43)(B)– (C) .  And Sections 1396d(a) and (r) define "medical assistance" and "early and periodic screening, diagnostic, and treatment services" (EPSDT).[18]

While these Medicaid Act provisions "speak[] to what a State must do to participate in" Medicaid, and may seek to "benefit" Medicaid enrollees, "missing from [these provisions] is . . . clear and unambiguous 'rights-creating language.'"  *Medina*, 145 S. Ct. at 2235 (quoting *Talevski*, 599 U.S. at 186).  In fact, for purposes of analyzing whether they use "rights-creating language," these Medicaid Act provisions are indistinguishable from the Medicaid any-qualified-provider provision in *Medina*, which the Supreme Court held does not create a private right of action.

In *Waskul v. Washtenaw County Community Mental Health*, the Sixth Circuit held that Sections 1396a(a)(8) and (a)(10) are privately enforceable.  979 F.3d 426, 447 (6th Cir. 2020).  However, *Waskul* applied the test set forth in *Blessing* to determine whether the statutory

---

[18] Because Section 1396d(a) and (r) are definitional, they cannot independently create a private right of action.  *See, e.g.*, *A.M.H. v. Hayes*, No. C2-03-778, 2004 WL 7076544 (S.D. Ohio Sept. 30, 2004) (unpublished).

provisions were privately enforceable, *id.* at 447, and *Medina* and *Talevski* require lower courts to apply a different test. In fact, *Medina* expressly instructs lower courts to avoid relying on the reasoning in *Blessing*. 145 S. Ct. at 2234. Accordingly, *Waskul* has been superseded.[19]

> ### 2. Plaintiffs Fail to Allege Facts to Establish a Violation of Section 671(a)(10) or Section 671(a)(16).

Even if the provisions of Sections 671(a) were privately enforceable, Plaintiffs fail to allege facts to establish a violation of those statutes with respect to any of the Named Plaintiffs. First, Plaintiffs do not allege facts establishing that the case planning provision of Section 671(a)(16) applies to any of the Named Plaintiffs. Section 671(a)(16) applies only to children receiving federally funded "foster care maintenance payments," *see id.* § 671(a)(16), which are only available for children who: meet certain financial eligibility requirements; are in a placement meeting certain requirements; and have been removed from home pursuant to a court order that finds, among other things, that "reasonable efforts" were made to preserve the family. 42 U.S.C. § 672(a)(1)–(3); *cf. T.M., ex rel. H.C. v. DeWine*, 49 F.4th 1082, 1090 (6th Cir. 2022) (explaining that the state provides services to some foster children who do not receive federal funding). The First Amended Complaint does not allege facts to show that any of the Named Plaintiffs meet these requirements.

Second, Plaintiffs fail to allege facts that show that DCS lacks "standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of

---

[19] In a different case, the Sixth Circuit found that a combination of several Medicaid provisions— including Sections 1396a(a)(8), (a)(10), and 1396d(r)(5)—create a private right. *Westside Mothers v. Haveman*, 289 F.3d 852, 863 (6th Cir. 2002). However, the Sixth Circuit later determined that conclusion was not binding, because the court found a private right based "generally [on] the 'screening and treatment provisions,'" and thus there was "no assurance that the panel considered whether the specified provisions of the Medicaid Act confer enforceable rights." *See Westside Mothers v. Olszewski* (*Westside Mothers II*), 454 F.3d 532, 539 (6th Cir. 2006).

26

national organizations concerned with standards for the institutions or homes," as specified in Section 671(a)(10). That is, Plaintiffs do not allege that Defendants' standards for approving foster homes do not meet this requirement. While Plaintiffs allege untimely certifications, *see, e.g.*, ECF 25 ¶ 62, Section 671(a)(10) does not mandate any timeline for approval of a foster home.

### 3. Plaintiffs Fail to Allege Facts to Establish a Violation of the Medicaid Act.

Even if Sections 1396a(a)(8), (a)(10), (a)(43)(B)–(C), and 1396d(a), (r) were privately enforceable, Plaintiffs do not allege facts to establish a violation of any of these statutes with respect to any of the Named Plaintiffs.

