# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| Keira[1] M., minor, by next friend STACIE ODENEAL; Darnell H., minor, by next friend SHERRY TAYLOR; Jasmine G., minor, by next friend STACIE ODENEAL; Amara G. and Zane G., minors, by next friend DARLENE VASTANO; Aaron C., Arielle H., Ava C., Andrew C., and Adrian H., minors, by next friend TRINA ROGERS; Zander M., minor, by next friend MARJORIE BRISTOL; Dewayne W., minor, by next friend EMILY JENKINS; Max W., minor, by next friend, SHERRY TAYLOR; Thomas H., minor, by next friend TIA BAILIFF; Jonah W., Sarah W., Adam D., Alice W., and Gavin W., minors, by next friend TIA BAILIFF; and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>MARGIE QUIN, Commissioner, Tennessee Department of Children's Services; CARLA AARON, Deputy Commissioner, Child Safety, Tennessee Department of Children's Services; and KAREN JOINTER BRYANT, Deputy Commissioner, Child Programs, Tennessee Department of Children's Services,<br><br>     Defendants. | Case No. 3:25-cv-00566<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>District Judge Aleta A. Trauger |

---

[1] In accordance with Rule 5.2(a) of the Federal Rules of Civil Procedure, the first names of the Plaintiff children and any other minors mentioned by name in this Complaint are pseudonyms. The first letters of the pseudonyms and the last name initials are the same as their real names.

## PRELIMINARY STATEMENT

1. Tennessee's foster care system is failing the children it is intended to protect. Tennessee's Department of Children's Services ("DCS") warehouses children in spaces which lack the basic necessities of life, including adequate food, bedding, soap, and potable water. Intended as temporary placements, DCS leaves children in these situations for months on end. Once placed in 'long-term' placements, children fare no better. DCS contracts with facilities which possess well-known track records of physical, mental, and sexual abuse. Children are placed in foster homes that have not been properly vetted, do not receive necessary information about the children, and do not receive the services necessary to care for them. Foster care is intended to be temporary, until children can either be reunited with their families or placed in another permanent home; however, children in Tennessee linger in foster care and are moved from place to place without the opportunity for a stable childhood.

2. The caseworkers required to support and protect foster children are overworked and undertrained. Due to crushing caseloads, DCS caseworkers are unable to reliably perform the basic duties necessary to oversee the well-being of the foster children assigned to their care. As concluded by a state audit in 2022, "[t]he safety, permanency, and well-being of Tennessee's most vulnerable children is in jeopardy."

3. DCS's dereliction of care is no mere oversight or mistake. It has been previously sued in federal court for violating the rights of foster children. As a result of the suit, DCS improved many aspects of the foster care system, until the court ended its jurisdiction over DCS's

2

performance metrics in 2017. However, eight years later, the state of Tennessee's child welfare system is just as bad, if not worse, than the crisis which engendered the previous lawsuit.

4. In 2000, a putative federal class action lawsuit was filed against Tennessee's child welfare system, asserting that the system that was supposed to protect and benefit children was instead violating their constitutional and federal statutory rights. *Brian A., et al. v. Bredesen, et al.*, Case No. 3:00-CV-00445 ("*Brian A.*"). After a failed effort to dismiss the lawsuit, the *Brian A.* defendants—the Governor of Tennessee and the Commissioner of DCS—agreed to a settlement pursuant to which they would implement systematic reform (the "*Brian A.* Settlement"). Under the terms of the *Brian A.* Settlement, the State defendants agreed that the Middle District of Tennessee would have continuing jurisdiction to ensure compliance with the *Brian A.* Settlement, and that such jurisdiction would terminate when the State defendants had accomplished certain exit criteria—criteria designed to ensure that the State defendants were upholding their basic obligations to children in the State's custody, and that children's fundamental rights were being protected.

5. Over the next decade, in compliance with the *Brian A.* Settlement and under court supervision, the State made substantial changes to its child welfare system, which resulted in a significant improvement in the lives of children in the State's custody. Former DCS Commissioner Jim Henry later acknowledged: "We've got to be honest: we didn't have a system here in 2000. I mean, we deserved to get a lawsuit. The fact is, we're a much better system now. We're better off for it, the kids are better off, and I think the taxpayers are better off."

6. After 16 years of court-supervised reform, in 2017, the Middle District of Tennessee determined that the State defendants had satisfied the performance metric criteria

identified in the *Brian A.* Settlement, and agreed to dismiss the majority of the lawsuit, ending the court's oversight of DCS's performance.

7. Things quickly declined in the absence of court supervision. Within just a few years, the hard-fought changes mandated by *Brian A.* all but vanished, and DCS is once again depriving children of their basic rights—rights that are protected by the U.S. Constitution, as well as by federal statutes.

8. Once again, Tennessee children in need of care and protection are being denied their constitutional and federal statutory rights and are placed at substantial risk of serious harm as a result of Defendants' actions and inactions.

## JURISDICTION AND VENUE

9. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

10. The Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

11. This Court has jurisdiction to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2002 and Rule 57 of the Federal Rules of Civil Procedure.

12. Venue in this District is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims herein occurred in this District, and Defendants maintain offices and conduct business in this District.

## CLASS ACTION ALLEGATIONS

13. This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

4

14. This action consists of one general class and one subclass; each class is sufficiently numerous to make joinder impracticable. The general class consists of at least 9,000 children who are in the legal and/or physical custody of DCS and/or with whom DCS has a special relationship (the "General Class"). The subclass consists of the thousands of General Class members who have or will have emotional, psychological, cognitive, or physical disabilities (the "ADA Subclass").

### Numerosity: Fed. R. Civ. P. 23(a)(1)

15. Each class is sufficiently numerous to make joinder impracticable. The General Class consists of at least 9,000 children who are or will be in the legal and/or physical custody of DCS and/or with whom DCS has a special relationship.

16. The ADA Subclass consists of thousands of children with disabilities who are or will be in the legal and/or physical custody of DCS and/or with whom DCS has a special relationship.

### Typicality: Fed. R. Civ. P. 23(a)(3)

17. The Named Plaintiffs' claims are representative of those of the General Class and/or the ADA Subclass, as they stem from the same policies, practices, or patterns of conduct, and are grounded in the same legal theories as the General Class and/or the ADA Subclass's claims.

18. The questions of fact and law raised by Named Plaintiffs are common and typical of each putative member of the classes whom they seek to represent.

19. Questions of fact common to the General Class include:

    a. Whether Defendants fail to provide children in Tennessee state custody with safe, secure, and appropriate foster care placements as required by law and reasonable professional standards;

b. Whether Defendants fail to provide and implement legally mandated case plans, including plans for permanent placement;

c. Whether Defendants fail to provide children with legally required services, consistent with reasonable professional standards, necessary to prevent them from deteriorating physically, psychologically, emotionally, and educationally;

d. Whether Defendants fail to conduct timely mental and physical evaluations of children who enter the State's custody;

e. Whether Defendants fail to maintain a case management system capable of adequately protecting foster children;

f. Whether Defendants fail to maintain a system that protects foster children from physical, psychological, and emotional harm; and

g. Whether Defendants fail to maintain a system that provides permanency to children within a reasonable period of time.

20. Questions of law common to the General Class include:

a. Whether Defendants' systemic failures violate Plaintiffs' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution;

b. Whether Defendants' systemic failures violate Plaintiffs' rights to a permanent home and family, as well as their rights to be free from harm and have their basic needs met, under the First, Ninth, and Fourteenth Amendments to the U.S. Constitution;

6

c.    Whether Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997; and

d.    Whether Defendants' systemic failures violate Plaintiffs' rights under the Medicaid Act;

e.    Whether Defendants' systemic failures violate the Equal Protection Clause of the Fourteenth Amendment.

21.    Questions of fact common to the ADA Subclass include:

a.    Whether Defendants supervise the State's foster care system in a manner that denies qualified children with disabilities the benefits of the State's services, programs, or activities in the most integrated setting appropriate to their needs, and;

b.    Whether Defendants fail to reasonably modify the State's foster care system to avoid discrimination against children with disabilities.

22.    Questions of law common to the ADA Subclass include:

a.    Whether Defendants' systemic failures violate Plaintiffs' rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and their respective implementing regulations by unnecessarily placing youth with disabilities in institutional settings, or placing them at risk thereof, instead of providing reasonable accommodations in community-based and/or least restrictive settings; denying them access to meaningful, individualized, and appropriate community-based treatment and support which would enable

7

children with disabilities to remain in the community; and failing to ensure that state and local officials make available a full range of home- and community-based placements, as well as the necessary and appropriate community-based services, which would guarantee access to the least restrictive and most integrated setting appropriate to their needs; and

b.  Whether Defendants' systemic failures violate Plaintiffs' rights under the ADA, RA, and their respective implementing regulations by failing to provide reasonable accommodations such as, but not limited to: community-based mental and behavioral services and access to programs, professionals, and/or equipment necessary to treat or accommodate disabilities.

**Adequacy: Fed. R. Civ. P. 23(a)(4)**

23.  The Named Plaintiffs will fairly and adequately safeguard the interests of the classes they seek to represent. Defendants have acted or failed to act on grounds that apply broadly to all class members, warranting class-wide declaratory and injunctive relief. Plaintiffs' counsel is unaware of any conflicts among class members. The Named Plaintiffs are represented by attorneys with extensive experience in class action litigation, child welfare litigation, and complex litigation.

24.  Marcia Robinson Lowry, Robyn Goldberg, and Anastasia Benedetto are attorneys with A Better Childhood, Inc., a non-profit legal organization, which has extensive experience and expertise in federal child welfare class action litigation actions throughout the U.S.

25.  Margaret Zwisler, William O'Reilly, and Julie Gorla are attorneys with the Barbara McDowell Social Justice Center, and each has extensive experience and expertise in federal civil litigation and class actions throughout the U.S.

8

26.     Wesley R. Powell, Justin Garbacz, and Amanda M. Payne are attorneys with Willkie Farr & Gallagher LLP, a law firm whose attorneys are experienced in class action civil rights litigation.

27.     Eric Hecker, of Wang Hecker LLP, is an experienced civil rights litigator who has represented foster children in individual and class actions and has served as lead counsel in class actions arising under 42 U.S.C. § 1983.

28.     Sarah B. Miller and Miranda MacNaughton are attorneys with Bass, Berry & Sims, PLC, a law firm that routinely handles class action and civil rights lawsuits.

### Fed. R. Civ. P. 23(b)(1)(A) and (B)

29.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(1). The General Class consists of approximately 9,000 members, and the ADA Subclass consists of thousands of members. Individual lawsuits would risk inconsistent and varying rulings, potentially leading to conflicting standards of conduct for Defendants. Moreover, separate actions by individual members could result in decisions that, in practice, would significantly hinder other members' ability to protect their interests.

### Fed. R. Civ. P. 23(b)(2)

30.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the General Class and ADA Subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the Class and Subclass.

9

## PARTIES

### I.     Named Plaintiffs

### Keira M.

31.     Plaintiff Keira M. (age 11) has been in DCS custody since August 2024 and remains in DCS custody as of the time of this filing. While in DCS custody, DCS has subjected Keira to unnecessary physical, mental, and emotional harm by failing to provide timely and appropriate mental health treatment, placing her in overly restrictive institutional settings, and obstructing her path to a permanent home.

32.     Keira appears in this action through her next friend, Stacie Odeneal. Stacie Odeneal is Keira's guardian ad litem ("GAL") and has been advocating for Keira's best interest since Keira came into DCS custody. She is very familiar with Keira's history and is dedicated to Keira's best interests.

33.     Keira was previously adopted out of DCS custody five years ago following significant abuse and neglect by her biological parents but went back into DCS custody in August 2024.

34.     After Keira was hospitalized in August 2024, Vanderbilt Hospital staff warned that returning her to her adoptive home would pose an imminent risk to her and the other children. In response, her adoptive parents followed medical advice and did not allow her to return home. Rather than support the family through crisis services, DCS took custody of Keira, alleging abandonment, but failed to follow its Family Crisis Intervention Program guidelines or offer stabilization services to preserve the adoptive placement.

35.     DCS then placed Keira in a transitional placement facility from August to November 2024, during which time she received no therapy or services despite a well-documented

10

history of mental health needs. Although transitional placements are intended to be short-term while assessments are completed, DCS neither completed timely assessments nor initiated appropriate services for Keira.

36. In November 2024, DCS placed Keira in a Level 4 (the most restrictive) institutional facility where she remains to this day. Despite repeated requests by Keira's GAL, DCS has provided no documentation to justify why this highest-level, most restrictive setting is appropriate for Keira, or that less restrictive alternatives were considered.

37. Keira has a prospective foster family ready and willing to care for her, and they have completed all licensing requirements, including a home study. However, DCS has delayed approval of the placement by failing to review the final home study, which has been pending with DCS's Office of Network Development. The prospective foster mother has a flexible weekday schedule which would allow her to visit Keira regularly, but the facility allows visitation only on Saturdays, impeding bonding. DCS has failed to intervene, despite knowing that these restrictions are preventing Keira from developing a relationship that could support her transition to family-based care.

38. Reports from the facility regarding Keira's progress are contradictory. Verbal updates are consistently positive, and Keira has been allowed to participate in high-level programming typically reserved for children nearing discharge. However, written reports—all authored by a single therapist—assert that Keira is not progressing and should be stripped of privileges. DCS has taken no action to investigate these discrepancies or assess Keira's actual level of progress.

39. In November 2024, Keira was denied her right to attend a Foster Care Review Board ("FCRB") meeting. The facility falsely reported that she was unavailable, although she was

present on campus and could have participated via video with minimal accommodation. DCS did not act to protect her right to participate in these critical permanency planning discussions.