As explained above, Section 1396a(a)(10) provides that the state plan must "provide . . . for making medical assistance available," and Section 1396a(a)(8) requires that the state plan must provide individuals with an "opportunity" to apply for "medical assistance," and "that such assistance shall be furnished with reasonable promptness to all eligible individuals." *Id.* § 1396a(a). "The term 'medical assistance' means payment of part or all of the cost" of certain "care and services" specified in the Medicaid Act, or "the care and services themselves, or both." *Id.* § 1396d(a). Accordingly, a state may "fulfill its Medicaid obligation" under Section 1396a either by providing the services itself or by agreeing to "pay[] for services" when delivered by a qualified provider. *See Nored v. Tenn. Dep't of Intell. & Dev. Disabilities*, No. 3:19-CV-00214-DCLC, 2021 WL 3729617, at *5 (E.D. Tenn. Aug. 23, 2021) (unpublished); *see also Westside Mothers v. Olszewski* (*Westside Mothers II*), 454 F.3d 532, 540 (6th Cir. 2006) ("What is required [by Sections 1396a(a)(8), (a)(10)] is a prompt determination of eligibility and a prompt payment to eligible individuals to enable them to obtain the necessary medical services." (cleaned up)); *John B.*, 626 F.3d at 360 n.2 (explaining that "[a] state may still fulfill its Medicaid obligations" under Sections 1396a(a)(8), (a)(10), and 1396d(a) "by paying for services"); *K.B. ex rel. T.B. v.*

27

*Mich. Dep't of Health & Hum. Servs.*, 367 F. Supp. 3d 647, 657 (E.D. Mich. 2019) ("A state may choose to only pay for services.").

In this case, Plaintiffs do not allege that Defendants are failing to pay with "reasonable promptness" for any service for any Named Plaintiff, and thus they do not allege facts to support a claim under Sections 1396a(a)(8) or (a)(10). *See Nored*, 2021 WL 3729617, at *5. Nor could Plaintiffs make such an allegation: the State pays for all medically necessary services for foster children that are coverable under the federal Medicaid statute. *See DCS Policy 20.7*; *Protocol for Health Servs.*, at 7. Plaintiffs do allege that Defendants are failing to ensure that certain services are in fact delivered to certain Named Plaintiffs, in part because of a lack of private providers available to deliver certain services. ECF 25 ¶¶ 31, 35, 78, 88, 127. However, these allegations do not give rise to a violation of Section 1396a(a)(8) or (a)(10). If certain health care services are not provided to a Named Plaintiff because of a lack of available providers, for example, that is <u>not</u> a violation of Section 1396a(a)(8) or (a)(10). *See Brown v. Tenn. Dep't of Fin. & Admin.*, 561 F.3d 542, 545 (6th Cir. 2009) ("[A] waiting list for waiver services does not violate federal law because the state's duty is to pay for services, not ensure they are provided.").

Similarly, Plaintiffs do not allege that the State failed to pay for any services for any Named Plaintiffs required by the Medicaid Act's EPSDT provisions, Sections 1396a(a)(43)(B)–(C), 1396d(a), (r). Taken together, the EPSDT provisions require States to cover, for certain enrollees, medically necessary services specifically enumerated in Section 1396d(a). *Parents' League for Effective Autism Servs. v. Jones-Kelley*, 339 F. App'x 542, 547 (6th Cir. 2009) (unpublished). Section 1396d(a), in turn, lists dozens of categories of services, such as inpatient hospital services, outpatient hospital services, prescribed drugs, physician services, certain therapies, and rehabilitative services. *Id*. § 1396d(a). However, the First Amended Complaint does not allege

28

that the State is failing to pay for any specific service listed in Section 1396d(a) for any Named Plaintiff.  Plaintiffs allege that some Named Plaintiffs did not, at certain points in the past, have "access" to certain "mental health" services, *see* ECF 25 ¶¶ 35, 55, 125, 159, but the First Amended Complaint generally does not identify what those specific services were, allege that those services fall within one of the enumerated categories in Section 1396d(a), or allege that the State would refuse to cover them if a provider was available to deliver them.[20]  Further, most of this alleged lack of "access" to unspecified "mental health" services occurred in the past, which is insufficient to establish an ongoing harm necessary to support a claim for future injunctive relief.  *See Tenn. Conf. of NAACP*, 139 F.4th at 568.

### B.  The Substantive Due Process Claims Fail as a Matter of Law (First Cause of Action).

The Fourteenth Amendment's Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1. This language speaks only to process and does not create any substantive rights, and therefore Plaintiffs' "Substantive Due Process" claims in this case are not supported by the text of the Due Process Clause.  *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 331–32 (2022) (Thomas, J., concurring) ("[T]he Due Process Clause at most guarantees process.  It does not, as the Court's substantive due process cases suppose, 'forbi[d] the government to infringe certain fundamental liberty interests at all, no matter what process is provided.'"  (alteration in original) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).

---

[20] Plaintiffs allege that Jasmine G. did not receive "attachment therapy," ECF 25 ¶ 77, and that Alice W. and Gavin W. did not receive "play therapy," *id.* ¶ 159.  However, Plaintiffs do not allege that the State refused to pay for these services if there was a provider available to deliver them.