40. In March 2025, after months of receiving no records regarding Keira's diagnoses or treatment plan, her GAL sent a letter threatening to subpoena her medical records. Within an hour, the facility moved Keira to discharge status and requested a discharge planning meeting. However, because DCS had not approved the pending foster home, Keira faces the possibility of being placed in an unknown temporary setting instead of with the family ready to receive her, further destabilizing a child whose mental health issues are worsened by instability.

41. As a direct result of DCS's actions and omissions, Keira has suffered and continues to suffer psychological and emotional harm. DCS housed her for months in temporary settings due to a lack of adequate placements, then transferred her to a harsh, overly restrictive facility without documentation of need. DCS has ignored credible warnings about the harm of this placement and failed to pursue a less restrictive, supportive home that is available and ready. As a result, Keira remains without proper mental health treatment, without a path to permanency, and without the stability that would allow her to heal and thrive.

### Darnell H.

42. Darnell H. (age 15) entered DCS custody in April 2018. He remains in DCS custody at the time of this filing. In the seven years since entering foster care, DCS has subjected Darnell to unnecessary and prolonged institutionalization, deprived him of educational and therapeutic services, and failed to act on multiple opportunities to secure him a safe, stable, and supportive home.

43. Darnell appears in this action through his next friend, Sherry Taylor. Sherry Taylor served as a Court Appointed Special Advocate ("CASA"); in this role, she regularly visited Darnell

in residential placement and assisted in advocating on his behalf in Child and Family Team meetings ("CFTMs") and court hearings. She is very familiar with Darnell's history and is dedicated to his best interests.

44. Darnell was taken into custody at eight years of age, after Darnell's mother struck him in the face, causing him to bleed, and abandoned him on the side of the road. Darnell found a firehouse, where he was treated by emergency medical technicians ("EMTs"). The EMTs took Darnell to the hospital for treatment. The hospital then contacted DCS, and Darnell was taken into DCS custody.

45. Over the past seven years, DCS has bounced Darnell between at least 15 separate placements. DCS has kept him unnecessarily in institutional placements for over 90% of this time. This repeated institutionalization has harmed Darnell, retraumatizing him and exacerbating his mental health conditions.

46. Adoption was added as a permanency goal for Darnell in April 2019, yet he still remains in DCS custody.

47. In November 2020, DCS's Child and Adolescent Needs and Strengths ("CANS") assessment of Darnell indicated the appropriate placement for Darnell was a Level 2 (therapeutic) foster home; nevertheless, DCS continually kept Darnell in more restrictive Level 3 and 4 residential facilities, with the exception of a six-month placement in a pre-adoptive home in 2023.

48. A psychological evaluation from the summer of 2022 found that residential facility settings continuously retraumatized Darnell and are detrimental to his mental health; the loud noises, fighting, and use of restraints triggered Darnell due to his prior physical abuse. Despite this, DCS has continued to house Darnell in residential facilities to the present day.

49. Darnell has not received adequate educational support while in DCS custody. Although Darnell has been housed primarily in residential facilities for the past five years, neither DCS nor their contracted facilities have advocated for appropriate testing, an accurate Individualized Education Plan ("IEP") from his school, nor ensured that he was offered appropriate educational services. In 2023, when Darnell was 13 years old, he was assessed as performing at a second-grade level. No remedial services are listed in his IEP as to appropriate educational services to help him catch up to his grade level in the required subject areas.

50. When Darnell was in his first foster home in 2019, he had no IEP and was struggling both in the home and at school. He was housed with two of his younger siblings. Due to the lack of appropriate testing, communication about his needs from DCS and an IEP, the foster mother remained ignorant of Darnell's needs and held him to standards that he was unable to meet. His GAL repeatedly requested that DCS provide educational testing and support for Darnell and pursue an IEP for him, but DCS refused.

51. Darnell disrupted from his placement with his siblings in the 2019 foster home, and he was separated from his siblings, who were later adopted by that foster mother. Except for a brief stay in a pre-adoptive home in 2023, Darnell has been housed in Level 3 or 4 residential settings ever since.

52. Darnell's former GAL was finally able to obtain an initial IEP for him in September 2021. However, the IEP contained contradictory information – his assessed reading and math proficiency was at the 1% level, despite "teacher observation" from the residential placement school stating that he was capable of 70% achievement in both subject areas. His GAL requested a psycho-education evaluation for Darnell and additional testing for possible learning disabilities, but DCS never arranged for the testing. When she withdrew as his GAL in early

14

2021, DCS and Darnell's residential placement promised to arrange for testing and have his school update his IEP accordingly, but this never occurred.

53. Darnell's former GAL is ready and willing to foster Darnell and possibly adopt him. The GAL has known Darnell since 2018, has knowledge of his specific needs, and is eager to provide him with the necessary support. Six months after stepping down as his GAL, in 2021, Darnell's former GAL completed foster parent training in order to foster Darnell. The former GAL was in contact with Darnell's DCS caseworker throughout this time, but the certification process for her home was never completed. Darnell stated that he wanted a two-parent home and the former GAL requested that DCS and the service provider help Darnell adjust his expectations so he could come and stay with her, but that did not occur.

54. In the fall of 2023, DCS placed Darnell in a pre-adoptive home where he stayed for only six months. Prior to transferring him to this pre-adoptive home, DCS failed to have his school update the IEP with the information from the assessment. DCS also failed to inform the foster parents of Darnell's behavioral and academic needs and falsely told them he was performing at grade level and receiving all "A's." Darnell was placed in a traditional classroom for his grade, but he was unable to perform the work because of the lack of necessary services. As a result, he struggled with behavioral issues at the school and after just six months, the pre-adoptive parents requested Darnell's removal, citing a lack of information and support from DCS.

55. After removing Darnell from the pre-adoptive foster home, DCS again bounced Darnell around, this time to a Level 4 placement, then to short-term and respite placements, and finally returned him to a Level 3 residential facility in May 2024, where he remains. This is in direct contradiction of the 2022 psychological exam that recommended no residential facility placements for Darnell.

56. Neither the residential facility nor DCS have provided Darnell with consistent access to hygiene products or clothing. During his first stay at this facility, his GAL offered to buy him a Christmas present and asked what he wanted. The only thing Darnell wanted was his "own deodorant stick."

57. From 2021 to 2023 and over the past year, Darnell's former GAL has provided him with body wash, deodorant, moisturizer, and clothing because DCS and the facility failed to meet his basic needs.

58. During his most recent residential stay, just two months after Darnell arrived at the Level 3 facility, he was assessed as suitable to step down in care. One year later, he remains at the same facility.

59. In February 2025, Darnell's contract caseworker reported to the FCRB that Darnell was ready to step down to a lower level of care. At that same meeting, Darnell told the FCRB that he did not feel safe at the residential facility. The FCRB called DCS into the meeting to discuss the issue; DCS failed to take any action.

60. Darnell has since reiterated to both DCS and the juvenile court that he feels unsafe at the facility, yet DCS continues to keep him there, claiming it has nowhere else to place him.

61. DCS has also failed to hold timely permanency meetings for Darnell. Although quarterly meetings are required, Darnell went almost one year between his most recent CFTM and the CFTM prior.

62. In late 2024, the former GAL again went through foster parents training in order to foster Darnell. When the GAL began the process to be certified as a foster/pre-adoptive home, she reached out to DCS to request group counseling with Darnell to prepare for the possible transition. DCS never responded to her email. The former GAL has also repeatedly requested in-person visits

and home passes for Darnell, but other than one short in-person visit in May 2025, DCS and its service provider have not responded to those requests either. The GAL has completed all training, and the only remaining steps are in DCS's hands. If DCS were to act promptly, she could be certified as a foster parent within two weeks. She has repeatedly informed DCS that she is pursuing foster parent certification solely to foster Darnell.

63.     Instead of pursuing placement with the GAL, DCS has continued to post that Darnell is available for adoption on its public website, ignoring a viable, willing caregiver.

64.     An impediment to stability for Darnell continues to be his lack of educational services. In emails to DCS providers and contract caseworkers, Darnell's former GAL has again requested more testing and corrections to his IEP, but DCS has failed to pursue either. DCS did not pursue a psycho-educational assessment, which is a required prerequisite for an IEP. DCS did not ensure that Darnell had an independent educational surrogate parent during the IEP process, as required. Tenn. Comp. R. & Regs. 0520-01-09-.20. Instead, DCS allowed their contracted agency—the entity who would bear the expense of any special services needed—to illegally use one of their employees as Darnell's educational surrogate.

65.     As a result, Darnell's most recent IEP, issued in late May 2025, is as incomplete, incorrect, and self-contradictory as the IEP which contributed to the disruption from the pre-adoptive home in 2022. His assessed reading proficiency and math proficiencies remain in the single digits, yet according to his IEP, he will be expected to reach 70% achievement in grade-level classes.

66.     As a direct result of DCS's actions and failures to act, Darnell has suffered and continues to suffer profound harm. DCS unnecessarily segregated and continues to segregate Darnell in an institution. Further, DCS has ignored professional recommendations, failed to act on

Darnell's repeated pleas for safety, and obstructed a potential placement with a qualified and dedicated caregiver. DCS's continued failures harm Darnell by denying him the stable, nurturing home he deserves and to which he is entitled, and by denying him the services he needs to succeed.

**Jasmine G.**

67.　Plaintiff Jasmine G. (age 15) entered DCS custody at age 12 and remains in DCS custody as of the date of this filing. DCS has subjected Jasmine to unnecessary physical, mental, and emotional harm by placing her in inappropriate institutional settings, failing to provide essential mental health care, and failing to ensure her basic needs are met.

68.　Jasmine appears in this action through her next friend, Stacie Odeneal. Stacie Odeneal is Jasmine's GAL and has been advocating in her best interest for years. She is very familiar with Jasmine's history and is dedicated to her best interests.

69.　DCS initially placed Jasmine, a child who had been trafficked by her biological mother, in a foster home with her sister, but failed to provide the intensive therapy necessary to address her severe trauma. In September 2023, DCS sent Jasmine to an out-of-state residential facility over 1,500 miles away due to the lack of appropriate in-state placements. The facility's program was designed as a six-month residential program, but Jasmine has now been institutionalized there for over 18 months with no clear plan for transition.

70.　The facility itself has repeatedly requested Jasmine's removal, citing its inability to meet her treatment needs, including a lack of specialized "attachment therapy" critical to her recovery. Despite her GAL's repeated requests, DCS has refused to move Jasmine to a more suitable placement. Jasmine's GAL again raised this issue at Jasmine's permanency hearing in March 2025.

71. Jasmine is prescribed psychiatric medications that are ineffective and have harmful side effects. Despite this, she has not received regular follow-up from medical staff, and her medications have not been adjusted in over 18 months. DCS has failed to follow its own procedures requiring regular assessment of treatment goals and symptom response.

72. Jasmine has not received consistent visits from an assigned caseworker during her 18-month placement. Instead, DCS has sent various unassigned caseworkers with no relationship to Jasmine. The most recent Affidavit of Reasonable Efforts (a sworn statement documenting DCS's efforts to reunify the family) from March 19, 2025, confirms that Jasmine had not been visited by her assigned caseworker for 10 months, with only two face-to-face visits during that 12-month period, neither by her assigned caseworker. During this period, Jasmine has been reassigned to four different caseworkers, each of whom is unfamiliar with her case.

73. In December 2024, Jasmine's facility again requested her removal following an incident. Jasmine packed all of her belongings in a garbage bag in anticipation, but DCS failed to retrieve her. A facility employee later threw away the bag containing all of Jasmine's clothing. Neither the facility nor DCS replaced the clothing, with the exception of random items from a "lost and found."

74. When Jasmine's GAL recommended using Jasmine's allowance to purchase new clothing, the facility stated Jasmine had no allowance, despite a state mandate of $2/day for all foster children in residential care. DCS took no action, even after the GAL escalated the issue to DCS's lead counsel in February 2025. DCS eventually issued a $250 clothing voucher in April 2025—over two months later.

75. Because she lacked appropriate clothing, Jasmine was unable to participate in equine therapy, a required component for program completion. Her GAL notified DCS of this barrier, but DCS took no timely corrective action.

76. Although Jasmine is almost 16 years old and has a right to attend CFTMs to participate in planning her future, DCS has conducted at least 17 meetings without Jasmine present. Jasmine reported to her GAL that she wants to attend CFTMs, but the facility has prevented her from doing so. DCS has never intervened to ensure that Jasmine attends these CFTMs. Prior to the most recent CFTM in February 2025, Jasmine's GAL emailed the facility to insist on Jasmine's presence. Despite this email, the facility did not bring Jasmine to the meeting until the GAL refused to let the meeting commence in Jasmine's absence. This is the first and only time Jasmine has been able to attend a CFTM.

77. There is a family who wants to adopt Jasmine, but DCS has failed to take steps to implement a plan for her transition to their home. Due to Jasmine's untreated attachment issues, she is afraid to be adopted by this family because she believes that if she opens herself to a relationship with someone, that person will eventually turn on her and abandon her. Attachment therapy is a form of psychotherapy specifically designed to help those with traumatic histories develop healthy relationships. Had DCS provided attachment therapy to Jasmine, it is likely that she would have been able to join this family that wants her and experience a stable, supportive family and community where she could thrive.

78. As a direct result of DCS's failures, Jasmine has suffered and continues to suffer physical, mental, and emotional harm. She has been warehoused in an inappropriate institutional facility without necessary therapeutic services or basic support. DCS continues to harm Jasmine by failing to act on well-documented deficiencies, neglecting to provide critical services, and

denying her the permanency and stability she could achieve in a home with a family ready to welcome her.