However, Defendants acknowledge that a controversial line of Supreme Court precedent binding on this Court has interpreted the Due Process Clause to "provide[]substantive, as well as procedural, protection[s] for 'liberty.'" *Dobbs*, 597 U.S. at 237. These substantive protections include most of the "rights guaranteed by the first eight Amendments" as well as "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Id*.

The Supreme Court has been "reluctant to expand" the list of unenumerated due process rights "because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). The Substantive Due Process doctrine creates a risk of courts "substitut[ing] their social and economic beliefs for the judgment of legislative bodies." *Dobbs*, 597 U.S. at 237 (quotations omitted). Mindful of this "temptation," *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 475 (6th Cir.), *aff'd sub nom. United States v. Skrmetti*, 606 U.S. --,145 S. Ct. 1816 (2025), the Supreme Court has imposed strictures on the recognition of unenumerated rights. First, courts analyze the asserted right at "the most specific level" of abstraction. *Michael H. v. Gerald D.*, 491 U.S. 110, 127 n.6 (1989) (plurality). "Level of generality is everything in constitutional law." *L.W.*, 83 F.4th at 475. By requiring a "careful description" of the asserted right, *Washington v. Glucksberg*, 521 U. S. 702, 721 (1997), the court ensures that the Due Process Clause protects only those rights agreed to at the time of ratification. *Clark v. Jackson*, 2023 WL 2787325, at *5 (6th Cir. 2023); *see L.W.*, 83 F.4th at 475. Second, courts require the right asserted to be "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Dobbs*, 597 U.S at 238 (quotation marks omitted). This is, "[t]o say the least, . . . a tough test." *Chambers v. Sanders*, 63 F.4th 1092, 1096 (6th Cir. 2023) (quotations omitted). Rightfully so. "Grounding new substantive due process

rights in historically rooted customs is the only way to prevent life-tenured federal judges from seeing every heart-felt policy dispute as an emerging constitutional right." *L.W.*, 83 F.4th at 477.

In the foster care context, the Supreme Court has recognized a narrow band of substantive rights guaranteed by the Due Process Clause, *i.e.*, the right to "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). Tennessee state law and policy appropriately require Defendants to provide foster children with much more than "basic human needs," and Defendants devote enormous resources to doing so. However, the constitutional protections are limited to ensuring the "basic human needs." *DeShaney*, 489 U.S. at 200.

In this case, Plaintiffs take "aspirational statutory, regulatory, and private standards as to a variety of topics within the overall complex of foster child care" and attempt to "convert each of them to constitutional requirements." *Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 55 (1st Cir. 2014). But the "rights" Plaintiffs advance are not "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition," *Dobbs*, 597 U.S. at 238.

Plaintiffs assert a litany of rights, including a right to be free of "maltreatment," rights to a certain type or length of custodial arrangement or placement, and rights to certain types of services, including education. *See, e.g.*, ECF 25 ¶ 276. However, Plaintiffs do not set forth these supposed "rights" at "the most specific level" of abstraction, *Michael H.*, 491 U.S. at 127 n.6, but instead describe them with vague and amorphous terms, such as "protection from unnecessary intrusions into the child's emotional and psychological well-being"; "services necessary to prevent unreasonable and unnecessary intrusions into the child's emotional and psychological well-being"; "conditions and duration of foster care reasonably related to the purpose of government custody"; "treatment and care consistent with the purpose and assumptions of government custody"; "in

31

custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody"; and "minimally adequate education," *see* ECF ¶ 276. Further, none of these "rights" are "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *See Dobbs*, 597 U.S. at 238. There is no evidence that, at the time the Fourteenth Amendment was enacted, that it was "deeply rooted in this Nation's history and tradition" to guarantee orphans or any other children a "right" to "protection from unnecessary intrusions into the child's emotional and psychological well-being" or a "right" to "services necessary to prevent unreasonable and unnecessary intrusions into the child's emotional and psychological well-being," for example.

In *Reno v. Flores*, consistent with the limited scope of substantive protections created by the Due Process Clause, the Supreme Court held that Substantive Due Process does not provide detained migrant children with the right to be placed in a family home with a nonrelative custodian, rather than in an institution. 507 U.S. at 302. The Court expressly addressed the consequence a contrary holding would have for state child welfare systems:

> If there exists a fundamental right to be released into what respondents inaccurately call a "non-custodial setting," . . . [i]t would presumably apply to state custody over orphans and abandoned children as well, giving federal law and federal courts a major new role in the management of state orphanages and other child-care institutions . . . . The mere novelty of such a claim is reason enough to doubt that "substantive due process" sustains it[.]