### Amara and Zane G.

79. Plaintiffs Amara G. (age 9) and Zane G. (age 8) are siblings who have been in DCS custody since 2017 and remain in DCS custody as of the date of this filing. DCS has subjected both children to unnecessary emotional, psychological, and behavioral harm by failing to provide safe and stable placements, depriving them of timely and consistent therapeutic services, and denying them a path to permanency and ongoing sibling contact.

80. Amara and Zane appear in this action through their next friend, Darlene Vastano. Darlene Vastano is and has been the CASA for Amara and Zane G. since 2017. In that role, she has known Amara and Zane G. and has been advocating in their best interest for approximately eight years. She is very familiar with Amara and Zane's history and is dedicated to their best interests.

81. Amara and Zane entered foster care at ages two and one, respectively, after being removed from their biological mother's care due to neglect. Their mother was regularly using drugs and would leave the children for long periods of time, including during periods of incarceration. The children were ultimately removed after Amara was physically abused in the home by a third party. DCS concluded that the mother failed to adequately supervise the children and thereby enabled the abuse.

82. DCS initially placed the children with an older, licensed foster parent who was known to them. That placement lasted about a year, but the foster parent ultimately decided she was not prepared to adopt. The children were then placed in a pre-adoptive foster home, which disrupted after the foster parents separated. After removal, DCS learned that the children had been

abused in the home. Although DCS conducted an internal investigation, it never disclosed the results. While in that same home, Amara was also sexually abused at daycare.

83. Around the end of 2022, the court terminated the biological mother's parental rights. At the same time, Amara's and Zane's placement disrupted, and both children began displaying significant behavioral challenges. Amara became physically aggressive and dysregulated. Zane, who has post-traumatic stress disorder ("PTSD") and symptoms of oppositional defiant disorder, began acting out aggressively and was hospitalized multiple times for self-harm by age six. He also engaged in defiant behaviors, such as intentional soiling. DCS assessed Zane as needing a Level 3 foster home, while Amara required a lower level of care. DCS separated the siblings, placing Amara back with the initial foster parent, who refused to take Zane.

84. Both children have experienced chronic delays and gaps in therapeutic care. Zane frequently went without therapy due to placement instability. Amara went without therapy for six months to a year because her school failed to provide it; DCS did not provide it either. During transitions, neither child received continuity of services, and weeks or months often passed without care. Although sibling therapy was recommended, DCS never arranged it.

85. From March to October 2023, Zane had no long-term placement. Though DCS claimed it was seeking a Level 3 home for him, Zane instead cycled through night-to-night foster arrangements. During the day, he was sent to a temporary holding facility that grouped children of different ages together. Seven-year-old Zane was placed with teenagers, leading to further deterioration in his mental health and behavior.

86. This unstable setup deprived Zane of any consistent caregiver exposed him to inappropriate peer interactions and left him isolated from his sister and any semblance of routine.

During this period, Zane received no therapy, and DCS failed to initiate new services in any of his placements. The instability significantly escalated his behavioral challenges.

87. Although DCS stated that it was seeking a Level 3 placement for Zane, he never received one. In August 2023, he was briefly placed in a short-term setting before returning to night-to-night care. For over a year, DCS placed Amara and Zane G. in separate, non-adoptive foster homes. DCS placed Zane in a Level 1 foster home with a provider who was pressured to accept him despite being unlicensed for Level 3 care. The foster parent received little support from DCS and was not provided with needed respite care.

88. In March 2025, Amara and Zane were placed together in a pre-adoptive home, but this placement only lasted approximately two weeks. After their brief placement together, Zane was hospitalized and then discharged without a permanent placement. During the transition, there were no services in place, and Zane received no education for several weeks.

89. Amara remains at the pre-adoptive home only until the end of the school year. Although the end of the school year is only a few weeks away, DCS does not have a placement plan for her either.

90. With the exception of two weeks in March 2025, Amara and Zane have now lived apart for two years. Although DCS is required to facilitate sibling visits, none of the seven caseworkers assigned to their case over the last eight years have arranged them. Their former foster parents from 2024 took it upon themselves to maintain the children's sibling bond, but even that has now been disrupted.

91. Despite court approval for a joint placement, Amara and Zane remain separated and have no permanency plans. A standing court order requires DCS to demonstrate ongoing efforts to find Zane a suitable placement, but progress has stalled.

92.     As a direct result of DCS's failures, including inappropriate placements, lack of therapy, denial of sibling contact, and failure to achieve permanency, Amara and Zane have suffered and continue to suffer significant emotional and behavioral harm. DCS's inaction has deepened their trauma, left their needs unmet, and denied them the security and stability that foster care is meant to provide.

**Aaron C., Arielle H., Ava C., Andrew C., and Adrian H.**

93.     Plaintiffs Aaron C. (age 9), Arielle H. (age 6), Ava C. (age 4), Andrew C. (age 2), and Adrian H. (age 1) (collectively, the "C/H Siblings") have been in DCS custody since December 2022 and remain in DCS custody as of the date of this filing. DCS has subjected the C/H Siblings to unnecessary physical, mental, and emotional harm by failing to provide required documentation, health coverage, therapy, and case management services—resulting in prolonged delays to medical and behavioral treatment and long-term developmental harm.

94.     Aaron, Arielle, Ava, Andrew, and Adrian appear in this action through their next friend, Trina Rogers. Trina Rogers is a friend of the kinship foster family where the children have resided for over two years. She is familiar with the C/H Siblings' history and is dedicated to their best interests.

95.     The C/H Siblings came into DCS custody after a family member reported their abuse and neglect, including sexual abuse by their biological grandparents. DCS placed the C/H siblings in a kinship foster placement with that family member in December 2022. Adrian H. was born after the removal of his siblings and was placed with the same foster family as a newborn.

96.     When DCS brought Adrian H. to the family member, they did not inform her of the baby's condition. Adrian has a hole in his heart, did not (and still does not) eat by mouth, is dependent on a feeding tube, and has needed multiple surgeries.

97. From December 2022 to March 2023, DCS placed the C/H Siblings with their family member but did not formalize the placement to make it an official placement. During this period, she was not given medical insurance for the children and did not have authority to seek medical care on their behalf. Acting on her own initiative, she obtained medical cards from the children's biological parents. When several of the children developed ear infections and Andrew suffered an asthma attack, DCS did nothing to support her and she had to call numerous doctors before finding one who would treat the children.

98. Even after DCS formally placed the C/H siblings with their family member (now their foster mother) in March 2023, DCS still failed to provide essential documents, including the children's birth certificates, Social Security cards, and proof of medical insurance coverage.

99. Despite their foster mother's repeated written requests to DCS officials, Ava's and Andrew's insurance lapsed in November 2023. DCS did not inform their foster mother of the lapse; she only discovered it when Andrew needed urgent care for an ear infection. TennCare coverage was not restored until August 2024, nearly nine months later, because DCS had failed to obtain the birth certificates required for the application.

100. These delays in insurance coverage caused significant disruptions to their necessary care. Ava could not attend specialty optometrist appointments and was unable to receive occupational therapy or dental care until TennCare was restored. Andrew missed occupational therapy, speech therapy, hearing tests, and dental appointments. As a result of the lack of insurance, both children's learning was delayed, and they were only diagnosed with autism in January 2024.

101. Despite the children's extensive trauma and need for therapeutic services, DCS failed to arrange therapy. Their foster mother independently located a therapist for the children and paid out-of-pocket for their care because the therapist did not accept TennCare. DCS assured

25

her it would cover the therapist's fees and also locate a provider within network, but it has done neither. The children are not receiving therapy at the frequency prescribed by medical professionals, as their foster mother cannot afford the ongoing costs.

102. Their foster mother discovered that Aaron was eligible to receive school counseling from an outside provider; however, DCS failed to complete the paperwork for months. Per policy, only DCS could complete the paperwork, so Aaron's counseling was consequently delayed.

103. DCS also delayed the C/H Siblings' enrollment in the Strong Families program, which provides grants for children with special needs. Their foster mother discovered the program on her own, but initial delays due to lack of insurance, and later, due to DCS's failure to complete the application paperwork, resulted in months of lost time. Though their foster mother provided the required forms and contact information to the caseworker, he failed to complete them. The C/H Siblings ultimately received the grants only after a four-month delay caused by DCS's inaction.

104. Since entering care in December 2022, the C/H Siblings have had four or five different caseworkers. Many caseworker visits have been perfunctory. Caseworkers failed to examine the condition of their foster home, did not speak to the children privately, and often were unfamiliar with the children or their case. Most visits were conducted by substitute caseworkers, rather than the assigned caseworker. Throughout these visits, their foster mother repeatedly requested assistance in obtaining necessary documentation and health insurance, to no avail.

105. DCS also failed to hold required CFTMs for the C/H Siblings. CFTMs were only held after the foster mother insisted on them, and DCS often allowed over seven months to lapse between meetings.

106. As a result of DCS's ongoing failure to provide essential documentation, case planning, health care, and services, the C/H Siblings have suffered and continue to suffer physical,

mental, and developmental harm. Delays in diagnosis and treatment have led to worsened medical conditions, including more invasive treatment than would have otherwise been necessary. DCS's ongoing refusal to provide therapy at the required frequency further harms the children's well-being, leaving them without the support necessary to address their trauma and developmental needs.

### Zander M.

107. Plaintiff Zander M. (age 15) has been in DCS custody since February 2015 and remains in DCS custody as of the date of this filing. DCS has subjected Zander to unnecessary physical, mental, and emotional harm by placing him in unsafe and temporary placements where he has been inappropriately restrained using unauthorized methods.

108. Zander appears in this action through his Next Friend, Marjorie Bristol. Marjorie Bristol—a Tennessee attorney who has spent nearly three decades advocating for vulnerable populations—practiced for four years as a GAL in foster cases, and spent over six years as lead education attorney for DCS. Since 2017, she has maintained her own child-focused legal practice. Marjorie Bristol has acquainted herself with the allegations in the Complaint regarding Zander's experience in foster care and is dedicated to his best interest.

109. DCS placed Zander at Cumberland Primary Assessment Center (an assessment facility on the Clover Bottom campus) for almost two months, from February 21, 2025, to April 15, 2025.

110. Although Clover Bottom houses children who have allegedly suffered parental abuse and/or neglect, the assessment facility is enclosed with razor-wire, and DCS permits staff to physically restrain children. Zander was physically manhandled twice over two months for walking towards a door which led to the razor-wire-enclosed yard.

111. On the first occasion, a male staff member forced Zander to a nearby couch. Once Zander was lying on the couch, the male staff member climbed on top of him and pinned Zander down with his body.

112. The second time, the male staff member restraining Zander came exceedingly close to Zander's genitals. Zander, who has a history of witnessing physical abuse between his parents, was traumatized by this contact. Despite the seriousness of the allegation, DCS took no known action to investigate the conduct or ensure his safety. DCS failed to respond to Zander's attorneys' requests for the incident reports; DCS also failed to respond to the grievances that Zander filed about these two incidents.

113. Throughout his entire stay at Clover Bottom, DCS provided Zander with inedible food served at unsafe temperatures. All food was cold, regardless of whether the food was supposed to be warm. This, combined with the treatment by staff, harmed Zander to the point that he was unable to defecate for weeks at a time. He filed daily grievances regarding the conditions and treatment at the facility, but again, he received no response. DCS also failed to respond to his attorneys' requests for copies of the grievances.

114. During his stay at Clover Bottom, Zander reported that his prescribed medications were causing him troublesome side effects. Although Zander has voiced his complaints, he continues to be given these medications. DCS has taken no action to explore this issue or work with medical professionals to adjust Zander's medications. Instead, DCS workers inaccurately claim that he refuses to take the medications.

115. DCS attempted to unnecessarily institutionalize Zander, based on their incorrect reports and their simultaneous failure to address Zander's medical needs. At a recent meeting to discuss Zander's long-term placement, DCS recommended a Level 3 (i.e., residential facility)

28

placement due to Zander's supposed medical "non-compliance." Zander's GAL was unable to refute DCS's inaccurate reports because DCS excluded her from the meeting after she asked to reschedule due to a conflict.

116. Zander requires special education services due to his intellectual disabilities and his mental health diagnoses. However, his IEP meeting was held before a psych assessment was completed, leading to inaccurate recommendations for his needs. While at Clover Bottom, DCS's version of "school" consisted solely of dispensing second-grade level worksheets to Zander, an approach that not only failed to meet his cognitive and academic needs but also demeaned him and worsened his mental health.

117. While DCS pursued an inappropriate and harmful institutional placement, they ignored a viable and appropriate foster home placement that was interested in providing a placement for Zander. When Zander's GAL provided DCS with the name of a family friend who wanted to foster Zander, DCS sat on this information for almost a full month before looking into this possibility. Eventually, DCS approved the family friend, and Zander was placed with the family friend on April 15, 2025, but only after an unnecessarily lengthy and traumatic stay at Clover Bottom.

118. As of the date of this filing, Zander remains in DCS custody. His current placement is with the family friend, but DCS has failed to implement any of the recommendations in Zander's permanency plan. The family just had their first therapy session at the beginning of June 2025, and DCS has ignored requests for assistance in updating Zander's IEP, has historically ignored requests to begin services with Zander's mother so that the family can be safely reunified, and ignores his attorneys' requests for documentation as to these steps. As a result, Zander is not getting the services he needs, nor does he know where he will ultimately live. DCS's failure to investigate

serious abuse allegations, to follow up on appropriate placements, and to provide necessary educational and mental health services has left Zander vulnerable, retraumatized, and without the support he needs to recover and succeed.

**Dewayne W.**

119. Plaintiff Dewayne W. (age 15) has been in DCS custody since April 2022 after coming into care through a Neglect and Dependency petition. In three years, DCS has sent Dewayne to twelve placements, including multiple stays in temporary placement centers. DCS has subjected Dewayne to unnecessary physical, mental, and emotional harm by placing him in facilities with unsafe living conditions, inappropriately housing him in lockdown facilities, and depriving him of his right to an appropriate education.