*Id.*

For all of these reasons, many courts have rejected the argument that Substantive Due Process protects a "right" to a type and duration of foster care placement,[21] "right" to services beyond basic medical care,[22] or a right to education.[23]

In any event, Plaintiffs fail to allege facts to establish a violation of any of the "rights" they advance with respect to any of the Named Plaintiffs. To prove a Substantive Due Process claim, a plaintiff must prove that: (1) the plaintiffs were deprived of a cognizable constitutional right; (2) the defendants' actions "shocked the conscience" and constituted "deliberate indifference"; and (3) the defendants' conscience-shocking deliberate indifference caused the constitutional deprivation. *See, e.g.*, *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–50 (1998); *Siefert*, 951 F.3d at 765–67; *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 636 (6th Cir. 2007); *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 476 (6th Cir. 1990); *Rios v. City of Del Rio*,

---

[21] *See, e.g.*, *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 853 (7th Cir. 1990) (no right to a "stable foster-home environment"); *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 507 (D.N.J. 2000) (no "right to 'not remain in state custody unnecessarily,' or 'be housed in the least restrictive, most appropriate and family-like placement while in state custody'" (citations omitted)); *Eric L. ex rel. Schierberl v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994) (no right to placement stability); *Jonathan R. v. Justice*, No. 3:19-CV-00710, 2023 WL 184960, at *7 (S.D.W. Va. Jan. 13, 2023) (unpublished) (no right to "services in the least restrictive, most family-like setting").

[22] *See Mark G. v. Sabol*, 717 N.E.2d 1067 (N.Y. 1999) (no right to an "array of social services"); *Baby Neal v. Casey*, 821 F. Supp. 320, 335–39 (E.D. Pa. 1993) (no right to broad array of foster care services), *rev'd on other grounds*, 43 F.3d 48 (3d Cir. 1994); *B.H. v. Johnson*, 715 F. Supp. 1387, 1397 (N.D. Ill. 1989) (no right to "family reunification" services or "adequate caseworkers").

[23] *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973); *see also e.g.*, *Heyne v. Metro. Nashville Pub. Sch.*, 686 F. Supp. 2d 724, 733 (M.D. Tenn. 2009), *aff'd in part, rev'd on other grounds*, 655 F.3d 556 (6th Cir. 2011) ("Education is not a fundamental right." (cleaned up)). Contrary to the weight of authority, the Sixth Circuit held that Substantive Due Process protected a right to education, but that decision was later vacated. *Gary B. v. Whitmer*, 957 F.3d 616, 642 (6th Cir.), *reh'g en banc granted*, *opinion vacated*, 958 F.3d 1216 (6th Cir. 2020). *See Stanford v. Northmont City Sch. Dist.*, No. 3:19-CV-399, 2023 WL 1819117, at *5 (S.D. Ohio Feb. 8, 2023), *aff'd*, No. 23-3203, 2023 WL 6389624 (6th Cir. Oct. 2, 2023) (unpublished) (holding that Substantive Due Process does not protect a right to education).

33

444 F.3d 417, 422–24, 426–27 (5th Cir. 2006) (citing *Collins*, 503 U.S. 115); *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1149 (3d Cir. 1995).

To prove that the defendants' actions were "deliberately indifferent," the plaintiffs must prove that the defendants "recklessly disregarded a risk so obvious that they either knew or should have known of it." *Lawler ex rel. Lawler v. Hardeman Cnty.*, 93 F.4th 919, 926–27 (6th Cir. 2024) (cleaned up). "Mere negligence is insufficient" to "establish deliberate indifference." *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021).

In this case, to the extent any asserted right is constitutionally cognizable, Plaintiffs' allegations fail to show that Defendants' actions are "deliberately indifferent" with respect to any of the Named Plaintiffs, or that those actions are causing any of the Named Plaintiffs to suffer a constitutional injury. To begin with, Plaintiffs do not allege that any of the Named Plaintiffs are currently experiencing maltreatment or face a substantial risk of imminent maltreatment, except for Thomas H. Accordingly, Plaintiffs have not alleged facts to support a Substantive Due Process claim based on a deprivation of this alleged "right to freedom from maltreatment" for any of the Named Plaintiffs, except for Thomas H. Plaintiffs also do not allege any facts that show, with respect to any Named Plaintiff, that Defendants are "recklessly disregard[ing]" a "substantial risk of harm" that is so obvious that Defendants "either knew or should have known of it." The First Amended Complaint alleges that the Named Plaintiffs have experienced injuries that, if true, are unacceptable to Defendants. However, Plaintiffs fail to identify any ongoing (or even past) actions that would constitute "deliberate indifference" with respect to the Named Plaintiffs' alleged "rights" to personal safety and security. Nor are Plaintiffs' generic and conclusory allegations about the performance of the child welfare system sufficient to establish a Substantive Due Process

34

violation.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions.").