120. Dewayne appears in this action through his next friend, Emily Jenkins. Emily Jenkins is an adoptive parent and was a CASA in Tennessee for almost ten years. She has also been a CASA board member and is a state-certified trainer in the Building Strong Brains program, which examines the impact of Adverse Child Experiences ("ACES"). Having spent nearly a decade advocating for foster children, Emily Jenkins is very familiar with Tennessee's foster care system. Emily Jenkins has acquainted herself with the allegations in the Complaint regarding Dewayne's experience in foster care and is dedicated to his best interests.

121. DCS policies advocate working toward reunification with biological parents where appropriate. However, DCS has failed to provide Dewayne's mother with sufficient planning, services, or support to enable reunification of the family for over two years. His biological mother was unaware that her counsel had been relieved and therefore was unable to meaningfully participate in the proceedings, nor was she counseled on how to meet her requirements. DCS claimed that his mother had failed to meet her duties needed to work towards reunification and

shuffled Dewayne from placement to placement without setting up meaningful visitation between Dewayne and his family. It was not until this was brought to the attention of the parties involved that she was appointed an attorney and began to receive the clarity, guidance, and services she needed. During this period, DCS's permanency plan for Dewayne was bare-bones and unhelpful.

122. Although DCS states that transitional and assessment placements are short-term placements for children awaiting foster placement, DCS housed Dewayne in these facilities for almost three months. From January 30, 2025, to April 25, 2025, he was passed back and forth between transitional housing and an assessment center. His FSW admitted and documented that no placement packets had been sent to any agency in an effort to find Dewayne a permanent placement. It was not until his Guardian ad Litem filed a Motion bringing this to the attention of the Court that packets were sent by DCS to Network Development, the section of DCS in charge of placements, in March 2025.

123. DCS has failed to keep accurate records of Dewayne. This was most evident when DCS reported to the court in March that Dewayne had been a runaway since January, apparently because that is what their records indicated. However, DCS should have known that and reported that Dewayne had been staying in DCS' Transitional Housing for over five weeks, had been in consistent and constant communication with his FSW, and had been present at each and every court appearance and DCS appointment.

124. Dewayne spent months at the transitional placement Resource Linkage, which used to be the Tennessee Preparatory School campus ("TPS"). TPS, which functioned essentially as an orphanage, was shut down under *Brian A.* in part due to environmental concerns, such as the non-potable water in the faucets. DCS re-opened this campus as transitional housing without

addressing the safety issues which caused its closure. Dewayne's room at this placement had large holes in the wall, no curtains, an air mattress as his bed, minimal linens, no door, dirty floors, graffiti and other marks on the walls, no furniture (his belongings were in garbage bags), and minimal supervision.

125. Between January 30 and February 28, 2025, Dewayne lived at Resource Linkage. He was wrongfully expelled from school on January 30, 2025. The expulsion was later modified to allow him to return after spring break. While a student is serving an expulsion, they are to be educated at an Alternative Learning Center (ALC); DCS failed to enroll him in the ALC. Instead they sent his mother to try to register him, even though she did not have custody and was therefore not legally permitted to do so. As a result, Dewayne missed school entirely from January 30 through March 17, 2025. By being out of school this long, he did not receive any of the services provided in his IEP, which has impacted his academic growth.

126. On February 28, 2025, DCS moved Dewayne to an assessment center. While in assessment centers children are unenrolled from their school and are supposed to be provided with education on the premises. Dewayne was placed in a restrictive lockdown setting, enclosed by razor-wire. Because DCS said they needed to "fix up" the original transitional housing he was in and alleged he needed assessments. DCS was aware that Dewayne had an appointment three days later for a full psychological evaluation. DCS had not previously said he needed assessments during the month he languished at Resource Linkage without any access to education or mental health treatment.

127. Since returning to transitional placement on the TPS campus, DCS has consistently interfered with Dewayne's education. DCS, who is responsible for transporting Dewayne to school, regularly drops him off late. Because the driver changes daily, there is no consistent

routine, and so Dewayne arrives late almost daily and misses vital instruction. His school district has tardiness policies that require them to give him in-school suspension (ISS) after a certain number of tardies. The diligence, determination, and advocacy of his IEP team and other stakeholders is the only reason ISS was avoided. Not only is DCS placing Dewayne at risk for ISS, but their actions resulted in direct interference with his education. Dewayne remains at risk of falling further behind, and the state has offered no plan to remediate the harm caused by weeks of missed education or to ensure that his specialized services resume.

128.  As a direct result of DCS's failures, Dewayne has suffered and continues to suffer harm. DCS has kept Dewayne in unsafe, unsanitary and unhealthy placements, continually retraumatized him with unnecessarily harsh placements, and allowed him to languish in foster care for years instead of providing the reasonable efforts appropriate to facilitate reunification with his biological family and community. Further, DCS has failed to provide Dewayne with the necessary mental health services and educational services necessary for his safety and well-being. Since his mother's legal representation resumed, she has exceeded the requirements of her Permanency Plan and Dewayne was finally sent home on a 90-day trial home visit. Despite this movement towards permanency, his path to returning to the custody of his mother remains obstructed by DCS's administrative errors, failure to provide timely services, and indifference to his well-being. Further, this three-year separation from his family and community has caused trauma that will not be easily remedied.

### Max W.

129.  Max W. (age 16) entered DCS custody in April 2024 and remains in DCS custody as of the date of this filing. In the one year since entering care, DCS has subjected Max to unnecessary physical, mental, and emotional harm by repeatedly placing him in unstable and

33

inappropriate placements, denying him access to education, and failing to provide necessary therapeutic and disability-related support.

130. Max appears in this action through his next friend, Sherry Taylor. While on staff at CASA, Sherry Taylor was the Team Lead for the volunteer assigned to Max; in that role, Ms. Taylor visited Max regularly and advocated on his behalf in CFTMs and court hearings. She is very familiar with Max's history and is dedicated to his best interests.

131. Max came into DCS custody because he was spending most of his life in the streets due to his grandmother's inability to care for him, leading to a determination of neglect.

132. Max has intellectual disabilities, and he suffers from depression and suicidal ideation. In June 2024, Max was suicidal and required intervention; his CASA advocate asked his DCS social worker to take him to the hospital for treatment, but the social worker replied that it was "not [her] job."

133. In the past year, Max has been in five placements.

134. DCS first placed Max at Resource Linkage, a transitional placement, apparently due to a lack of appropriate foster homes suited to his needs, where DCS kept him for two months before sending him to a residential facility.

135. The facility did not have any teachers for several weeks after their teacher left in July 2024, nor did they provide any alternative education. Max did not receive any education during this time.

136. The teacher hired in August 2024 verbally abused Max for his intellectual disabilities. On one occasion, the teacher mocked Max to his face as being "slow."

137. In Max's discharge planning from the residential facility, DCS determined that Max required a therapeutic foster home. His team was told that he should be the only child in the home.

138. Despite the recommendation, in December 2024, DCS placed Max in a non-therapeutic foster home with caregivers who lacked any relevant training. Just three days after placement, DCS violated its own recommendation by placing another child in the home long-term and placing an additional child there for "respite" stays, undermining the stability and support Max required. The foster parents, overwhelmed and unprepared, requested Max's removal after less than three months.

139. In March 2025, DCS next moved Max to a Disability and Intellectual Disability Support ("DIDS") residential facility. While there, the staff called the police on Max for taking the group landline telephone into his room. Despite Max's disabilities, staff subjected him to police interrogation and pressured him to "confess." When Max asked to remain silent, staff had him arrested for being "unruly." Max was detained for the weekend, was never charged with a crime other than being "unruly," which is not a detainable offense.

140. The staff at the DIDS facility continued to frequently call the police on Max over similar, non-criminal behavior.

141. The home manager at the DIDS facility locked Max out of the home and called the police on him. Max was so distraught that he was actively attempting to cut his wrists when first responders arrived; an EMT had to remove the cutting object from Max's hands to prevent further self-harm.

142. Not long after this incident, Max disclosed to his CASA advocate that he was experiencing suicidal ideation. Facility staff delayed calling 911 on Max's behalf, stating that the

35

house manager's permission was needed to do so. The facility did not call 911 until the DCS team leader intervened, despite repeated requests by Max's CASA advocate.

143. Max indicated that his psychotropic medications caused severe side effects and mood disruptions; nevertheless, the facility increased the dosages twice within the span of one month. The first increase, in early April 2025, doubled the prior dosage. DCS has taken no action to alleviate Max's suffering, leading to a May 2025 court order for Max to be seen by a medical provider.

144. DCS failed and continues to fail to take any action against the residential facility for their mistreatment of Max. DCS left Max at this same facility until the end of May 2025.When DCS finally removed Max from the facility, they did so without holding a CFTM and without notifying his team. DCS placed Max at a Level 2 facility, despite his assessment recommendation for a Level 3 facility.

145. As a result of DCS's failures, Max has suffered and continues to suffer physical, emotional and psychological harm. DCS has destabilized him by moving him from place to place; despite this frequent movement, DCS is unable or unwilling to place Max in a safe home with services appropriate to his needs. DCS has knowingly deprived Max of his right to safety and proper medical treatment while in its care and subjects him to caregivers who abuse him.

**Thomas H.**

146. Thomas H (age 13) has been in DCS custody for five years. His parents' rights were terminated on April 13, 2022, and DCS currently has full guardianship over Thomas. He has been in multiple placements over these 5 years. DCS has failed to provide Thomas with appropriate health care, subjected him to physical and emotional harm by failing to provide safe and stable placements, denied him ongoing sibling contact, and deprived him of his right to an education.

36

147. Thomas appears in this action through his next friend, Tia Bailiff. Ms. Bailiff is Thomas' GAL and has been advocating in his best interest for years. She is very familiar with Thomas' history and is dedicated to his best interest.

148. Thomas has significant mental health issues, which DCS has continually refused to address adequately. He has documented auditory and visual hallucinations, and he has attempted to harm others.

149. Thomas has begged DCS to place him at a residential facility because it is the only place where he has access to the level of medication and treatment necessary to address his mental health issues. He has begged DCS for a residential placement because it is "the only thing that made the bad man stop." Dr. Boiter, the DCS doctor responsible for residential placements for foster children in Thomas' region, has never treated Thomas, despite requests from Thomas' GAL and next friend. Nevertheless, Dr. Boiter decided that residential placement was not appropriate for Thomas.

150. DCS completed a Child and Adolescent Needs and Strength ("CANS") assessment on Thomas that was full of misinformation that DCS long refused to rectify. Thomas' biological mother severely sexually abused Thomas, and the termination of parental rights petition listed sexual abuse as the reason for termination; however, Thomas' CANS assessment stated that Thomas has not suffered sexual abuse. Thomas has a no-contact order against his biological mother due to the sexual abuse, but the information in the CANS listed her as a "great support." The CANS also stated that the biological mother was participating in services, but in reality, she has been missing for more than a year. Despite multiple requests from Thomas' GAL and next friend to update his CANS, she does not know if these errors have been rectified.

37

151. Thomas receives services through Youth Villages, a privately contracted provider with DCS. About 2.5 years ago, Thomas' then-foster mother asked Youth Villages to re-do Thomas' safety plan because it was not effective; while on this plan, Thomas hurt himself, another person, and an animal. Youth Villages, however, refused to re-evaluate the safety plan. Youth Villages did increase Thomas' weekly counseling services from once to twice a week for a period, but these counselling sessions often consisted of little more than worksheets for Thomas to complete.

152. In approximately June 2021, Thomas' then-foster mother sent him to an acute care facility after an incident where Thomas' hallucinations posed a threat to himself and those around him. Youth Villages admonished the foster mother because the acute care facility was not a Youth Villages facility. When Thomas returned to the foster home, he started screaming when the therapist began to leave. The foster mother, following Youth Villages' own protocols, called Youth Villages for aid. A Youth Villages therapist came to the home to attempt de-escalation but without success. After trying "the five coping mechanisms," the therapist said that she would call a supervisor. The supervisor told the therapist to try "the five coping mechanisms"; meanwhile, Thomas had progressed to punching himself in the face. GAL and Next Friend Bailiff got involved with the phone calls to Youth Villages after the call with the supervisor. On the fourth call with supervisors, GAL and Next Friend Bailiff told the Youth Villages supervisor and foster mother that she was going to file a neglect/abuse petition if the foster mother did not call 911; Youth Villages continued to protest any acute intervention, claiming that this was not part of the safety plan. The foster mother, fearing for Thomas' safety, called 911 at the GAL's instruction. Shortly after this incident, DCS removed Thomas from the foster mother's care, who has since adopted Thomas' biological sibling.

153. Since removing Thomas from the foster mother's care, DCS has shuffled Thomas between at least five placements where he has suffered inadequate and unsafe housing. DCS has kept him in non-residential office spaces where he had to sleep on the floor. DCS also placed him in unsafe placements where he has reported physical and sexual abuse by other children to adults around him.

154. In one placement during the 2024-2025 school year, Thomas refused to leave his school at the end of the school day after informing an adult employee at Youth Villages about abuse he experienced in his placement. That Youth Villages employee then called Thomas' former foster mother, who was still in close contact with Thomas, to ask her to convince him to return to the placement because Youth Villages did not have an alternative location for Thomas at the time. Thomas' former foster mother refused to suggest to Thomas that he return to a house where he felt unsafe. After Thomas' former foster mother submitted an anonymous child abuse complaint on his behalf about these issues, DCS and Youth Villages has limited Thomas' ability to speak with her or his biological sibling over the phone.