## C. The Familial Association Claims Fail as a Matter of Law (Second Cause of Action).

Plaintiffs allege that Defendants have violated their "rights to a permanent home and familial association" based on the First, Ninth, and Fourteenth Amendments to the Constitution. ECF 25 ¶ 279.  That is, Plaintiffs assert that Defendants have an affirmative constitutional obligation to find all foster children a permanent home and family.

The Court should dismiss this claim because the Supreme Court has never "broached— much less recognized—this affirmative duty."  *Jonathan R. v. Justice*, No. 3:19-cv-00710, 2023 WL 184960, at *11 (S.D.W. Va. Jan. 13, 2023) (unpublished).  As a policy matter, Defendants prioritize achieving timely permanency for all foster children and devote enormous resources to achieving that goal.  However, courts have rejected the argument that the Constitution imposes an affirmative duty on states to identify and provide a permanent home for a child.  *See, e.g.*, *Gary G. v. Newsom*, No. 5:23-cv-00947, 2024 WL 4354697, at *12 (C.D. Cal. Sept. 30, 2024) (unpublished); *Ocean S. v. Los Angeles Cnty.*, 2024 WL 3973047 (C.D. Cal. June 11, 2024) (unpublished); *Jonathan R.*, 2023 WL 184960, at *11–*13.

## D. The ADA and Rehabilitation Act Claims Fail as a Matter of Law (Fourth Cause of Action).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act imposes similar requirements, and thus the statutes are often analyzed together.  *Thompson v. Williamson Cnty.*, 219 F.3d 555, 557 n.3 (6th Cir. 2000).  Plaintiffs do not contend that Defendants are excluding children with disabilities from

35

their programs but rather assert that Defendants are violating the ADA and the Rehabilitation Act because foster children "have been or are at risk of being placed in overly restrictive settings," ECF 25 ¶ 294.

These claims should be dismissed because the ADA and Section 504 do not prohibit "risk of" placement in segregated settings, and Plaintiffs have not alleged facts to establish that Defendants are causing any of the Named Plaintiffs to experience "unjustified institutionalization" or a serious risk of such institutionalization.

### 1. The ADA and Rehabilitation Act Do Not Prohibit "Risk of" Unjustified Institutionalization.

In *Olmstead v. L.C.*, two plaintiffs institutionalized in a psychiatric hospital brought ADA claims against a state, and the Supreme Court held that a state subjecting an individual to "unjustified institutionalization" could violate the ADA's prohibition on discrimination in certain circumstances. 527 U.S. 581 (1999). In the decades following *Olmstead*, several courts substantially expanded *Olmstead* by concluding that the ADA also prohibits state action that causes a "serious risk of" unjustified institutionalization. *See, e.g.*, *Waskul*, 979 F.3d at 461; *M.R. v. Dreyfus*, 663 F.3d 1100, 1116–17 (9th Cir. 2011), *opinion amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012). To arrive at this interpretation, these courts did not closely examine the text of the ADA, but deferred to guidance from the U.S. Department of Justice (DOJ) that "sufficient risk of institutionalization" violated the ADA.[24] *See, e.g.*, *Pashby v. Delia*, 709 F.3d 307, 322–23 (4th Cir. 2013).

---

[24] DOJ, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and* Olmstead v. L.C. (June 22, 2011), http://bit.ly/3JBHzkN.

36

*Loper Bright Enterprises v. Raimondo* squarely forbids deference to such agency interpretations of statutes and therefore supersedes these decisions. 603 U.S. 369, 399–401, 412 (2024). Instead, "[c]ourts must exercise their independent judgment" in interpreting statutes. *Id*. Regardless of any ambiguity in the statute, the Court must find the "best reading of the statute"— *i.e.*, "the reading the court would have reached if no agency were involved"—using traditional tools of statutory construction. *Id*. at 400–01 (internal quotation marks omitted).