155. Thomas has made at least two complaints of sexual assault in his current placement to adults and through calls to his caseworker. After his second complaint, Thomas briefly ran away from the facility in an attempt to escape this abuse. As of the time of this filing, he remains in the same placement.

156. DCS has also deprived Thomas of his educational rights. In a call to his former foster parent in May 2025, he said that he had not received any schooling for approximately three months.

157. As a direct result of DCS's actions and failures to act, Thomas has suffered and continues to suffer physical, mental, and emotional harm. DCS has refused to properly medicate

or treat Thomas' mental health issues. These harms are compounded by DCS's repeated failure to provide Thomas with safe housing or educational opportunities, or appropriately act on his allegations of abuse, all of which have harmed Thomas' wellbeing and his ability to grow and thrive.

### Jonah W., Sarah W., Adam D., Alice W., and Gavin W.

158.  Plaintiffs Jonah W. (age 10), Sarah W. (age 9), Adam D. (age 8), Alice W. (age 6), and Gavin W. (age 4) are siblings who entered DCS custody on April 12, 2022, and remain in DCS custody as of the date of this filing. While in DCS custody, DCS has subjected these children to unnecessary emotional and psychological harm by failing to provide essential trauma-informed therapeutic services, denying them placement stability, and delaying their path to permanency.

159.  Jonah W., Sarah W., Adam D., Alice W., and Gavin W. appear in this action through their next friend, Tia Bailiff. Ms. Bailiff is each child's GAL and has been advocating in their best interests for years. She is very familiar with each child's history and is dedicated to their best interests.

160.  The children were taken into custody after police discovered them in a car with their parents, who were arrested after being found in possession of loaded meth syringes within the children's reach. The children were filthy, with feces running down their legs. After removal, DCS initially opened the case in Robertson County, but transferred it to Sumner County on May 27, 2022, due to a prior case there. Over the following five months, DCS cycled the children through unknown numbers of temporary placements—the exact number remains unknown because DCS does not track temporary placements. Despite repeated inquiries, DCS failed to inform the children's GAL of their location until December 2022.

161. All five children have been diagnosed with a need for trauma therapy due to the abuse and neglect they experienced in their biological home, but none of them have received individualized trauma-informed therapy. Instead, a school program called Cornerstone provided limited group sessions to the three older children. These sessions did not address their trauma or provide individualized support. DCS subsequently discontinued the program for two of the children without offering any replacement services. The two youngest children have received no therapy at all because DCS lacks play therapy services. As of the time of this filing, none of the children are recommended for ongoing therapy despite their diagnoses because, according to their caseworker, the children are well adjusted and do not need additional services.

162. As a result of DCS's repeated failures, the family court issued findings of no reasonable efforts by DCS on April 23, 2024, and again on June 11, 2024. A third motion was filed by the children's GAL on January 3, 2025.

163. Throughout their 29 months in foster care, the children have had at least six different caseworkers—including four in the past year alone. DCS's petition to terminate parental rights, filed in February 2025, remains pending due to DCS's refusal to provide discovery to the children's attorney, leaving these young children still far from achieving the permanence and stability to which they are legally entitled.

164. As a direct result of DCS's actions and omissions, Jonah, Sarah, Adam, Alice, and Gavin have suffered and continue to suffer emotional and psychological harm. DCS has failed to meet even minimal professional standards by neglecting to provide trauma-informed services, failing to track placements, failing to keep their GAL informed, and failing to act with urgency to secure them a permanent home. These children remain in limbo, traumatized, underserved, and without the stability every child deserves.

## II. Defendants

165.     Defendant Margie Quin is the Commissioner of DCS. As such, Commissioner Quin is directly responsible for, and has direct control over, whether DCS provides constitutionally and statutorily adequate services to the Named Plaintiffs herein and the putative class of foster children they seek to represent. Commissioner Quin is sued in her official capacity.

166.     Defendant Carla Aaron is the Deputy Commissioner of Child Safety for DCS. Deputy Commissioner Aaron is responsible for overseeing the Office of Child Safety of DCS. As such, Deputy Commissioner Aaron is directly responsible for, and has direct control over, whether DCS provides constitutionally and statutorily adequate services to the Named Plaintiffs herein and the putative class of foster children they seek to represent. Deputy Commissioner Aaron is sued in her official capacity.

167.     Defendant Karen Jointer Bryant is the Deputy Commissioner of Child Programs for DCS. Deputy Commissioner Jointer Bryant is responsible for overseeing the Office of Child Programs for DCS. As such, Deputy Commissioner Jointer Bryant is directly responsible for, and has direct control over, whether DCS provides constitutionally and statutorily adequate services to the Named Plaintiffs herein and the putative class of foster children they seek to represent. Deputy Commissioner Jointer Bryant is sued in her official capacity.

## DCS'S WIDESPREAD AND SYSTEMATIC VIOLATION OF CHILDREN'S RIGHTS

## I.     The Role of DCS

168.     DCS is the state agency in Tennessee responsible for overseeing child welfare, yet it has consistently failed to uphold its duty to protect the vulnerable children in its care. DCS is charged with five overarching missions: (1) protect children from abuse, mistreatment, or neglect;

42

(2) provide prevention, early intervention, rehabilitative and educational services; (3) pursue appropriate and effective behavioral and mental health treatment; (4) ensure that health care needs, both preventative and practical, are met; and (5) keep children safe. Tenn Code Ann. § 37-5-102. DCS fails on all five counts. DCS's foster care system and child protective services are plagued by systemic failures that cause foster children physical and psychological harm, leave them without stability in their home life and community, and deprive them of necessary treatment and services. DCS leaves children to languish in their deeply flawed foster system for years without a clear path to a permanent home.

### A. Comptroller Audits Reveal Persistent Failures in Tennessee's Child Welfare System

169. The Tennessee Comptroller of the Treasury conducts audits and oversight of state agencies, including DCS. Tenn. Code Ann. § 4-29-111. Since 1997, the Comptroller's Office has conducted multiple Performance Audit Reports of DCS. In its most recent audit of DCS in 2022, the Comptroller found that "[t]he Department of Children's Services is struggling to provide support services to Tennessee's most vulnerable children and youth."

170. The audit revealed a consistent pattern of DCS's failure to address critical deficiencies in child welfare despite repeated findings, recommendations, and calls for reform. Despite the identification of severe and pervasive problems in prior audits (most recently in 2016 and 2019), the 2022 Comptroller's audit "found that DCS did not assess risks or develop controls in several areas that we have both previously reported and found in the current audit."

171. The Comptroller identified four major, recurring issues which they had identified in multiple reports going back several years, and which DCS has made no efforts to fix. Case manager turnover and staffing shortages have worsened over time, with high turnover rates and

43

unmanageable caseloads leading to delays in child protection, investigations, and placements. By 2022, the staffing crisis had reached a breaking point, severely hindering DCS's ability to meet its obligations to children in state custody.

172. Additionally, child placements and institutionalization have remained significant concerns. As early as 2016, audit reports warned of a lack of appropriate placements for children with complex needs, leading to an over-reliance on institutional care. The 2019 audit report reinforced these concerns, noting a shortage of long-term, family-like placement options. By 2022, the situation had become dire, with DCS housing children in state office buildings and sending them out of state due to a severe shortage of foster homes and therapeutic placements.

173. The audits have also repeatedly flagged DCS's inadequate response to child safety and abuse investigations. In 2019, audit reports documented oversight failures in handling allegations of abuse and neglect. By 2022, these deficiencies had escalated, with children remaining in unsafe environments due to DCS's failure to meet investigation timelines.

174. At that point, the audit showed that DCS lacked a consistent process for responding to allegations of sexual abuse and harassment within residential facilities, putting vulnerable children at increased risk of harm.

175. Finally, persistent failures in case management and data tracking have plagued DCS operations. By 2022, TFACTS, the agency's case management system, had become a major barrier to efficiency, with the Comptroller finding that outdated technology caused delays in placement decisions, financial processing, and case tracking.

176. Although DCS put into place some improvements during the years the *Brian A.* reforms were required, the audits show that the steps toward these reforms were not institutionalized and were abandoned with the termination of the *Brian A.* case.

## II.     Safety in Placements

177.     Risk and safety assessments identify pending dangers or threats regarding a child; after dangers are identified, workable safety plans ensure that a child can remain with a family in a safe and stable way. Where identified risks cannot be mitigated by safety plans or where the family caring for the child is unable to fulfill the requirements of a safety plan, the child can be moved to a more appropriate home or other location that can meet his/her needs. It is critical for caseworkers to conduct timely and accurate assessments on an ongoing basis and to monitor the execution of safety plans. The Administration for Children and Families, an office within the U.S. Department of Health and Human Services, audits every state's performance in this area and other critical metrics of child welfare via Child and Family Service Reviews ("CFSRs").

178.     In the most recent CFSR for Tennessee from 2024, DCS only conducted adequate risk and safety assessment and management in 50% of foster cases reviewed, an alarming statistic that demonstrates a failure to ensure proper placements and to protect children from harm.

179.     Tennessee does not track foster homes disqualified due to background checks on a statewide basis, nor does it have an accurate statewide system that would allow it to do so, leaving the potential for prospective foster families, turned down in one county, to go on to another county without addressing the issues rendering them unfit to foster.

180.     DCS is responsible for ensuring the safety and well-being of foster children placed in residential facilities. However, repeated failures in oversight, investigation, and compliance with federal standards have left children vulnerable to sexual abuse and neglect.

181.     According to DCS policy, their Special Investigations Unit is supposed to investigate all allegations of abuse or neglect of children in foster care; however, in 2021, DCS did not investigate 34 out of 211 (16.1%) allegations of sexual abuse and/or sexual harassment

within residential facilities. Instead, DCS refers complaints about abuse in facilities to law enforcement to investigate. DCS does not track the referrals nor follow up with law enforcement to learn the results of the investigations. DCS does not conduct investigations nor referrals regarding sexual harassment complaints.

182. DCS also fails to investigate facilities for lack of supervision in connection with reports of sexual activity between children at residential facilities.

183. Further, DCS utilizes residential facilities that house both foster children and youth involved in the juvenile justice system, meaning that foster children are frequently placed in the same settings as those involved with juvenile justice.

184. Of the sexual abuse investigations performed by DCS in 2021, 92% were not completed within the required time frame. On average, the sampled investigations took approximately 50%-100% longer than allowed by DCS policy.

185. DCS's failure to investigate all allegations of sexual abuse and failure to conduct or complete their investigations timely puts children into the very danger that may have instigated a child's removal from their home.

186. DCS's systemic failure to properly investigate allegations of sexual abuse and harassment in residential facilities perpetuates a dangerous environment for the children it is meant to protect.

## III. Defendants' Policies and Practices Fuel Tennessee's Placement Crisis

### A. Placement Instability and Lack of Foster Homes

187. When children cannot remain safely in their own homes, DCS is responsible for providing placements that meet their emotional, physical, and social needs. However, DCS's inability to recruit and maintain available foster homes continues to present serious challenges to

DCS's ability to make appropriate placement decisions. Case managers frequently resort to placing children in temporary accommodations such as state office buildings or transitional facilities for extended durations. Compounding this issue, the case management system is ill-equipped to capture real-time child placement data or track placement availability, creating negative impacts for both children and DCS employees.

188. Child welfare policy prioritizes placing children in foster care within family-like environments, ideally close to their home communities and, whenever possible, with kin caregivers and siblings. Providing stable and appropriate placements is essential to protecting children's well-being and maintaining family bonds. However, due to a lack of adequately supported foster homes and specialized treatment programs, DCS often moves children frequently among various foster homes, institutions, group settings, and other temporary or emergency placements. This shortage of foster homes has resulted in an overreliance on placements that fail to meet children's needs, including unsafe or inappropriate congregate care facilities.

189. DCS's placement system is based on a rotation of various on-call placement workers from a shared group of multiple counties. Its use of this system often results in placement of children in the county where the on-call worker is assigned and familiar with the pool of foster parents rather than in a placement within their county of origin. This system unnecessarily separates children from their natural community support, places barriers on therapy and visitation with their family of origin, and causes unnecessary removals from their schools. For children with special education needs, this is especially disruptive.

190. DCS has failed to maintain an adequate pool of foster and adoptive families, leaving children without stable placements and failing to ensure families reflect the racial and ethnic diversity of those in need.

47

191. DCS fails to properly support its foster families, particularly those foster families who have high-needs foster children in their homes. DCS frequently places foster children with foster parents who lack the training or experience necessary to support high-needs foster children. DCS often places these high-needs foster children in homes without ever informing the foster families of the children's needs. DCS then fails to provide the services to the child or the foster family which might enable the family to provide a stable home and threatens retaliation against families who request aid. As a result, foster parents often request removal of children they are not equipped to raise, foster parents close their homes to future foster children, and prospective foster parents are dissuaded from becoming certified foster homes.

192. Placement instability triggers a cascade of overlapping and compounding harms, including: (i) disruption of a child's sense of security and attachment to caregivers; (ii) re-traumatization by repeating the experience of removal; (iii) decreased chances of reunification and exiting care, along with an increased risk of re-entering care after reunification; (iv) interruptions in education; (v) loss of opportunities to build long-term relationships with supportive adults; (vi) heightened vulnerability to abuse and neglect; (vii) developmental delays or setbacks due to inconsistent caregiving and disrupted attachment; (viii) an increased likelihood of running away from placements; (ix) interruptions in a child's therapeutic relationship with mental health providers and gaps in treatment; (x) worsening mental health symptoms; (xi) delays in diagnosis or access to mental health treatment; (xii) difficulties developing coping skills and adaptive behaviors to manage stress and emotions; and (xiii) higher rates of juvenile delinquency and institutionalization.

193. According to a report by the Tennessee Commission on Children and Youth, in 2022, Tennessee ranked number one in the nation for how often it moved foster children among different placements.