In *Waskul*, the Sixth Circuit held that plaintiffs may "state a claim by sufficiently alleging that they are at serious risk of institutionalization." 979 F.3d at 461. In reaching that conclusion, the court relied on DOJ regulations and the DOJ sub-regulatory guidance interpreting the ADA. *See id.* at 459–61. The court did not decide whether those DOJ interpretations were entitled to deference because the defendants in *Waskul* "d[id] not dispute the DOJ's interpretation of *Olmstead* or that Plaintiffs can sustain a claim simply by showing that they are at serious risk of institutionalization," and a contrary reading of DOJ regulations would be "unreasonable." *Id.* at 461. *Waskul* did not, as *Loper Bright* now requires, examine the text of the ADA to determine the "best reading" "the court would have reached if no agency were involved." 603 U.S. at 400. (internal quotations marks omitted). Accordingly, *Waskul* is inconsistent with *Loper Bright*, and this Court need not follow it. *United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014) (explaining that a panel decision is no longer controlling authority if it is "inconsistent [with a] decision of the United States Supreme Court").

With the Supreme Court lifting the fog of deference that has long precluded courts from independently analyzing the ADA and the Rehabilitation Act, these statutes clearly do not prohibit a "serious risk of" unjustified institutionalization. The relevant provision of the ADA reads: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from

37

participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The relevant provision of the Rehabilitation Act similarly reads: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794.

These statutes prohibit "discrimination," not a "risk of" discrimination. As the Fifth Circuit held, nothing in the text of the ADA "suggests that a risk of institutionalization, without actual institutionalization, constitutes actionable discrimination." *United States v. Mississippi*, 82 F.4th 387, 392 (5th Cir. 2023). The ADA "does not define discrimination in terms of a prospective risk to qualified disabled individuals." *Id.* Rather, "[i]n stating that no individual shall be 'excluded,' 'denied,' or 'subjected to discrimination,' the statute refers to the actual, not hypothetical administration of public programs." *Id.* Nor does *Olmstead* support reading the ADA or the Rehabilitation Act as prohibiting "serious risk of" "unjustifiable institutionalization." *Olmstead* involved two individual plaintiffs who were in fact institutionalized, and it thus "turn[ed] on actual 'unjustifiable institutionalization,' not on hypothetical future events." *Mississippi*, 82 F.4th at 394.

Likewise, DOJ's regulations implementing the ADA do not prohibit "serious risk of" institutionalization. DOJ's "integration mandate" regulation reads in full: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Nothing in this text suggests that a "risk of" institutionalization is discrimination. DOJ's contrary interpretation of its regulation is not supported by the regulatory text and is not entitled to deference. In *Kisor v. Wilkie*, the Supreme Court limited deference to agency regulatory interpretations to situations where the

38

"regulation is genuinely ambiguous" about the question at issue, "even after a court has resorted to all the standard tools of interpretation." 588 U.S. 558, 573–75 (2019). In this case, DOJ's regulations are not "genuinely ambiguous": Like the ADA itself, Section 35.130 does not prohibit "risk of" of segregation or unjustified institutionalization. Accordingly, *Kisor* precludes any deference to DOJ's interpretation of Section 35.130(d) as prohibiting "serious risk of" unjustified institutionalization. *Mississippi*, 82 F.4th at 393–94. Further, even if DOJ's regulations prohibited "serious risk of" unjustified institutionalization, they would be *ultra vires* and invalid as inconsistent with the text of the ADA. *See, e.g.*, *Bowman v. United States*, 564 F.3d 765, 769 (6th Cir. 2008).

In contrast to DOJ's regulations, HHS's regulations implementing the Rehabilitation Act were amended last year to prohibit "serious risk of" unjustified institutionalization.[25] *See* 45 C.F.R. § 84.76 (effective Jul. 8, 2024). However, HHS promulgated that regulation "to promote consistency with" the ADA, DOJ's implementing regulations, DOJ's sub-regulatory guidance, and court decisions deferring to DOJ's interpretation. Proposed Rule, 88 Fed. Reg. 63392, 63393, 63482 & nn.514, 515, 520 (Sept. 14, 2023). HHS's interpretation of the Rehabilitation Act reflected in these regulations is not entitled to deference after *Loper Bright*, and it is not the "best reading of the statute." *See* 603 U.S. at 400. The Rehabilitation Act prohibits "discrimination," not a "risk of" discrimination. Further, the Rehabilitation Act does not even prohibit actual "unjustified institutionalization": as the Supreme Court observed in *Olmstead*, "[u]nlike the ADA," the Rehabilitation Act "contains no express recognition that isolation or segregation of persons with disabilities is a form of discrimination." *See* 527 U.S. at 600 n.11. Accordingly,

---

[25] This regulation is currently the subject of litigation, and the case is stayed while the federal government considers whether it will continue to defend the regulation. *See* Order, *Texas v. Becerra*, No. 5:24-cv-225 (N.D. Tex. August 5, 2025), ECF 70 (attached as Ex. 9).

HHS's regulations are *ultra vires* and invalid as contrary to the statute. *See, e.g.*, *Bowman*, 564 F.3d at 769.