194. In FY2023, 33% of children in the foster care system experienced instability, having been moved to three or more placements within a single year. This alarming trend is not limited to children already in care. Among first-time foster children who entered the system in 2022, 38% had experienced three or more placements by December 31, 2023. For children entering in 2023, 31% had already experienced three placements by the end of the year.

B. Temporary Placements

195. Because DCS does not maintain enough appropriate placements, it houses children in unsuitable and temporary settings, including office buildings, hotels, hospitals, transitional housing, "Isaiah" houses (run by independent non-profits), assessment centers, and Department of Disability and Aging ("DDA") Supported Living Protocols operated by rotating caregivers (assessment centers for children with intellectual and/or developmental disabilities). Despite Defendant Quin's assurances to state lawmakers that children were no longer sleeping in DCS offices except in Shelby County as of March 2023, records show that office stays resumed by November 2023 and continued into 2024. Contrary to her claims, nearly 100 children have spent nights in DCS offices this year. Children subjected to these placements frequently experience months of instability, living in conditions that lack basic necessities. DCS caseworkers say this is a pattern, not an exception. DCS has no policies to ensure that these settings are adequately supplied with food, toiletries, and other necessities. Because DCS has abdicated its responsibility to consistently provide these necessities, these sites are often supplied by community donations, resulting in varying levels of support.

196. The Deputy Commissioner for Child Programs acknowledged that children are often forced to stay overnight in temporary settings because providers are unwilling to accept high-needs children. Without proper placements, children requiring specialized care are left in limbo, compounding their trauma and destabilizing their futures.

### i. Transitional Placements, Assessment Centers, and DDA Supported Living Protocols

197. DCS uses a number of temporary placements, including transitional placements, assessment centers, "Isaiah Houses" (run by independent non-profits), DDA Supported Living Protocols, and intake centers.

198. According to DCS policy, children are placed in assessment centers for the purpose of assessing their needs. DCS policy limits the maximum length of stay in an assessment center to 30 days.

199. Contrary to policy, most children placed in these assessment centers are there for far longer than 30 days; it is rare that DCS and their contracted providers even complete the child's assessment within 30 days.

200. DCS subjects the children at assessment centers to draconian conditions more commonly found in adult prisons. Intake centers are routinely staffed by personnel from the sheriff's department. DCS is explicitly authorized to shackle children when they are taken off-site for doctor's appointments and other visits. Policies allow the use of chemical weapons, such as pepper-spray, against children. DCS limits children's in-person and telephonic communication and monitors children's calls, including calls to family and to their GALs. GALs have been prevented from seeing children they represent. One assessment center located at the Clover Bottom campus

in Nashville is surrounded by barbed wire, which was installed only after DCS began using the campus as an assessment center.

201. According to DCS policy, children with intellectual and/or developmental disabilities are placed in DDA Supported Living Protocols for the purpose of assessing their needs. DCS policy limits the maximum length of stay in DDA Supported Living Protocols to 30 days.

202. DDA Supported Living Protocols are staffed by contract agencies that employ rotating hourly caseworkers that lack the specialized training and capabilities required to provide services for children with intellectual and/or developmental disabilities. Children placed in these homes have very little supervision and support.

203. Contrary to policy, children placed in these Supported Living Protocols are there for far longer than 30 days; it is rare that DCS and their contracted providers even complete the child's assessment within 30 days. In spite of these children having known intellectual and/or developmental disabilities, DCS fails to ensure their special educational needs are met, fails to provide them with adequate services to support their disabilities, and fails to ensure they are receiving services in the most integrated setting.

204. The living conditions in many of the temporary placement buildings are dangerous. Upon information and belief, several buildings have holes in the walls and exposed electrical wiring. One of the three large centers in the state, Resource Linkage, is housed in a building that was closed under *Brian A.*, in part, due to lead in the water pipes. Signs above every water fountain and sink stated, "Non-potable water. Do not drink."

205. The food provided at these temporary placements is inadequate and unhealthy. Upon information and belief, children are not fed regular and substantive meals. Many of the buildings lack kitchen facilities; DCS feeds children only food that can be prepared in air-fryers

or microwaves, such as chicken nuggets, French fries, or Hot Pockets. Breakfast often consists solely of doughnuts.

206. DCS creates dangerous situations by mixing children of varying ages, genders, and reasons for placement, and by mixing children with delinquency findings with children removed from their homes due to abuse or neglect. Children as young as seven years old are placed in spaces with teenagers. Boys and girls are often placed together, requiring shared bathrooms. Children charged with violent criminal offenses are placed together with children removed from their homes due to the trauma of inflicted violence; boys with rape and assault charges are placed together with girls.

207. During these months-long stays, children do not receive treatment for their behavioral/mental health needs. Upon information and belief, mental health professionals are rarely, if ever, in-house at the centers. Although in theory, DCS will drive children to the offices of mental health professionals, this rarely occurs in practice; many mental health professionals refuse to work with DCS because of DCS's track record of not paying the contracted rate for their services.

## IV. Permanency

208. The primary objective of foster care is to provide children with a temporary, secure, and nurturing environment, while their parents work to resolve the challenges that led to their separation. When reunification is not an option, a foster care system must take prompt action to establish permanency through adoption or guardianship, often with relatives. Ensuring stability is essential for a child's emotional, educational, and social well-being, as extended time in foster care can undermine their sense of security and lead to lasting negative effects.

209. DCS caseworker permanency plans are critical to a child's progress out of the foster system. Permanency plans identify a permanency goal (e.g., reunification, adoption) and the steps needed to achieve this goal. In the most recent CFSR report, appropriate permanency goals were only rated as a strength in 36% of cases. Without consistent and timely oversight, children are left in a state of limbo, unable to achieve the permanency they need for long-term and mental health.

210. Even when permanency goals are identified, DCS still causes children to languish in foster care unnecessarily. In 2022, children with a permanency goal of adoption, and whose parental rights have been terminated in furtherance of that goal, still waited 27.5 months on average before being adopted, over 8 months longer than the national average.

## V. Workloads and Staffing

211. Qualified caseworkers are vital to the administration of every child welfare system. They are responsible for ensuring the safety, permanency, and well-being of children who are at risk of abuse, neglect, or exploitation. To carry out this critical task, they must assess the needs of each child and family, develop individualized plans to meet those needs, and monitor progress toward achieving the desired outcomes.

212. Manageable caseloads are necessary to the provision of comprehensive and individualized services to each child and family in a caseworker's care. Having a manageable caseload requires few enough cases so that workers can take the time to build rapport, engage in meaningful conversations, and identify the unique needs and strengths of each child and family. Additionally, caseworkers must work collaboratively with other professionals and community resources to address complex issues and provide timely interventions. Without the capacity to perform these duties, caseworkers cannot ensure that foster children are safe, supported, and able to thrive in their families and communities.

213. When caseloads exceed reasonable professional standards, caseworkers are unable to devote the necessary time and attention to each child in their care. Additionally, overburdened workers often experience burnout and high levels of stress, leading to turnover and a shortage of experienced workers. High turnover increases caseload burdens on remaining caseworkers, reduces productivity and morale, and increases feelings of hopelessness and frustration.

214. Caseworker turnover commonly results in delayed permanency for foster children. One study found that foster children with one caseworker in a given year had an approximately 75% chance of achieving permanency, those with two caseworkers had an approximately 18% chance of permanency, and those with more than three caseworkers had only a 2% chance of permanency.

215. Caseworker turnover in Tennessee is high, with an average statewide turnover rate of 27%. One in four counties has a turnover rate higher than 40%.

216. While monitored pursuant to the *Brian A.* settlement, Tennessee achieved and maintained an average caseload of 20 children per case manager in 2017, a standard that was codified in Tenn. Code Ann. § 37-5-132.

217. After DCS was released from *Brian A.*'s mandated oversight, caseloads quickly ballooned. From 2020 to 2022, caseloads increased by 63%. Regional caseload averages rose to as much as double the statutory maximum, with over one-third (37%) of case managers carrying more than the statutory maximum in May 2022.

218. In 2023, Defendant Quin announced a caseload maximum of ten cases per first-year caseworker. Upon information and belief, that standard is not followed, and average caseloads do not indicate how many individual workers are within that limit. Upon information and belief, new caseworkers perform much of the workload for cases that are listed under supervisors' names.

54

219. On March 4, 2024, Defendant Quin testified to the Tennessee House Government Operations Committee that Davidson County's recent average caseload was fifty cases. She further testified that the lowest average, after a "surge event" focused on closing cases, was twenty-nine cases.

220. As a result, the amount of overtime for caseworkers has steadily risen. 80% of caseworkers worked overtime in fiscal year 2022. Although about 15 hours of overtime per caseworker was reported, DCS supervisors frequently requested that case managers not report their overtime.

221. In addition to overwhelming case responsibilities, caseworkers are required to work overnight at transitional placements and office buildings where children are housed. Frequently, this overnight shift is bookended with regular day shifts both before and afterward.

222. As a result of DCS's practices, turnover and vacancy rates have skyrocketed. The annual case manager turnover rate rose from 15.5% in 2018 to 55.5% in 2022. In 2021, 97% of case managers left DCS. Case manager vacancy rates rose from 6.5% in 2017 to 22% in 2022.

## VI. Oversight Over Contracted Private Providers

223. DCS routinely contracts out their casework duties to the same private organizations contracted to provide placements. Children who have a private agency caseworker frequently do not have a worker from DCS. Upon information and belief, these private caseworkers do not receive training in DCS policies or protocols, nor is there oversight by the public agency over the private caseworkers.

224. Complaints about private casework and private provider employees are reviewed by the same private provider who employs them. Foster children, GALs, and other involved individuals are frequently unable to reach anyone at DCS who is willing to claim responsibility

for overseeing contractors. Similarly, complaints of abuse at private facilities that house children in DCS custody are investigated by the same providers running those facilities.

## VII.    Case Plans

225.    DCS is required under federal law to provide children in foster care with a case plan that is reviewed regularly, at least once every six months, until a child's case is resolved and the child leaves DCS custody. Federal law requires case plans to include a large amount of information about the child and family, to identify necessary services and to focus on ways to resolve the case and support the foster child, including plans to effectively engage family members and services to address the family's and the child's needs. In addition, the plans require ongoing monitoring by DCS to ensure that the child's case is making progress toward its goals.

226.    In recognition of the importance of timely, individualized, and appropriate case plans, the *Brian A.* settlement required DCS to hold CFTMs at least every three months; although DCS achieved this standard when monitored in 2016 and 2017, it has since fallen woefully short.

227.    The 2024 CFSR, the most recent federal review of Tennessee's child welfare system, found that periodic reviews of case plans were often not held in a timely manner. Upon information and belief, in some cases, CFTMs are held as little as once per year.

228.    The CFSR also found that case plans are generic, not individualized to the child's needs, and are not regularly updated to reflect changing circumstances. Of the case plans that exist, DCS only identifies appropriate permanency goals in 40% of sampled cases. Of the files sampled in the CFSR, children's files lacked ongoing risk assessment in 50% of cases. 100% of cases sampled either did not have an ongoing risk assessment at all or had an incomplete risk assessment

which only focused on pre-identified concerns instead of conducting a fresh assessment to discover areas of concern.

## VIII.  <u>Unnecessary Use of Residential Placements</u>

### A.  Insufficient Access to Community-Based Services for Children in DCS Care Leads to Increased Institutional Placement

229.  Members of the ADA Subclass are "qualified individuals with disability[ies]" as defined by the ADA, 42 U.S.C. § 12131(2), and its regulations, 28 C.F.R. § 35.104. A disability is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108.

230.  Under the ADA, individuals with disabilities are entitled to receive goods, services, facilities, privileges, advantages, and accommodations in the most integrated setting appropriate to their needs. An integrated setting is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B.

231.  DCS has failed to uphold this mandate by systematically and unnecessarily placing children with complex needs—particularly those with disabilities—in institutional settings rather than in family-like, community-based placements where they receive home and community-based mental, physical, and behavioral health services.

232.  Similarly, DCS systematically places children with complex needs and disabilities into unnecessarily restrictive institutional settings where a more integrated institutional level of care or placement in a therapeutic foster home would be appropriate.

233. Case managers across Tennessee consistently report significant challenges in securing long-term, stable placements for children who require higher levels of care. In a recent budget meeting, DCS data revealed a troubling trend: over the past four years, the Department has increasingly relied on its most restrictive and costly services, while community-based options have declined.

234. Although DCS justifies this by claiming that necessary services are unavailable, this reasoning ignores the Department's legal obligation to develop services that enable children with disabilities to receive care in the least restrictive, most integrated setting appropriate for their needs, and to ensure that the services are adjusted so that children with disabilities can equally benefit from those services.

235. Rather than investing in therapeutic foster care, wraparound services, and community-based treatment options, DCS has chosen to rely on segregated institutional settings, depriving children of the opportunity to grow and develop in environments that promote family and community connections.

236. Once placed in out-of-state or institutional settings, children are often left there long after they could be safely transitioned to less restrictive environments. DCS has failed to take meaningful steps to integrate these children back into their communities or ensure they receive the necessary support to remain in family-like settings.

237. By systematically denying children access to appropriate community-based services and placements, DCS has violated its duty to ensure that children with disabilities receive care in the most integrated setting possible. This failure represents a substantial departure from professional standards in child welfare and demonstrates deliberate indifference to the well-being of the children in its custody.

### B. Lack of In-State Residential Placements

238. DCS is facing a critical shortage of in-state placements for children with complex mental health and behavioral needs, exacerbated by its failure to provide sufficient supportive services to children in specialized, therapeutic foster homes.