In any event, to the extent Plaintiffs rely on DOJ or HHS regulations to support their "at risk" theory of liability, regulations cannot create a private cause of action. "[F]ederal regulations promulgated pursuant to [] statutes are . . . incapable of independently conferring" private rights. *Johnson v. City of Detroit*, 446 F.3d 614, 629 (6th Cir. 2006). "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Caswell v. City of Detroit Hous. Comm'n*, 418 F.3d 615, 618 (6th Cir. 2005) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001)). As explained above, the ADA and the Rehabilitation Act prohibit discrimination, but they do not prohibit "risk of" discrimination. *See supra*. Therefore, even if DOJ or HHS has authority to implement regulations to prohibit a "serious risk of" unjustified institutionalization, Plaintiffs cannot rely on those regulations to bring a claim in federal court. *Cf. Sandoval*, 532 U.S. at 286 (holding that Title VI does not confer a private right of action to enforce regulations, even though regulations themselves were valid); *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 913–14 (6th Cir. 2004) (holding that regulation requiring "transition plans" to make facilities more accessible "does more than simply apply or effectuate" the ADA and "therefore, it is not enforceable under Title II's private cause of action").

Finally, Plaintiffs' interpretation of the ADA and the Rehabilitation Act is also inconsistent with *Alexander v. Choate*, 469 U.S. 287 (1985) and *Olmstead*. In *Alexander*, Tennessee's Medicaid program decreased coverage of inpatient hospital care from 20 days to 14 days, which the plaintiffs argued discriminated against individuals with disabilities because it had a disparate impact. Balancing "the need to give effect to the statutory objectives and the desire to keep § 504

40

within manageable bounds," the Supreme Court held that Tennessee did not violate the Rehabilitation Act because the policy "does not deny the handicapped access to or exclude them from the particular package of Medicaid services" and "made the same benefit—14 days of coverage—equally accessible to both handicapped and nonhandicapped persons," and "the State is not required to assure the handicapped 'adequate health care' . . . ." *Id.* at 299, 309. The Court "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases under § 504." *Id.* at 292, 299. Similarly, in *Olmstead*, the Court expressly rejected the notion that "the ADA requires States to provide a certain level of benefits to individuals with disabilities." *Olmstead*, 527 U.S. at 603 n.14 (cleaned up). As in *Alexander*, Plaintiffs in this case do not allege that Defendants "deny" or "exclude" the Named Plaintiffs from any Medicaid service, but instead allege that Defendants are causing "serious risk of" unjustified institutionalization because they do not ensure that all Named Plaintiffs receive a sufficient amount of community-based services. However, *Alexander* and *Olmstead* held that the statutes do not require states to provide individuals with "adequate health care" or a "certain level of benefits."

In this case, Plaintiffs do not allege that 14 of the Named Plaintiffs—Amara G., Zane G., Aaron C., Arielle H., Ava C., Andrew C., Adrian H., Zander M., Dewayne W., Jonah W., Sarah W., Adam D., Alice W., and Gavin W.—are in "institutional," "restrictive," or "segregated settings," but allege only that they face some amorphous "risk of" such placement. Because "risk of" unjustified institutionalization is not actionable under the ADA or the Rehabilitation Act, the ADA and Rehabilitation Act claims of these 14 Named Plaintiffs should be dismissed, along with any class claims based on allegations of "risk of" such institutionalization or segregation.

41

## 2. Plaintiffs Fail to Allege Facts to Support an ADA or Rehabilitation Act Claim.

In *Olmstead*, two institutionalized plaintiffs sought to move into the community, which the State's treatment professionals determined was appropriate, but the State declined to enroll the plaintiffs in an existing community-based services program, thereby prolonging the plaintiffs' institutionalization. 527 U.S. 581. Under those facts, the Supreme Court held that the plaintiffs could establish a violation of the ADA by proving that the state's action caused them to experience "unjustified institutionalization." *Id.* at 587, 600–07. However, the Supreme Court held that institutionalization is only "unjustified" if: "the State's treatment professionals" conclude that community placement is "appropriate"; the plaintiff prefers community placement; and the community placement "can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." *See id.* at 587, 607.

Accordingly, to plead an ADA violation under *Olmstead*, Plaintiffs in this case must allege facts that show: (1) Defendants' refusal to pay for community-based services cause the Named Plaintiff to be institutionalized (or, under Plaintiffs' theory, face a "serious risk" thereof); (2) the Named Plaintiff's legal guardian prefers the child to be placed in the community; (3) "the State's treatment professionals" concluded that the Named Plaintiff is appropriate for community placement; and (4) community placement of the Named Plaintiff can be "reasonably accommodated."