239. DCS's failure to anticipate and plan for the rising demand for more intensive and specialized care has exacerbated the crisis, leaving some of Tennessee's most vulnerable children without appropriate in-state treatment options.

240. From January 2018 to July 2022, the number of children in DCS custody increased by 7%, yet DCS leadership failed to take sufficient action to prepare for a corresponding increase in the need for foster homes, treatment facilities, and secure residential placements. The Council on Accreditation, which sets national best practice standards for child and family services, recommends that agencies proactively recruit a diverse array of foster and treatment placements to ensure that children receive safe, consistent, and nurturing care. Tennessee's failure to adhere to these recommended practices has contributed to the growing placement crisis, particularly for children requiring specialized treatment.

241. The severity of mental health issues among children in state custody has increased, yet Tennessee lacks the necessary infrastructure, resources, and trained foster families to meet their needs. Foster parents report that they do not receive adequate support or training to care for children with significant psychiatric, neurodevelopmental, or behavioral challenges.

242. As a result, Tennessee sends an increasing number of children to out-of-state placements, many of which also do not have appropriate programs to address the needs of children sent to them, and many of which have questionable programs and a shortage of appropriate staffing. As of November 2024, DCS had more than 200 children in out-of-state institutions. These

facilities span 15 different states, including Alabama, Utah, Arizona, Georgia, Pennsylvania, Texas, Ohio, Florida, Virginia, Louisiana, Wyoming, Mississippi, Arkansas, Oklahoma, and South Carolina.

243. Tennessee's inability to provide in-state care for children with complex needs is a direct result of poor planning, and a failure to develop sufficient residential and therapeutic foster care resources.

244. DCS officials have acknowledged the urgent need for expanded residential capacity and more trained therapeutic foster homes. DCS has acknowledged the urgent need for more in-state placement options and trained therapeutic foster homes, but its solution—the DCS Real Estate Plan—falls short. Instead of prioritizing community-based care, the plan relies on building or converting large, institutional facilities that do little more than warehouse children within state lines.

## IX. **Lack of Education**

245. The Tennessee Constitution affords all Tennessee children the right to an education. Tenn. Const. Art. XI, § 12. Tennessee law affords all children with disabilities the right to a free and appropriate public education which includes the provision of "special education and related services designed to meet the child's unique needs." Tenn. Code Ann. § 49-10-103. However, DCS routinely deprives children of education for weeks or months at a time.

246. DCS frequently moves children to night-to-night placements, bringing them to a different location every night. During the day, DCS places these children at group centers such as Resource Linkage. While bouncing these children from place to place, DCS either fails to enroll children in school or fails to transport children to their schools. Due to lack of placement

availability, DCS keeps these children in placement limbo, without education for significant periods of time.

247. DCS provides laptops for online schooling in some of their temporary placements; however, it does not provide the internet access necessary to connect to educational lessons and materials. Caseworkers are forced to use their work phones (if provided) or their personal phones as "hot-spots" for children to access schoolwork.

248. DCS purports to provide on-site education to children at assessment centers; however, upon information and belief, DCS does not provide any teachers, instruction, or opportunities for interaction or collaboration with educators. Instead, DCS distributes worksheets to the children at assessment centers without any support or guidance to complete them. Frequently, the worksheets provided fall far below the grade level of the children receiving them, depriving children of an appropriate education.

249. DCS applies their worksheet distribution system to all children at assessment centers, regardless of their needs, diagnoses, or IEPs.

## X.  <u>Lack of Medical Care</u>

250. Ensuring that children and youth in the custody of DCS receive adequate medical and dental care is critical to the children's health and well-being. Regular preventive care, early diagnosis, and treatment are essential to restoring and maintaining children's health.

251. Under the Medicaid Act, a state which accepts federal Medicaid funding must meet minimum federal requirements set forth in the Social Security Act and its implementing regulations. 42 U.S.C. § 1396a(a). Tennessee has accepted federal funding and is so bound. Tenn. Code Ann. § 71-5-101 *et seq.*

61

252. The Medicaid Act requires Tennessee to provide medical assistance, including services known as "Early and Periodic Screening, Diagnostic, and Treatment Services" ("EPSDT") for children who are eligible for Medicaid. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B). Foster children are eligible for Medicaid, which Tennessee administers through the state agency TennCare.

253. States are required to provide screenings to identify children's mental and physical health needs, as well as arrange for treatment services necessary to correct or ameliorate a child's mental or physical health conditions. 42 U.S.C. §§ 1396a(a)(10)(A); 1396a(a)(43)(C); 1396d(a)(4)(B); 1396d(r)(1); 396d(r)(5).

254. DCS's Office of Child Health is responsible for ensuring that all children in its custody receive appropriate health care. Each of the 12 DCS regions has a regional health team, including a regional nurse consultant, a health advocacy representative, and a service appeals tracking coordinator, which coordinates with TennCare and enters medical data into TFACTS. However, systemic failures within DCS, including an overreliance on outdated paper forms and manual processes, have led to significant delays and mismanagement in providing necessary healthcare services to children in foster care.

255. DCS must provide the required initial EPSDT screenings with "reasonable promptness." 42 U.S.C. § 1396(a)(8). DCS policy mandates that all children receive initial EPSDT medical screenings within 30 days of entering custody. Additionally, all children 12 months or older must receive a dental examination within 30 days of entering custody and every six months thereafter, pursuant to the schedule recommended by the American Academy of Pediatrics. Despite these requirements, DCS routinely fails to meet these deadlines, preventing early detection of medical and dental conditions and leaving children vulnerable to untreated health issues.

62

256. DCS's reliance on manual, paper-based processes to complete, review, and follow up on children's medical and dental screenings has created systemic errors and significant delays in services. The inefficiencies in these outdated processes introduce opportunities for mismanagement, missing documentation, and delays in critical follow-ups.

257. The quality of medical data recorded in TFACTS is unreliable, raising concerns about the accuracy of children's medical records. Due to inconsistencies in documentation, neither DCS management nor external auditors can confidently verify whether children receive the care they need. The lack of a reliable medical tracking system increases the risk that children with urgent healthcare needs will go unnoticed. Delays in screening reviews prevent children from receiving timely medical interventions, worsen undiagnosed health conditions, and deprive case managers of the ability to make informed decisions about children's healthcare needs.

258. The high turnover rate of case managers and excessive caseloads further contribute to delays in healthcare. Case managers are responsible for ensuring that children receive timely screenings, follow-up care, and necessary treatments. However, when case managers frequently leave their positions, new caseworkers must take over unfamiliar cases, often with incomplete or missing medical records. This results in children missing critical health appointments, experiencing gaps in treatment, and remaining in limbo while waiting for necessary care.

259. Mental health services remain inadequate across Tennessee, with children in foster care frequently unable to access trauma-informed therapy, psychiatric evaluations, and behavioral health interventions. DCS's failure to provide timely medical and dental screenings, combined with systemic inefficiencies, provider shortages, and case manager turnover, has had devastating consequences for the children in its custody. Many children are left without necessary treatments, worsening their existing health conditions and increasing the risk of long-term medical

63

complications. In addition, children with severe mental health needs remain untreated, exacerbating their behavioral challenges and hindering their ability to achieve stable placements.

260. Tennessee's high rate of foster instability combined with the network adequacy issues for behavioral health treatment results in frequent delays for children to begin receiving services and large gaps in receipt of services each time a child loses a placement and has to go back on the wait list for services in their new placement location. DCS regularly fails to search for new providers in the child's new location for extended periods of time after a change in placement.

## XI. Failure to Establish a Reliable Information System

261. A reliable and functional information system is an essential component of an effective foster care system. To ensure the safety and well-being of children, caseworkers must have access to accurate, complete, and easily accessible information that allows them to make informed decisions about placements, case management, and child welfare interventions. However, TFACTS, the central database used by DCS, has been plagued by systemic failures since its implementation in 2010. These ongoing technical deficiencies, system inefficiencies, and reporting inaccuracies have severely hindered DCS's ability to manage cases effectively.

262. TFACTS was intended to serve as the primary case management tool for tracking placements, ensuring compliance with medical and dental screenings, managing financial transactions, and facilitating oversight of foster care cases. However, persistent system malfunctions have forced caseworkers to rely on cumbersome manual processes, spreadsheets, emails, and phone calls to obtain critical information, leading to delays in case management, miscommunication, and failures in child welfare oversight.

263. Since its launch, TFACTS has been riddled with system functionality issues, including slow system processing, unexpected user logouts, and the inability to generate accurate

program reports. In 2021, DCS implemented a financial enhancement feature designed to streamline payments to foster parents and private providers. While this update improved financial transactions, the update caused significant problems with other parts of the system, including disruptions to case management data, limitations in system reporting capabilities, and delays in accessing essential case information. As a result, DCS employees were left unable to run critical program reports or verify data accuracy, further undermining the Department's ability to manage child welfare cases effectively.

264. The inadequacy of TFACTS has forced case managers and regional administrators to create their own makeshift tracking systems. Because TFACTS lacks real-time tracking capabilities, case managers must manually search for placement availability using phone calls, emails, and spreadsheets, instead of relying on an automated system. This outdated approach leads to delays in finding appropriate placements for children in foster care and contributes to unnecessary disruptions in children's lives.

265. One of the most serious deficiencies of TFACTS is its inability to accurately record and track child placements. When children are placed in temporary settings such as state offices, hotels, or transitional placements, the system can only record the child's location as a "regional state office," rather than identifying the specific placement. As a result, DCS management lacks visibility into the actual whereabouts of children in custody, creating accountability gaps and making it impossible to track children in real time and to determine the additional services needed. Each DCS region has been forced to maintain independent Excel spreadsheets to track children in temporary placements, leading to fragmented and unreliable data, and an inability to track where serious problems arise.

266.     The number of temporary placements has increased, yet top DCS management remains unaware of the number and location of children in these placements due to the system's tracking failures. Without an accurate, centralized placement tracking system, case managers struggle to locate available beds, delaying placements and prolonging instability for children.

267.     The inefficiencies of TFACTS have directly contributed to delays in finding stable placements, ensuring timely medical care, and preventing disruptions in services. Case managers already struggle under heavy caseloads, staff shortages, and high turnover rates, and the additional administrative burden caused by system failures further prevents them from effectively serving children in foster care.

268.     TFACTS also fails to automate and aggregate data needed to track systemic child abuse trends. The Special Investigations Unit ("SIU") monthly report is intended to flag patterns of abuse by identifying individuals with ten or more instances of abuse. However, TFACTS cannot accurately generate this data, forcing staff to manually count investigations and input findings into spreadsheets. This process is highly susceptible to human error, with investigators miscounting cases or failing to identify repeat offenders due to duplicate profiles in TFACTS.

269.     DCS's failure to maintain a functional and accurate information system is a primary cause of delayed services, missed visits, and harmful placements.

## XII.     Tennessee's Troubled Child Welfare History

270.     The 2022 Performance Audit Report by the Department of the Comptroller is the latest in a long line of documents detailing DCS's failures. Audits by the Department of the Comptroller describe these failures repeatedly over the course of three decades, and DCS's lack of action to remedy them.

271.    DCS met the required *Brian A.* settlement metrics by 2017, leading the court to terminate jurisdiction over all metrics on July 17, 2017. Unfortunately, DCS's performance declined soon after. Today, DCS's performance in many areas has sunk to pre-*Brian A.* levels.

a.    In January 2017, DCS had a rate of 96% compliance with the required average caseload limit of 20 cases per caseworker. By fiscal year 2019, compliance dropped to 89%. By April 2022, compliance was down to 63%.

b.    In FY2017, DCS timely performed a CANS assessment in 99% of cases. By FY2022, the rate of timely assessments had fallen by 17%.

c.    In FY 2017, DCS moved children an average of 6.6 times per 1,000 days. By FY 2023, this had ballooned to 10.1 moves per 1,000 days.

d.    In a March 2017 report, 97%-100% of children with a goal of reunification had at least one face-to-face visit with a parent of at least one hour. DCS abandoned this metric almost immediately; from July 2017 to June 2018, this metric dropped to 56%. By early 2024, foster children's visitation with parents and siblings in foster care was rated as adequate in only 46% of cases.

## XIII.    Actual Justiciable Controversy as to Which Plaintiffs Have a Stake in the Outcome

272.    Based upon the foregoing, an actual controversy exists between the parties regarding the following issues of fact:

a.    Defendants' actions and inactions maintain a system that fails to provide Plaintiffs with safe, secure, and appropriate foster care placements; fails to provide and implement permanency plans; fails to provide foster children

with necessary services; and fails to regularly evaluate foster children's physical and mental well-being.

b.  Defendants' actions and inactions constitute a policy, pattern, practice, or custom of deliberate indifference to the substantial and unreasonable risk of physical, psychological, and emotional harm to children in DCS custody.

c.  Defendants' practices are so deficient collectively that they re-inflict injury on the abused and/or neglected Plaintiffs and amount to the deprivation of Plaintiffs' rights while in government custody, including the right to be free from the infliction of unnecessary pain, the right to conditions and duration of foster care reasonably related to the purpose of government custody, the right to a permanent home and family, the right to treatment and care consistent with the purpose and assumptions of government custody, and the right to services necessary to prevent unreasonable and unnecessary intrusions into their emotional well-being. Defendants' deprivation of Plaintiffs' rights while in government custody has given rise to an actual, existing controversy between the parties.

273.    Plaintiffs have a real stake in the outcome of this case, as their physical and mental health has been harmed, and remains at substantial and unreasonable risk of being further harmed, as a result of Defendants' actions and inactions.

274.    Defendants retain the practical power to adversely affect Plaintiffs, as they are ultimately or directly responsible for, and have ultimate or direct control over, whether DCS provides constitutionally adequate services to the Plaintiffs herein and the putative classes of foster children they seek to represent.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – Substantive Due Process
### (Against All Defendants)

275. Each of the foregoing paragraphs is hereby repeated and incorporated by reference as if fully set forth herein.

276. A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to provide reasonable care to and protect from harm a child it has taken into its foster care custody.