Plaintiffs have not alleged facts to support these elements of their claims for any of the Named Plaintiffs. To begin with, Plaintiffs have not alleged that Defendants declined to pay for any community-based services for any of the Named Plaintiffs or otherwise took any action that denies any Named Plaintiff such services. To the contrary, the First Amended Complaint suggests that a constellation of circumstances—many of which are outside the control of Defendants—

42

cause some Named Plaintiffs to remain or be placed in residential treatment or create a "serious risk of" such placement. *See* ECF 25 ¶¶ 34–35, 50–51, 54–55, 69. When placement in residential treatment is caused by the lack of third-party providers willing to serve a child in the community, for example, there is no causal link between state action and the alleged harm of residential treatment. In contrast, *Olmstead* involved institutionalization caused by the defendants' act of not paying for community-based services for the two plaintiffs.

In addition, the First Amended Complaint does not allege that the legal guardians of any of the five Named Plaintiffs allegedly placed in residential treatment (Darnell H., Max W., Thomas H., Keira M., and Jasmine G.) would prefer for the Named Plaintiff to be placed in the community, and it does not allege that "the State's treatment professionals" determined that a community-based placement is "appropriate" for three of the five Named Plaintiffs allegedly placed in residential treatment (Keira M., Jasmine G., and Max W.). In fact, Plaintiffs allege that Max W. should be placed in residential treatment. ECF 25 ¶ 143.

Finally, Plaintiffs do not allege facts that establish that three of the five Named Plaintiffs allegedly placed in residential treatment—Darnell H., Max W., and Thomas H.—can be "reasonably accommodated" in the community. Plaintiffs do not allege, for example, that there is a foster family willing to accept any of these three Named Plaintiffs. In fact, the First Amended Complaint suggests that placing Darnell in the community cannot be reasonably accommodated at this time: DCS has twice placed Darnell in family homes, but both of those placements disrupted. *See* ECF 25 ¶ 50–51, 54–55. And, again, Plaintiffs allege that Max W. should not be placed in the community at this time. ECF 25 ¶¶ 143, 148.

43

### E. Plaintiffs Do Not Allege They Exhausted Their Claims Through the Individuals with Disabilities Education Act's (IDEA) Administrative Process (First and Fourth Causes of Action).

A plaintiff "'seeking relief that is also available'" under the IDEA must first exhaust the IDEA's administrative process before bringing claims in federal court "'under the Constitution, the ADA, the Rehabilitation Act, or other Federal laws protecting the rights of children with disabilities.'" *Doe by K.M. v. Knox Cnty. Bd. of Educ.*, 56 F.4th 1076, 1080–81 (6th Cir. 2023) (quoting 20 U.S.C. § 1415(*l*)). The IDEA allows relief for "the denial of a free appropriate public education." *Id.* (internal quotation marks omitted). Accordingly, children with disabilities cannot bring federal claims seeking a "free appropriate public education" before exhausting the IDEA's administrative process.

In this case, Plaintiffs allege that Defendants have denied Named Plaintiffs and absent class members with disabilities an appropriate public education in violation of the ADA, the Rehabilitation Act, and Substantive Due Process, and they seek relief requiring Defendants to provide such educational services to them. *See, e.g.*, ECF 25 ¶¶ 49–50, 118–19, 126, 128, 155, 243–47, 276(g), 282(f), 291, 294. However, Plaintiffs do not allege that any of the Named Plaintiffs or absent class members have exhausted the administrative process under the IDEA. Accordingly, Plaintiffs' ADA, Rehabilitation Act, and Substantive Due Process claims should be dismissed to the extent they rely on the allegation that Defendants have failed to provide appropriate educational services.

### CONCLUSION

For all the reasons set forth above, the First Amended Complaint should be dismissed.

Respectfully submitted,

September 5, 2025

/s/Philip Peisch
Philip J. Peisch
Caroline M. Brown, *pro hac vice*
Julia M. Siegenberg
Brown & Peisch PLLC
1233 20th St. NW, Suite 505
Washington, DC 20036
ppeisch@brownandpeisch.com

/s/ Jordan K. Crews
Jordan K. Crews, BPR #34541
Senior Assistant Attorney General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 532-7913
jordan.crews@ag.tn.gov

***Attorneys for Defendants***

**CERTIFICATE OF SERVICE**

I, Philip Peisch, hereby certify that I caused a true and correct copy of the foregoing to be filed through the ECF system and served electronically on the registered participants as identified on the Notice of Electronic Filing.

September 5, 2025                                    /s/ Philip Peisch

                                                    Philip J. Peisch