277. The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, or custom that is inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to Plaintiffs' constitutionally protected liberty, property, and privacy interests. As a result, Plaintiffs are presently suffering an ongoing constitutional deprivation of their substantive due process rights under the Fourteenth Amendment to the United States Constitution so long as they remain in state custody subject to statewide policies and practices that expose all foster children to a substantial risk of physical, psychological, mental, and emotional harm.

278. These substantive due process rights include, but are not limited to:

    a.    the right to freedom from maltreatment while in foster care;

    b.    the right to protection from unnecessary intrusions into the child's emotional and psychological well-being while in government custody;

    c.    the right to services necessary to prevent unreasonable and unnecessary intrusions into the child's emotional and psychological well-being while in government custody;

69

<ol type="d" start="4">
<li>the right to conditions and duration of foster care reasonably related to the purpose of government custody;</li>
<li>the right to treatment and care consistent with the purpose and assumptions of government custody;</li>
<li>the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody; and</li>
<li>the right to receive a minimally adequate education.</li>
</ol>

279. Plaintiffs have no adequate remedy at law and therefore are entitled to injunctive relief.

**SECOND CAUSE OF ACTION**

**42 U.S.C. § 1983 – Right to Familial Association**
**(Against All Defendants)**

280. Each of the foregoing paragraphs is hereby repeated and incorporated by reference as if fully set forth herein.

281. The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, or custom that is inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to Plaintiffs' constitutionally protected liberty and privacy interests. Defendants' policies and practices amount to an ongoing intrusion into foster children's fundamental rights to a permanent home and familial association o derived from the First Amendment right of association, the Ninth Amendment reservation of rights to the people, and the Fourteenth Amendment substantive due process protections.

282. Plaintiffs have no adequate remedy at law and therefore are entitled to injunctive relief.

70

**THIRD CAUSE OF ACTION**

**The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.***
**(Against All Defendants)**

283.     Each of the foregoing paragraphs is hereby repeated and incorporated by reference as if fully set forth herein.

284.     The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, or custom of depriving Plaintiffs of their rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, to:

a.     placement in a foster placement that conforms to nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

b.     a written case plan that includes a plan to provide safe, appropriate and stable foster care placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

c.     a written case plan that ensures that the child receives safe and proper care while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

d.     a written case plan that ensures provision of services to parents, children and foster parents to facilitate reunification, or where that is not possible, the permanent placement of the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

e.     a written case plan, where appropriate, that ensures the location of an adoptive or other permanent home for the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(E);

71

f.     a written case plan that ensures the educational stability of the child while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

g.     a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

h.     a case review system in which the status of the child is reviewed no less frequently than every six months by a court, or person responsible for case management, for purposes of determining the safety of the child, continuing necessity and appropriateness of the placement, extent of compliance with the permanency plan and projected date of permanency, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C); and

i.     receive quality services to protect each child's safety and health, 42 U.S.C. § 671(a)(22).

285.     Plaintiffs have no adequate remedy at law and therefore are entitled to injunctive relief.

## **FOURTH CAUSE OF ACTION**

### **Americans with Disabilities Act and Rehabilitation Act**
### **(Asserted by the ADA Subclass Against Defendants)**

286.     Each of the foregoing paragraphs is hereby repeated and incorporated by reference as if fully set forth herein.

287.     Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12132, and its enabling regulations, 28 C.F.R. 35.101 *et seq*., prohibit discrimination against individuals with disabilities.

288. ADA Subclass Plaintiffs have behavioral, developmental and psychiatric disabilities, which qualify them as individuals with disabilities within the meaning of the ADA, 42 U.S.C. § 12132(2), and "otherwise qualified individuals with a disability" under the Rehabilitation Act, 29 U.S.C. § 794; 29 U.S.C. § 705(20). They meet the essential eligibility requirements for the receipt of foster care services provided by DCS.

289. Defendants are public entities, or public officials of a public entity, subject to the provisions of the ADA, 42 U.S.C. § 12132(1)(A). Such entities also receive federal financial assistance and are thus subject to the requirements of the Rehabilitation Act. 29 U.S.C. § 794(b); 34 C.F.R. 104.51.

290. Title II of the ADA prohibits a public entity from excluding a person with a disability from participating in, or denying the benefits of, the goods, services, programs and activities of the entity or otherwise discriminating against a person on the basis of his or her disability.

291. Likewise, the Rehabilitation Act and its enabling regulations prohibit discrimination in the provision of services by any entity receiving federal funding. 34 C.F.R. 104.4(b)(1)(ii), (b)(2); 34 C.F.R. 104.52(a)(2).

292. Under the regulations enforcing the ADA, the state may not "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others . . . ." 28 C.F.R. § 35.130(b)(1)(iii).

293. Accordingly, DCS must provide children with disabilities an equal opportunity to access foster care services and educational services, in the least restrictive appropriate setting, as it provides children without disabilities in its custody.

294. Moreover, Defendants have an affirmative duty to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

295. As set forth above, the regulatory hallmark and guiding force of disability law is the provision of services, including the child's placement in the most integrated environment appropriate to the youth's needs. 28 C.F.R. § 35.130(d); 34 C.F.R. § 104.4(b)(2); *see also Olmstead v. L.C.*, 527 U.S. 581, 602 (1999).

296. As a direct and proximate result of Defendants' violations of Title II of the ADA and the Rehabilitation Act, Plaintiffs have been or are at risk of being placed in overly restrictive settings, being deprived of education, and being subjected to unnecessary trauma because of their disabilities, as set forth above, and will continue to suffer injury until Defendants are required to, and have, come into compliance with the requirements of the ADA and Rehabilitation Act.

## FIFTH CAUSE OF ACTION

**The Medicaid Act, 42 U.S.C. § 1396 *et seq.***
**(Against all Defendants)**

297. Each of the foregoing paragraphs is hereby repeated and incorporated by reference as if fully set forth herein.

298. The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, or custom of depriving Plaintiffs of their rights under the Medicaid Act, as amended by the Social Security Amendments of 1967, to:

    a.    Medical assistance, 42 U.S.C. §§ 1396a(a)(10), 1396d(a);

    b.    Medical assistance with reasonable promptness, 42 U.S.C. § 1396a(a)(8);

74

c.     Timely early and periodic screening, diagnostic, and treatment services, 42 U.S.C. § 1396d(r);

d.     Early and periodic screening, diagnostic, and treatment services provided by or arranged for by Defendants, 42 U.S.C. § 1396a(a)(43)(B);

e.     Corrective treatment arranged by Defendants, 42 U.S.C. § 1396a(a)(43)(C); and

f.     Necessary healthcare, diagnostic services, treatment, and other measures to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, 42 U.S.C. § 1396d(r)(5).

## **PRAYER FOR RELIEF**

WHEREFORE, the Named Plaintiffs, on behalf of the putative Class and Subclass they represent, respectfully request that this Honorable Court exercise its legal and equitable powers and award Class-wide relief as follows:

I.     Order that this action be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

II.     Permanently enjoin Defendants from subjecting Plaintiffs to practices that violate their rights, including by:

a.     Requiring Defendants to provide all children who enter foster care placement with an adequate and individualized written case plan within 60 days of entering care:

    i.     describing a plan for reunification with the child's parents, for adoption, or for another permanent, family-like setting;

75

ii. describing any interim placements appropriate for the child while the child moves toward a permanent home-like setting;

iii. describing the steps needed to keep the child safe during the child's time in Defendants' custody; and

iv. describing applicable treatments, services, and/or supports to address the child's identified needs;

b. Requiring Defendants to take all necessary steps to ensure the terms of a child's case plan are implemented on a timely basis;

c. Requiring that Defendants ensure all children who enter foster care placement receive necessary services by:

i. within 30 days of the child entering DCS care, conducting a comprehensive evaluation of the child's needs that is performed by a qualified individual and includes whether the child has any physical and/or mental disabilities sufficient to be categorized as a child with disabilities under the ADA;

ii. requiring that Defendants ensure all children whose case plan identifies a need for services and/or treatment timely receive those services and/or treatments;

iii. requiring that Defendants ensure an adequate array of community-based therapeutic services are available to children with disabilities; and

iv. conducting reevaluations as the child's circumstances change;

d. Requiring Defendants to competently and regularly evaluate foster children's physical and mental well-being by:

76

i. requiring Defendants to recruit and retain enough qualified and appropriately trained workers providing direct supervision and planning for children in accordance with reasonable professional standards as set by the Council on Accreditation and/or Child Welfare League of America;

ii. requiring Defendants to enforce caseload standards in accordance with reasonable professional standards;

iii. conducting a workload analysis by an organization approved by Plaintiffs and Defendants; to determine manageable caseloads, and implementing the recommendations of that analysis;

iv. conducting a needs assessment by an organization approved by Plaintiffs and Defendants to determine additional resource needs for services to reach a constitutional minimum for services for Tennessee foster children and implement the recommendations of that assessment;

v. requiring Defendants to develop accurate, up-to-date systems and processes for tracking children's medical and dental screenings; and

vi. requiring DCS to establish and enforce mandatory performance metrics that comport with federal standards;

e. Requiring Defendants to provide children in their custody with foster care placements that are safe, appropriate, and in the least restrictive environment that best suits their individual needs, including:

i. ensuring children are not placed in offices or any hotels or facilities not licensed to provide for the placement of children;

77

ii. prioritizing keeping sibling groups together and keeping children geographically close to their home communities;

iii. eliminating the practice of placing children in multiple short-term placements;

iv. protecting children from harm by visiting at least monthly in the child's placement, and adequately vetting prospective foster homes;

v. eliminating the practice of sending children to out-of-state institutions, except under extraordinary circumstances;

vi. thoroughly investigating complaints of maltreatment in care in both foster homes and congregate care or institutional facilities;

vii. eliminating the practice of allowing foster children to be shackled while in placement;

viii. providing treatment and services consistent with reasonable professional standards;

ix. recruiting, training, supporting an array of appropriate foster placements that meet the particular behavioral, cultural, and mental health needs of children;

x. restricting Defendants from placing any child in a congregate care setting based on the unavailability of foster home resources;

xi. requiring that Defendants ensure that all children with physical, mental, intellectual, or cognitive disabilities receive foster care services in the most integrated setting appropriate to the child's needs, including, in as many

instances as is required by reasonable professional standards, family foster homes with supportive services; and

xii. requiring that Defendants conduct annual case record reviews of a statistically significant sample of children in Defendants' custody to measure how likely children in Defendants' custody are to receive timely permanence, as required by state and federal law; how often they are maltreated in care; and how well placement stability is maintained for these children; and

xiii. ensuring that children receive timely permanence, placement stability and a rate of maltreatment in care that is within national standards.

III. Pursuant to 28 U.S.C. § 2201, declare that:

a. Defendants' practices amount to an absence of professional judgment and deliberate indifference to the substantial and unreasonable risk of physical, psychological, mental, and emotional harm to Plaintiffs while in DCS custody and accordingly violate Plaintiffs' right to be free from harm under the Fourteenth Amendment to the U.S. Constitution;

b. Defendants' practices violate the Fourteenth Amendment's substantive due process protections;

c. Defendants' practices violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 *et seq.*;

79

d. Defendants' practices violate Plaintiffs' rights under Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794; and

e. Defendants' practices violate Plaintiffs' rights under the Medicaid Act, 42 U.S.C. § 1396 et *seq.*

IV. Award Plaintiffs the reasonable costs and expenses incurred to litigate this action, including reasonable attorneys' fees, under 28 U.S.C. § 1920, 42 U.S.C. § 1988, and the Federal Rules of Civil Procedure 23(e) and (h).

V. Grant such other equitable relief as the Court deems just, necessary, and proper to protect Plaintiffs from further harm while in foster care in the care and custody of DCS.

DATED: 12, November 2025

Respectfully submitted,

*/s/Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice* filed)
mlowry@abetterchildhood.org
Robyn Goldberg (*pro hac vice* forthcoming)
rgoldberg@abetterchildhood.org
Anastasia Benedetto (*pro hac vice* filed)
abenedetto@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone: (646) 795-4456
Facsimile: (212) 692-0415

Margaret M. Zwisler (*pro hac vice* filed)
m.zwisler@mcdowellsocialjusticecenter.org
William O'Reilly (*pro hac vice* filed)
w.oreilly@mcdowellsocialjusticecenter.org
Julie R. Gorla (*pro hac vice* filed)
j.gorla@mcdowellsocialjusticecenter.org
**THE BARBARA MCDOWELL SOCIAL**

**JUSTICE CENTER**
3607 Whispering Lane
Falls Church, VA 22041
Telephone: (513) 319-9609

Wesley R. Powell (*pro hac vice* filed)
wpowell@willkie.com
Justin Garbacz (*pro hac vice* filed)
jgarbacz@willkie.com
Amanda M. Payne (*pro hac vice* filed)
apayne@willkie.com
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

Eric Hecker (*pro hac vice* forthcoming)
ehecker@wanghecker.com
**WANG HECKER LLP**
305 Broadway, Suite 607
New York, New York 10007
Telephone: (212) 620-2600

*/s/ Sarah B. Miller*
Sarah B. Miller (TN Bar # 033441)
Miranda MacNaughton (TN Bar # 042592)
**BASS BERRY & SIMS PLC**
21 Platform Way South, Suite 3500
Nashville, TN 37203
Telephone (615) 742-6200
Facsimile (615) 742-6293
smiller@bassberry.com
miranda.macnaughton@bassberry.com
Phone: (615) 742-7800

*Attorneys for Plaintiffs*

81