## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

Keira M., minor, by next friend STACIE ODENEAL, *et al.*,

      Plaintiffs,

v.

MARGIE QUIN, Commissioner, Tennessee Department of Children's Services, *et al.*,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:25-cv-00566
Judge Aleta A. Trauger

## MEMORANDUM

Nineteen named plaintiffs, all currently or formerly foster children in the custody of the Tennessee Department of Children's Services ("DCS"), have filed a class action lawsuit on behalf of themselves and others similarly situated, naming as defendants the state officials responsible for administering DCS and Tennessee's foster care system: Margie Quin, in her official capacity as the DCS Commissioner; Carla Aaron, in her official capacity as Deputy Commissioner of Child Safety for DCS; and Karen Jointer Bryant, in her official capacity as Deputy Commissioner of Child Programs for DCS (referred to herein as "defendants" or, collectively, "DCS"). (Second Am. Compl. ("SAC"), Doc. No. 55 ¶¶ 165–67.) The plaintiffs assert that DCS has engaged in "widespread and systemic violations" of the rights of foster children in DCS custody. (*Id.* at 42.) They bring claims for relief under 42 U.S.C. § 1983, based on alleged violations of their substantive due process rights and right to familial association under the Fourteenth Amendment of the U.S. Constitution, and based on alleged deprivations of their rights under the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.*, and the Medicaid Act, 42

U.S.C. § 1396 *et seq.*; and claims under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, based on alleged discrimination against a subclass of foster children with disabilities.

Now before the court is the defendants' Motion to Dismiss. (Doc. No. 36.) Although the motion was originally aimed at the plaintiffs' First Amended Complaint, the plaintiffs were permitted to amend or correct their pleading after the filing of the Motion to Dismiss, and the parties then stipulated that the briefing on the Motion to Dismiss applies equally to the SAC. Accordingly, the court construes the Motion to Dismiss as targeting the SAC as the operative pleading. For the reasons set forth herein, the motion will be granted in part and denied in part.

## I. BACKGROUND

### A. Factual Allegations

The Tennessee foster care system operated under a series of federally supervised settlement agreements reached in the case of *Brian A. v. Haslam*,[1] from 2001 until that case was finally dismissed in 2019. *See* Order Dismissing Case with Prejudice and Terminating Jurisdiction, *Brian A. v. Haslam*, No. 3:00-cv-00445 (M.D. Tenn. Feb. 25, 2019), ECF No. 601 (Crenshaw, C.J.).

According to the plaintiffs, while tremendous progress was made under *Brian A.*, DCS began backsliding almost immediately after the court's oversight terminated. (SAC ¶ 7.) Now, the plaintiffs allege that the Tennessee foster care system is once again "failing the children it is designed to protect." (*Id.* ¶ 1.) Of particular concern is DCS's alleged practice of housing children "temporarily" for months at a time in office spaces and other areas lacking such basic necessities as adequate food, bedding, soap, and potable water. (*Id.*) In addition, the plaintiffs allege that

---

[1] The case was filed initially against Donald Sundquist in his official capacity as the Governor of Tennessee at the time. Governor Phil Bredesen was eventually substituted for Sundquist, and Governor Bill Haslam later substituted for Bredesen.

children receive long-term placement with foster homes that have not been properly vetted and, alternatively, are placed in facilities with documented abuse problems. (*Id.*) The plaintiffs point to staffing shortages and poor training that have result in "crushing caseloads" for DCS caseworkers. (*Id.* ¶ 2.) The plaintiffs assert that these practices violate their federal statutory and constitutional rights, placing them at continued risk of serious harm resulting from the defendants' actions and inactions, and they seek to maintain this case as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

The defendants are the Commissioner of DCS, Deputy Commissioner of Child Safety for DCS, and the Deputy Commissioner of Child Programs for DCS, each named in her official capacity only. (*Id.* ¶¶ 165–67.) Collectively, these defendants are responsible for, and have direct control over, DCS's provision of constitutionally and statutorily adequate services for children in foster care. (*Id.*) According to the plaintiffs, DCS has consistently failed to uphold its duty to protect the children in its care from abuse, mistreatment, and neglect; to provide adequate preventative, rehabilitative, and educational services; to pursue appropriate and effective behavioral and mental health treatment; to ensure that foster children's healthcare needs are met; and generally to keep these children safe. (*See* ¶ 168 (citing Tenn. Code Ann. § 37-5-102).) Instead, the foster care and child protective services systems are "plagued by systemic failures" that "cause foster children physical and psychological harm, leave them without stability in their home life and community, and deprive them of necessary treatment and services," as "DCS leaves children to languish in their deeply flawed foster system for years without a clear path to a permanent home." (*Id.*)

In support of their allegations, the plaintiffs point to a 2022 Audit Report[2] of DCS by the Tennessee Comptroller of the Treasury that documents DCS's "struggl[es] to provide support services to Tennessee's most vulnerable children and youth." (*Id.* at 169.)[3] According to the plaintiffs, the 2022 Audit Report revealed a "consistent pattern of DCS's failure[s]" and "calls for reform," and it noted in particular that DCS has failed to correct the "severe and pervasive problems" identified in previous Audit Reports in 2016 and 2019.[4] (*Id.* ¶ 170.) The four major, recurring issues identified by the Comptroller in the 2022 Audit Report are (1) case manager turnover and staffing shortages, which "have worsened over time," have led to "unmanageable caseloads," and have significantly hindered DCS's ability to protect children in state custody; (2) a shortage of long-term, family-like placement options leading to an "over-reliance on institutional care," "with DCS housing children in state office buildings and sending them out of state due to a severe shortage of foster homes and therapeutic placements"; (3) inadequate response to child safety and abuse allegations, thus endangering children by leaving them in unsafe environments; and (4) "persistent failures in case management and data tracking" due to reliance on a woefully outdated case management system. (*Id.* ¶¶ 171–75.)

The SAC alleges that these failures, among others, mean that DCS does not adequately ensure safety in placements; does not maintain an adequate number of foster homes; relies too heavily on "unsuitable and temporary settings"—including overnight placements in office

---

[2] With their more recently filed Motion for Preliminary Injunction, the plaintiffs filed as an exhibit the December 2025 Performance Audit Report of DCS by the Comptroller. (Doc. No. 68-1.)

[3] The plaintiffs purport to quote the 2022 Audit Report, but they did not attach a copy of it to their pleading and do not provide pin cites for the purportedly quoted portions. The court, therefore, quotes from the SAC, omitting internal quotation marks.

[4] The court observes that DCS was still, theoretically at least, under federal court oversight when the 2016 and 2019 Audit Reports were issued.

buildings, hotels, assessment centers, and even DCS offices—that are not adequately supplied with food, toiletries, and other necessities and do not provide minimally adequate schooling; leaves children in "assessment centers" for much longer than the maximum allowed length of 30 days, where children are subjected to "draconian conditions" similar to those of adult prisons, with inadequate supervision and support; does not move promptly toward achieving permanent placements through adoption or guardianship; and does not provide adequate education or medical or mental health care. (*Id.* ¶¶ 195, 200.)

The SAC also relates facts pertaining to the specific situations of the nineteen named plaintiffs (all of whom appear in this action through a guardian ad litem ("GAL") or a Court Appointed Special Advocate ("CASA")). Each child's story is unique and uniquely heartbreaking, while bearing at the same time many similarities to those of other children in the foster care system.

<u>Keira M.</u>

Plaintiff Keira M., who was 11 years old when the original Complaint was filed, has been in DCS custody since August 2024. (SAC ¶ 31.) She was adopted out of DCS custody approximately five years ago. Then, in August 2024, she was hospitalized, and the hospital "warned that returning her to adoptive home would pose an imminent risk to her and the other children." (*Id.* ¶ 34.) As a result, her adoptive family did not allow her to return home, and DCS took custody of her. In doing so, it allegedly failed to follow its own Family Crisis Intervention Program guidelines or to offer stabilization services to "preserve the adoptive placement." (*Id.*) Keira was placed in a "transitional" facility for several months, during which she did not receive necessary mental health therapy or related services, despite documented need, and DCS did not complete timely assessments or initiate appropriate services. (*Id.* ¶ 35.) In November 2024, she was institutionalized at a "Level 4 (the most restrictive)" facility, although DCS has never provided

her GAL documentation to explain why this setting is necessary and appropriate or to show that less restrictive alternatives were considered. (*Id.* ¶ 36.) Although a prospective foster family willing to assume her care has been identified and has completed all the licensing requirements, DCS has delayed approval and, more generally, has "ignored credible warnings about the harm of [the institutional] placement and failed to pursue a less restrictive, supportive home that is available and ready. As a result, Keira remains without proper mental health treatment, without a path to permanency, and without the stability that would allow her to heal and thrive." (*Id.* ¶ 41.)

Darnell H.

Plaintiff Darnell H. (age 15 when this case was filed), has been in DCS custody since April 2018, during which time DCS has "subjected [him] to unnecessary and prolonged institutionalization, deprived him of educational and therapeutic services, and failed to . . . secure him a safe, stable, and supportive home," despite opportunities for same. (*Id.* ¶ 42.) He has been in at least fifteen placements in seven years, most of them institutional; the repeated institutionalization has harmed Darnell by "retraumatizing him and exacerbating his mental health conditions." (*Id.* ¶ 45.) In addition, although an assessment conducted in 2020 identified a Level 2 therapeutic foster placement as most appropriate for him, he has mostly been housed in more restrictive Level 3 and 4 residential facilities. (*Id.* ¶ 47.) He has not received adequate educational support while in DCS custody, despite testing showing that he was performing at the second-grade level when he was thirteen years old. When he was placed in his first foster home in 2019 with two of his younger siblings, the placement failed because DCS did not adequately train or prepare the foster mother for Darnell's specific educational and mental health needs, despite his GAL's repeated requests for additional educational testing and support. (*Id.* ¶ 50.) Another home placement in 2023 failed due to DCS's failure to provide the necessary information and support

regarding Darnell's behavioral and academic needs. (*Id.* ¶ 54.) His former GAL is willing to foster and possibly adopt Darnell and has completed all the necessary training, but DCS has not taken steps to facilitate that possibility. (*Id.* ¶¶ 53, 62–63.) Instead, Darnell has continued to "bounce[]" around between institutional placements, despite the documented harm such placements cause him.

The residential facility where he has lived since May 2024 has failed to provide him consistent access to hygiene products or adequate clothing. (*Id.* ¶ 56.) In February 2025, he reported feeling unsafe at the facility, but DCS has not investigated this report and has kept him there, stating that it has nowhere else to place him. And, although Darnell has been assessed as ready to move to a step down in care, he remains in a Level 3 facility. (*Id.* ¶ 58–60.) The plaintiffs allege that, as a direct result of DCS's actions and failures to act, Darnell has suffered and continues to suffer profound harm through continued institutionalization and DCS's failure to act on his pleas for safety and its obstruction of a placement with a qualified and dedicated caregiver, among other things. (*Id.* ¶ 66.)

Jasmine G.

Jasmine G. (age 15) has been in DCS custody since age 12. Despite being severely traumatized as a result of having been "trafficked by her biological mother," she was placed in a foster home with her sister but without the treatment necessary to address her trauma. In September 2023, due to a lack of appropriate in-state placements, Jasmine was sent to an out-of-state residential facility, where she has remained for over eighteen months, despite the facility's having requested her removal, citing its inability to meet her treatment needs. (*Id.* ¶¶ 69–70.) She has been prescribed ineffective and harmful psychiatric medications that have not been adjusted in over eighteen months, has not received consistent visits from her assigned caseworker, and has not been

permitted to attend Child and Family Team meetings ("CFTMs") concerning her future, despite being eligible to do so. (*Id.* ¶¶ 71–72, 76.)

A family willing to adopt Jasmine has been identified, but DCS has failed to take steps to facilitate that transition or to provide mental health treatment for Jasmine that would permit her to develop healthy family relationships. (*Id.* ¶ 77.) As a result of DCS's failures, Jasmine has suffered and continues to suffer physical, mental, and emotional harm caused by being "warehoused" in an inappropriate institutional setting without the necessary services and support. (*Id.* ¶ 78.)

<u>Amara G. and Zane G.</u>

Amara G. (age 9) and Zane G. (age 8) are siblings who have been in DCS custody since 2017, when they were respectively ages 2 and 1, due to neglect by their biological mother and physical abuse by a third party. (*Id.* ¶¶ 79, 81.) They have cycled through several foster placements, in one of which they suffered abuse; Amara was also sexually abused at daycare. (*Id.* ¶ 82.) Both children have exhibited mental health symptoms, physical aggression, and defiant conduct. They have not consistently received necessary mental health treatment and have now been separated, due to Zane's need for a higher level of care. Amara has been returned to their original foster parent, who refuses to take Zane. Zane, for a substantial period of time, had no long-term placement, instead cycling through "night-to-night foster arrangements" while spending days in a "temporary holding facility that grouped children of different ages together." (*Id.* ¶ 85.) The siblings have remained separated; Zane has not received a long-term placement or appropriate mental health treatment, despite a "standing court order [that] requires DCS to demonstrate ongoing efforts to find Zane a suitable placement." (*Id.* ¶ 91.) The plaintiffs allege that DCS's failures have "deepened [Amara's and Zane's] trauma, left their needs unmet, and denied them the security and stability that foster care is meant to provide." (*Id.* ¶ 92.)

Aaron C., Arielle H., Ava C., Andrew C., and Adrian H.

These five children (the "C/H siblings"), ranging in age from 9 to 1, are siblings who entered DCS custody in December 2022. (*Id.* ¶ 93.) According to a Declaration submitted by the defendants in support of their Motion to Dismiss, these children were formally adopted on July 9, 2025, by decree entered in the Chancery Court for Dickson County, Tennessee, and are no longer in DCS custody. (Doc. No. 36-9, Coleman Decl. ¶ 4.) However, prior to their adoption, DCS failed to adequately provide and pay for necessary medical care for these children, causing "significant disruptions to their necessary care" and delayed diagnoses. (SAC ¶ 100.) DCS failed to arrange for mental health therapy, despite extensive trauma and a documented need for such services. More generally, DCS failed to provide essential documentation, case planning, health care, and services, causing the C/H siblings to suffer significant and ongoing physical, mental, and developmental harm. (*Id.* ¶ 106.)

Zander M.

Zander M. (age 15) has been in DCS custody since February 2015 and has been subjected to "unnecessary physical, mental, and emotional harm" through repeated "unsafe and temporary placements where he has been inappropriately restrained." (SAC ¶ 107.) Specifically, he was placed for two months in 2025 at an assessment center that was "enclosed with razor-wire," where he was "physically manhandled" twice for "walking towards a door which led to the razor-wire-enclosed yard," which traumatized Zander. (*Id.* ¶ 110; *see id.* ¶¶ 111–12.) DCS did not respond to Zander's attorney's requests for incident reports or to grievances filed by Zander relating to these incidents. While Zander was at this facility, his medical, mental health, and educational needs were not met, and DCS failed to respond to his "daily grievances" regarding the unacceptable conditions and treatment. And, while DCS pursued "an inappropriate and harmful institutional placement"

for Zander, it ignored a "viable and appropriate foster home placement" opportunity for months. (*Id.* ¶ 117.) Although Zander has now been placed with a family friend, DCS has "failed to implement any of the recommendations in Zander's permanency plan," as a result of which Zander is not getting the services he needs and still does not "know where he will ultimately live." (*Id.* ¶ 118.) DCS's failures have left Zander "vulnerable, retraumatized, and without the support he needs to recover and succeed." (*Id.*)

Dewayne W.

Dewayne W. (age 15) has been in DCS custody since April 2022, coming into care through a Neglect and Dependency Petition. (*Id.* ¶ 119.) He had twelve placements in three years, including several at temporary placement centers where he was traumatized by unsafe living conditions and denied access to an appropriate education. (*Id.*) Although DCS policies require working toward reunifying children with biological parents where appropriate, DCS failed to provide Dewayne's mother the services and support needed for possible reunification for two years and instead shuffled Dewayne from inappropriate placement to inappropriate placement, "without setting up meaningful visitation" with his family. (*Id.* ¶ 121.) He spent "months" at "Resource Linkage," which "used to be the Tennessee Preparatory School Campus"—a facility shut down under *Brian A.* due in part to environmental concerns—where he experienced "large holes in the wall, no curtains, an air mattress as his bed, minimal linens, no door, dirty floors, graffiti and other marks on the walls, no furniture (his belongings were in garbage bags), and minimal supervision," as well as no schooling. (*Id.* ¶¶ 124, 125.)

The plaintiffs allege that DCS has repeatedly placed Dewayne in "unsafe, unsanitary and unhealthy placements, continually retraumatizing him with unnecessarily harsh placements, and allowed him to languish in foster care for years" instead of moving him toward reunification with

his family. (*Id.* ¶ 129.) It has also failed to provide him with necessary mental health and educational services. (*Id.*) Although Dewayne has been returned to his mother's care for a "90-day trial home visit," his path toward returning him to his mother's custody "remains obstructed by DCS's administrative errors, failure to provide timely services, and indifference to his well-being." (*Id.*)

<u>Max W.</u>

Max W. (age 16) has been in DCS custody since April 2024, prior to which he had been living on the streets. Since being taken into DCS custody, he has repeatedly been subjected to unstable, inappropriate placements and deprived of educational, therapeutic, and disability-related supports. (*Id.* ¶ 129.) He suffers from intellectual disabilities and depression with suicidal ideation. (*Id.* ¶ 132.) Because of a lack of foster homes that would suit his needs, he was placed at Resource Linkage, a transitional placement, for two months before being sent to a residential facility. The residential facility where he landed had no teachers and provided no alternative education for some period of time during the summer of 2024. (*Id.* ¶¶ 134–35.) Despite DCS's determination that Max needed to be placed in a "therapeutic" home with no other children, he was placed in a non-therapeutic foster home with caregivers who lacked the necessary training to support a child with Max's needs, and another child was placed in the same home while he was there. Max's placement only lasted three months because the foster parents were "unprepared and overwhelmed." (*Id.* ¶¶ 137–38.) Max was then placed in a Disability and Intellectual Disability Support residential facility, where the staff continually called the police on him over trivial, non-criminal misbehavior. (*Id.* ¶¶ 139–40.) When he was finally moved from this facility, which had caused him further trauma, he was placed at a Level 2 facility, despite being assessed as needing a Level 3 facility. (*Id.* ¶ 144.) The plaintiffs allege that DCS has "knowingly deprived Max of his right to safety and

proper medical treatment while in its care" and that Max has suffered and continues to suffer physical, emotional and psychological harm. (*Id.* ¶ 145.)

Thomas H.

The rights of the parents of Thomas H. (age 13) were terminated in April 2022, and Thomas has been in DCS custody for five years, during which he has been in multiple placements. (*Id.* ¶ 146.) He has significant mental health issues, which DCS has not adequately addressed; it has failed to provide an effective safety plan or to place him in a facility where he can receive consistent care and attention to his mental health needs, and he has gone for lengthy periods with no schooling. His records contain numerous inaccuracies that DCS has never attempted to rectify. He remains placed in a home where he alleges he has suffered abuse, and DCS has not adequately investigated his abuse allegations. (*Id.* ¶ 155.) DCS's failure to adequately treat Thomas's mental health issues has caused significant harm that is "compounded" by its failure to provide him safe housing or educational opportunities, or to act on his abuse allegations. (*Id.* ¶ 157.)

Jonah W., Sarah W., Adam D., Alice W., and Gavin W.

Siblings Jonah W. (age 10), Sarah W. (age 9), Adam D. (age 8), Alice W. (age 6), and Gavin W. (age 4) have been in DCS custody since April 2022. (*Id.* ¶ 158.) For the first five months after removal from their parents, they cycled through an "unknown number[] of temporary placements"—the exact number unknown because DCS does not track temporary placements. (*Id.* ¶ 160.) Their GAL did not even know where they were until December 2022. (*Id.*) All five children are traumatized due to the neglect experienced in their biological home, but they have not received the necessary "individualized trauma-informed therapy," and the two youngest have received no mental health therapy of any kind, "because DCS lacks play therapy services." (*Id.* ¶ 161.) Further, despite their severe trauma and mental health diagnoses, their DCS caseworker has not

recommended ongoing therapy for any of the children. (*Id.*) A family court has issued at least two orders finding that DCS has made no "reasonable efforts" toward achieving permanency and stability for the children. (*Id.* ¶ 162.) They have had at least six caseworkers in 29 months and remain in limbo, "traumatized, underserved, and without the stability every child deserves." (*Id.* ¶ 164.)

### B. Legal Claims and Demands for Relief

Based on these allegations, the plaintiffs bring a claim under 42 U.S.C. § 1983, asserting that the defendants' actions and inactions amount to a deliberate indifference to the plaintiffs' substantive due process rights protected by the Fourteenth Amendment.

Second, the plaintiffs bring a claim under 42 U.S.C. § 1983, asserting that the defendants' actions and inactions amount to deliberate indifference and "ongoing intrusion" into the plaintiffs' "fundamental rights to a permanent home and familial association," rights the plaintiffs claim are derived from the First, Ninth, and Fourteenth Amendments to the U.S. Constitution. (*Id.* ¶ 281.)

Third, the plaintiffs assert a claim—apparently under § 1983 (though the plaintiffs do not make this clear)—based on violations of statutory rights allegedly secured by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997.

Fourth, the plaintiffs allege that a subclass of plaintiffs, including some of the named plaintiffs, have behavioral, developmental, and psychiatric disabilities, which qualify them as individuals with disabilities within the meaning of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"), and that the defendants' actions and inactions have deprived this subclass of plaintiffs of their rights under the ADA and the RA by putting them at "risk of being placed in overly restrictive settings, being deprived of education, and being subjected to unnecessary trauma because of their disabilities." (*Id.* ¶ 296.)

Fifth and finally, the plaintiffs assert a claim (again, implicitly under § 1983) based on the violation of rights purportedly created by the Medicaid Act, as amended by the Social Security Amendments of 1967.

To remedy these alleged violations, the plaintiffs seek a wide-ranging, comprehensive permanent injunction

a. Requiring Defendants to provide all children who enter foster care placement with an adequate and individualized written case plan within 60 days of entering care:

i. describing a plan for reunification with the child's parents, for adoption, or for another permanent, family-like setting;

ii. describing any interim placements appropriate for the child while the child moves toward a permanent home-like setting;

iii. describing the steps needed to keep the child safe during the child's time in Defendants' custody; and

iv. describing applicable treatments, services, and/or supports to address the child's identified needs;

b. Requiring Defendants to take all necessary steps to ensure the terms of a child's case plan are implemented on a timely basis;

c. Requiring that Defendants ensure all children who enter foster care placement receive necessary services by:

i. within 30 days of the child entering DCS care, conducting a comprehensive evaluation of the child's needs that is performed by a qualified individual and includes whether the child has any physical and/or mental disabilities sufficient to be categorized as a child with disabilities under the ADA;

ii. requiring that Defendants ensure all children whose case plan identifies a need for services and/or treatment timely receive those services and/or treatments;

iii. requiring that Defendants ensure an adequate array of community-based therapeutic services are available to children with disabilities; and

iv. conducting reevaluations as the child's circumstances change;

d. Requiring Defendants to competently and regularly evaluate foster children's physical and mental well-being by:

i. requiring Defendants to recruit and retain enough qualified and appropriately trained workers providing direct supervision and planning for children in accordance with reasonable professional standards as set by the Council on Accreditation and/or Child Welfare League of America;

ii. requiring Defendants to enforce caseload standards in accordance with reasonable professional standards;

iii. conducting a workload analysis by an organization approved by Plaintiffs and Defendants; to determine manageable caseloads, and implementing the recommendations of that analysis;

iv. conducting a needs assessment by an organization approved by Plaintiffs and Defendants to determine additional resource needs for services to reach a constitutional minimum for services for Tennessee foster children and implement the recommendations of that assessment;

v. requiring Defendants to develop accurate, up-to-date systems and processes for tracking children's medical and dental screenings; and

vi. requiring DCS to establish and enforce mandatory performance metrics that comport with federal standards;

e. Requiring Defendants to provide children in their custody with foster care placements that are safe, appropriate, and in the least restrictive environment that best suits their individual needs, including:

i. ensuring children are not placed in offices or any hotels or facilities not licensed to provide for the placement of children;

ii. prioritizing keeping sibling groups together and keeping children geographically close to their home communities;

iii. eliminating the practice of placing children in multiple short-term placements;

iv. protecting children from harm by visiting at least monthly in the child's placement, and adequately vetting prospective foster homes;

v. eliminating the practice of sending children to out-of-state institutions, except under extraordinary circumstances;

vi. thoroughly investigating complaints of maltreatment in care in both foster homes and congregate care or institutional facilities;

vii. eliminating the practice of allowing foster children to be shackled while in placement;

viii. providing treatment and services consistent with reasonable professional standards;

ix. recruiting, training, supporting an array of appropriate foster placements that meet the particular behavioral, cultural, and mental health needs of children;

x. restricting Defendants from placing any child in a congregate care setting based on the unavailability of foster home resources;

xi. requiring that Defendants ensure that all children with physical, mental, intellectual, or cognitive disabilities receive foster care services in the most integrated setting appropriate to the child's needs, including, in as many instances as is required by reasonable professional standards, family foster homes with supportive services; and

xii. requiring that Defendants conduct annual case record reviews of a statistically significant sample of children in Defendants' custody to measure how likely children in Defendants' custody are to receive timely permanence, as required by state and federal law; how often they are maltreated in care; and how well placement stability is maintained for these children; and

xiii. ensuring that children receive timely permanence, placement stability and a rate of maltreatment in care that is within national standards.

(SAC at 75–79.) The plaintiffs also seek judicial declarations under 28 U.S.C. § 2201 to the effect that the defendants' practices "amount to an absence of professional judgment and deliberate indifference to the substantial risk of . . . harm to Plaintiffs while in DCS custody," in violation of the constitutional amendments and statutes on which the plaintiffs' claims are premised.

### C. The Defendants' Motion

The defendants seek dismissal of the SAC in its entirety. Invoking Federal Rule of Civil Procedure 12(b)(1), they raise a number of threshold challenges to the court's ability to hear the case on its merits, including that the court lacks subject matter jurisdiction because the plaintiffs lack standing to bring their claims and because the claims of the five C/H siblings who have been adopted are moot. The defendants also invoke abstention doctrines under *Younger v. Harris*, 401 U.S. 37 (1971), and *O'Shea v. Littleton*, 414 U.S. 488 (1974), asking the court to decline to exercise jurisdiction even if it otherwise exists. Alternatively, the defendants assert that the claims should

be dismissed on their merits, under Rule 12(b)(6), for failure of the SAC to allege facts sufficient to state claims for which relief may be granted.

The defendants' Motion to Dismiss (Doc. No. 36) is supported by a Memorandum of Law (Doc. No. 37) and several exhibits (Doc. Nos. 36-1 through 36-10). The plaintiffs filed a Response in opposition to the motion (Doc. No. 48), and DCS filed a Reply in further support thereof (Doc. No. 57). In addition, the defendant filed two Notices of Supplemental Authority (Doc. Nos. 61, 74), to which the plaintiffs filed Responses (Doc. Nos. 62, 75).

When a defendant moves to dismiss under both 12(b)(1) and (b)(6), the court must "consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if this court lacks subject matter jurisdiction." *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 817 (6th Cir. 2017). Abstention raises an entirely different issue, as it asks the court to decline to exercise jurisdiction that otherwise exists and irrespective of whether the complaint states colorable claims. *See Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 660 (6th Cir. 2002) ("Abstention is 'an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.'" (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)). This issue, too, must be addressed before the merits.

After working its way through all of these threshold issues, the court finds that the plaintiffs have standing, that the claims of adopted plaintiffs are not moot, and that the abstention doctrines do not apply. Addressing the merits, the court finds that the plaintiffs plead colorable claims for violations of their substantive due process rights under § 1983 and disability discrimination under the ADA and the RA, but their claims based on violations of the Adoption Assistance and Child Welfare Act and the Medicaid Act must be dismissed.

## II. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### A. Legal Standard

The defendants assert that this action must be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). (Doc. No. 37 at 17.) "[W]here subject matter jurisdiction is challenged under Rule 12(b)(1), as it was here, the *plaintiff* has the burden of proving jurisdiction in order to survive the motion." *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 817 (6th Cir. 2017) (quoting *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)), *abrogated by Knick v. Twp. of Scott*, 588 U.S. 180 (2019), *as recognized in Freed v. Thomas*, 81 F.4th 655, 658 (6th Cir. 2023).

"A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994)). The distinction matters because, if the defendant makes a facial attack, the court must accept all of the allegations in the complaint as true to determine "whether the plaintiff has alleged a basis for subject matter jurisdiction." *Id.* If the defendant makes a factual attack, the court may consider and weigh evidence, including evidence outside of the pleadings, to determine whether the plaintiff has "carrie[d] the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Ready for the World Inc. v. Riley*, No. 19-10062, 2019 WL 4261137, at *2 (E.D. Mich. Sept. 9, 2019) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)).

Here, although they reference matters outside the pleadings in footnotes, the defendants purport to make a facial attack on standing. (*See* Doc. No. 37 at 18 ("Plaintiffs do not *allege facts* to establish [the standing elements].").) The court, therefore, declines to consider the matters outside the pleadings in addressing the standing argument and will instead rule based on the

allegations in the SAC. With regard to their mootness argument, the defendants make a factual attack, presenting evidence that the five C/H siblings have been adopted since they filed this case. That fact is undisputed for purposes of the Motion to Dismiss, and the court accepts it as true for purposes of ruling on the mootness issue.

## B. Analysis—Standing

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. A case or controversy exists when at least one plaintiff "establish[es] that [she] ha[s] standing to sue." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (alterations in original) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). At its most basic level, the doctrine of standing "requires an individual to have a personal stake in a case's outcome." *Somberg v. McDonald*, 117 F.4th 375, 378 (6th Cir. 2024) (citing *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024)). If no named plaintiff has standing, the court lacks subject-matter jurisdiction to hear the case. *See Williams v. City of Cleveland*, 907 F.3d 924, 934 (6th Cir. 2018) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." (quoting *O'Shea*, 414 U.S. at 495).

To establish Article III standing at the pleading stage on a facial attack, a plaintiff must allege facts plausibly demonstrating that "(1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Block v. Canepa*, 74 F.4th 400, 408 (6th Cir. 2023) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "These constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case." *Welty v. Dunaway*,

749 F. Supp. 3d 882, 901 (M.D. Tenn. 2024). The plaintiff has the burden of demonstrating all three elements "separately for each form of relief sought." *Friends of the Earth*, 528 U.S. at 185.

### 1. The Parties' Arguments

DCS does not address the injury-in-fact or causation arguments, thus effectively conceding—at least for purposes of its Motion to Dismiss—that these elements are established. Instead, DCS maintains that the plaintiffs cannot satisfy redressability—that is, they cannot show that the relief they seek is "likely" to redress any of the named plaintiffs' alleged injuries. DCS contends that the plaintiffs do not seek relief specific to any of the named plaintiffs, as they must do in a Rule 23(b)(2) putative class action, and instead seek *only* class-wide relief in the form of broad policy reforms with only a speculative and tangential relationship to the plaintiffs' alleged injuries.

Thus, for example, the defendants point out that several of the named plaintiffs allege that they are experiencing, or at risk of experiencing, unsafe or inappropriate placements or have suffered maltreatment or abuse (*see, e.g.*, SAC ¶¶ 41, 66, 69, 87, 117, 125; *see also id.* ¶¶ 82, 110–12, 153–55), but the SAC does not demand different placements for these plaintiffs. Instead, it seeks broad program improvements, including that DCS be required to recruit and train additional staff; ensure that the caseworkers have manageable caseloads; recruit and maintain more foster placements; establish and enforce performance metrics; and update its tracking systems. (*See id.* at 77–78.) Additionally the SAC asks the court to require DCS to "provide children in [its] custody with foster care placements that are safe, appropriate, and in the least restrictive environment that best suits their individual needs," by putting into place such measures as monthly visits at each placement; the adequate vetting of prospective foster homes; thorough investigation of allegations of maltreatment; prohibiting placement "in a congregate care setting based on the unavailability of foster home resources"; "recruiting, training, supporting an array of appropriate foster

placements that meet the particular behavioral, cultural, and mental health needs of children"; and "ensuring that children receive timely permanence, placement stability and a rate of maltreatment in care that is within national standards." (SAC at 77–79.)

The defendants assert that, even if all of these measures *were* implemented, they would not necessarily improve the lives of any of the plaintiffs—except arguably Thomas H., who is the only plaintiff who plausibly alleges ongoing injury or a substantial risk of imminent mistreatment. (*See* Doc. No. 37 at 20.) Notably, as DCS points out, none of the plaintiffs alleges that he or she has been, is currently, or is at imminent risk of "shackling," so eliminating the practice of shackling would not affect any of the named plaintiffs.[5]

The defendants also argue that many of these proposals depend on the actions of third parties who are beyond the court's control and that redressability is difficult, if not impossible, to establish when remedying the underlying injury requires actions by third parties who are not defendants whom the court can enjoin. (Doc. No. 37 at 20 (citing *Murthy*, 603 U.S. at 74; *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345 (6th Cir. 2016)).) Specifically, hiring more caseworkers and recruiting more foster families willing to foster—particularly those willing to foster children with special needs—are tasks not entirely within the defendants' control. Likewise, regarding the named plaintiffs' allegations about their lack of access to adequate mental and physical healthcare, the defendants argue that the broad relief sought in the SAC is not reasonably likely to cause any named plaintiff to receive additional healthcare beyond what he or she is currently receiving, because the care is provided by private healthcare providers, and a court order directing DCS to ensure that all children receive the services specified in their case plans or to ensure an "adequate

---

[5] The defendants assert that DCS policy already authorizes "mechanical restraints" only in "limited circumstances." (Doc. No. 37 at 20 (citing DCS Policy 31.19 (rev. Sept. 8, 2023), http://bit.ly/4n9Z8Hd (in the record as Doc. No. 36-7).)

array of community-based therapeutic services" "will not magically produce private providers willing to serve the Named Plaintiffs." (Doc. No. 37 at 22–23.)

Finally, DCS argues that, insofar as the relief requested by the plaintiff would constitute what amounts to an entire overhaul of DCS's foster system, granting the relief the plaintiffs seek would "violate principles of federalism and separation of powers." (Doc. No. 37 at 23 (citing *Jonathan R. v. Morrisey* ("*Jonathan R. IV*"), 768 F. Supp. 3d 756 (S.D.W. Va. 2025), *appeal docketed*, No. 25-1232 (4th Cir. March 12, 2025)).) The defendants point out that the plaintiffs do not "seek to enjoin a particular unlawful action" by the defendants and, instead, seek broad "system reforms to [the defendants'] administration of' the child welfare system" in Tennessee. (*Id.* at 24.)

The plaintiffs respond to this redressability argument by pointing out that, when the causation element is undisputed, "there is a presumption that judicial relief is likely to redress the injury caused by the defendant." (Doc. No. 48 at 17 (citing *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2134 (2025)).) They also assert that DCS's contention that improvements to the foster care system have occurred "[a]s a result of [its] efforts" while *Brian A.* was still pending constitutes a concession that there are reasonable steps the defendants can take to redress the plaintiffs' injuries. (*Id.* (quoting Doc. No. 37 at 16).) Further, they argue that the redressability bar is low—that they only need to demonstrate that judicial relief is *likely* (even if not certain) to make some small difference for Tennessee's foster children. (*Id.* (citing *Diamond*, 145 S. Ct. at 2137).) They insist that the information in their pleading "supports the commonsense conclusion" that hiring more caseworkers to reduce excessive caseloads and improve supervisor-to-supervisee ratios, recruiting more foster families and providing them with better support, moving children into permanent homes, and improving data maintenance and tracking will significantly reduce "the risk of harm to which Plaintiffs are daily exposed." (*Id.* at 18.)

*2.    Discussion*

It is well established that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (first citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); and then citing *Friends of the Earth*, 528 U.S. at 185). "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). As stated above, the plaintiffs must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 181.

A handful of recent decisions in cases involving challenges to failing foster care systems have addressed the issue of standing. For the most part, they have concluded that the plaintiffs have standing to bring broad claims for injunctive relief to address systemic problems. For instance, in *B.K. ex rel. Tinsley v. Snyder*, a class action against the administrators of the Arizona Department of Child Safety, the sole remaining named plaintiff foster child alleged that she had been "deprived of necessary health care, separated from her siblings, deprived of family contact, and placed in inappropriate care environments," that these deprivations violated her rights to due process and to "reasonably prompt early and periodic screening, diagnostic, and treatment services (EPSDT services) under the Medicaid Act," and that "these violations [we]re caused by specified state-wide policies and practices." 922 F.3d 957, 964 (9th Cir. 2019). In an interlocutory appeal of the district court's class certification order, the Ninth Circuit held that the plaintiff had standing for purposes of her due process claim based on the defendants' alleged violation of her right, and

the class's right, to substantive due process by "failing to care adequately for the children in the class." *Id.* at 966. The court stated:

> B.K. has serious medical diagnoses that require prompt and adequate medical care from her custodian, which is the State of Arizona. She has presented evidence that she has not received adequate medical care or appropriate placements in the past as well as evidence that statewide policies and practices expose her to a risk of similar future harms. If state officials failed and continue to fail to provide her "reasonable safety and minimally adequate care and treatment appropriate to [her] age and circumstances" through the deficient statewide policies and practices she alleges, the harm to her will have been caused by those officials. If those allegedly deficient policies and practices are abated by an injunction, that harm may be redressed by a favorable court decision. B.K. therefore has standing to press the due process claims she brings on behalf of the General Class.

*Id.* at 967 (internal citations omitted).[6] *See also B.F. ex rel. Faulk v. López*, No. 1:23-cv-00109-JRR, 2026 WL 696753, at *15–16 (D. Md. Mar. 12, 2026) (in a case challenging state policies regarding the administration of psychotropic drugs to children in foster care, denying motion for dismissal on standing grounds, rejecting the defendants' argument that the requested relief would "improperly interfere with [the state agency's] operation and transform the Court into its overseer," and finding that the court had authority to declare actions unlawful and to award broad injunctive relief "tailored to the specific challenged policies and practices, and the specific constitutional violations alleged"); *accord Gary G. v. Newsom*, No. 5:23-cv-00947-MEMF-BFM, 2024 WL 4354697, at *4 (C.D. Cal. Sept. 30, 2024) (where the plaintiff foster children alleged harm "stemming from inadequate placement and monitoring, inadequate case planning, and inadequate provision of medical services," denying motion to dismiss for lack of standing, finding that these "harms would likely be remedied if [the state agency] had enough caseworkers to adequately place and monitor children, conduct case planning, and ensure provision of medical services" and that

---

[6] The court reached similar conclusions with respect to the plaintiff's standing to bring claims on behalf of two subclasses. *B.K.*, 922 F.3d at 972, 974.

"this [was] sufficient to show standing at the pleadings stage"), *motion to certify appeal denied*, No. 5:23-cv-00947-MEMF-BFM, 2025 WL 3691954 (C.D. Cal. Feb. 12, 2025), *reconsideration denied*, No. 5:23-cv-00947-MEMF-BFM, 2025 WL 1754951 (C.D. Cal. June 24, 2025); *see also Ocean S. v. Los Angeles Cnty.*, No. LA CV23-06921 JAK (Ex), 2024 WL 3973047, at \*11–12(C.D. Cal. June 11, 2024) (denying motion to dismiss for lack of standing in foster care case and rejecting the defendants' federalism arguments, noting that "[m]any cases support the conclusion that it is reasonable to conclude, at the pleading stage, that the proposed injunctive relief is likely to ameliorate the alleged systemic failures that allegedly harm Plaintiffs" (collecting cases)), *permission to appeal granted*, No. 24-7577 (9th Cir. Feb. 28, 2025), *appeal docketed*, No. 25-1354 (9th Cir. Mar. 4, 2025); *Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1089 (D. Alaska 2023) (denying motion to dismiss for lack of standing in foster care case, observing that federalism concerns should be balanced against the federal courts' obligation to "vigilantly enforce federal law," irrespective of whether "compliance with the Constitution may be expensive"), *permission to appeal denied*, No. 23-2726 (9th Cir. Dec. 18, 2023).

One recent opinion, *Jonathan R. IV*, reached a contrary conclusion regarding standing. In that case, the plaintiffs were a class of children in state foster care custody who had originally filed suit in 2019, alleging that the state officials charged with administering the state's foster care program violated their constitutional and statutory rights. *See Jonathan R. IV*, 768 F. Supp. 3d at 759. More specifically, they alleged "lack of foster care placements; an overwhelmed system that leads to inadequate, temporary, and overcrowded foster home placements; an overreliance on institutional care for children; a failure to ensure placement stability; a failure to track foster children; a failure to employ and retain a sufficient number of case workers; a failure to provide and develop services; a failure to engage in permanency planning; and a failure to properly plan

for the children's future." *Jonathan R. v. Justice,* No. 3:19-CV-00710, 2021 WL 3195020, at *2 (S.D.W. Va. July 28, 2021), *aff'd in part, rev'd in part and remanded sub nom. Jonathan R. ex rel. Dixon v. Justice* ("*Jonathan R. II*"), 41 F.4th 316 (4th Cir. 2022). The plaintiffs sought relief in the form of a declaration that the state's actions were unconstitutional, an injunction "craft[ing] policies to reform" the state system, and the appointment of a "Monitor to study and supervise Defendants." *Jonathan R. IV*, 768 F. Supp. 3d at 760.

The court, more than four years into the litigation—after an interlocutory appeal, and after certifying both a general class consisting of all West Virginia foster children who are or will be in state foster care custody and a subclass consisting of all members of the general class with a disability—issued an order *sua sponte* dismissing the case for lack of standing based primarily on federalism concerns. Stating that it is not the job of the judicial branch of government to set policy, legislate, or govern, the court found that the plaintiffs' lawsuit asked the court to "step beyond constitutional limits" and to go so far as to "craft[]policies that would, in effect, place West Virginia's foster care system under indefinite federal control" and "systemically reform DHS to oversee agency hiring, budget allocations, and caseworker caseloads," none of which, the court found, was within its constitutional authority. *Id.* Upon conducting a small survey of recent "foster care cases across the country," the court noted that these other cases had only sporadically or generally addressed standing, typically without reaching redressability. *See id.* at 767.[7] The West

---

[7] The court cited several cases that either did not analyze standing at all or did not address the issue of redressability, even if they addressed other standing factors, including *B.K. ex rel. Tinsley*, 922 F.3d at 966–67; *31 Foster Child. v. Bush*, 329 F.3d 1255, 1263–69 n.6 (11th Cir. 2003); *Bryan C. v. Lambrew*, 340 F.R.D. 501 (D. Maine 2021); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 151–53 (D. Mass 2011); *Sam M. ex rel. Elliott v. Chafee*, 800 F. Supp. 2d 363 (D.R.I. 2011); *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 509 (D. Neb. 2007); *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428, at *3–*5 (D. Nev. May 14, 2007).

Virginia court acknowledged that, in some of the cases referenced above, notably *Gary G.*, *Ocean S.*, and *Jeremiah M.*, the courts were "presented with redressability," but it found that none approached the issue "in the systematic way" that the West Virginia court "believe[d] necessary." *Id.* at 768 & n.8

Notably, the appeal of the dismissal in *Jonathan R. IV* is pending in the Fourth Circuit, while the appeal of the denial of the motion to dismiss on redressability grounds in *Ocean S.* is pending in the Ninth Circuit. The Sixth Circuit has not addressed the precise issue presented here, but it permitted *Brian A.* to proceed on claims similar to those presented here, and it has never held that courts lack jurisdiction to enter broad injunctive relief affecting the operation of state agencies whose policies violate constitutional rights. This court is persuaded that, at this stage in the proceedings, the plaintiffs have adequately established standing.

First, while administering the foster care system may "raise sensitive federalism concerns," it also "goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief." *Horne v. Flores*, 557 U.S. 433, 448, 450 (2009). The plaintiffs here seek systemic relief to remedy systemic flaws that have caused or contributed to the harms they have suffered while in the custody of Tennessee's foster care system. As the Fourth Circuit recognized, "[r]eforming foster care case-by-case would be like patching up holes in a sinking ship by tearing off the floorboards." *Jonathan R. II*, 41 F.4th at 336 (4th Cir. 2022).

Further, "the precise mechanics of the requested injunctive relief are not at issue at this stage." *Ocean S.*, 2024 WL 3973047, at *12. Instead, the plaintiffs only need to show that "it is likely, as opposed to merely speculative, that the[ir] injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 181. Here, the plaintiffs allege concrete injuries stemming from the defendants' alleged failures, including harm stemming from inadequate

placement and monitoring, inadequate case planning, and inadequate provision of medical and mental health services. It is likely, as opposed to merely speculative, that at least some of these harms would be remedied if DCS had enough caseworkers to adequately place and monitor children, conduct case planning, and ensure that children receive necessary services. It is also not necessarily inevitable that the relief the plaintiffs seek would interfere directly with the funding of the foster care system. Some of it, in fact, already appears to be embodied in the law, meaning that the plaintiffs are requesting that the defendants be required to comply with established standards. If the plaintiffs show that DCS is failing to meet applicable constitutional standards, an order to enforce it to meet its obligations would not be inappropriate as a matter of law.

To be sure, the plaintiffs clearly seek some forms of relief for which none of the named plaintiffs has established standing. For example, as noted above, no plaintiff alleges that he or she has been shackled or is facing imminent risk of shackling. However, on the other end of the spectrum, Thomas H. alleges that he has been abused in his current foster care settings, but DCS has not promptly investigated the allegations of abuse and has left him in that placement. (SAC ¶ 155.) Enjoining the defendants to promptly investigate abuse allegations would likely provide Thomas H. immediate relief. Similarly, providing support and training for Dewayne W.'s mother would alleviate the risk of Dewayne W.'s returning to foster care. All of the children allege lack of access to necessary medical and/or mental health treatment, which could be alleviated by implementation of the requested injunctive relief addressing these issues. Moreover, by failing to challenge causation, the defendants have effectively conceded that their *de facto* policies and procedures have caused or contributed to the plaintiffs' harm, which means that changing them would likely effect relief. Because prospective injunctive relief may remedy the plaintiffs' injuries, parallel prospective declaratory relief is also appropriate and available. *Accord Mikel v. Quin*, 58

F.4th 252 (6th Cir. 2023) ("[F]ederal courts may award injunctive and declaratory relief against state officials when the relief is 'designed to end a continuing violation of federal law.'" (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).

The court, at this juncture, finds that the plaintiffs have adequately alleged that at least some of the requested relief will redress some of the plaintiffs' alleged injuries, for purposes of the standing inquiry. The court remains mindful that any relief accorded must be narrowly tailored, but the scope of any injunction can be addressed more appropriately at a later stage of litigation.

### C.      Mootness

The defendants assert that the five C/H siblings have been adopted and are no longer in DCS custody (*see* Doc. No. 36-9, Coleman Decl. ¶ 4); the plaintiffs do not dispute that fact. Because these children are no longer in DCS custody, the defendants argue that their claims have been rendered moot and must be dismissed. The defendants also contend that Dewayne W.'s claims are moot because, as the plaintiffs allege, he has been reunited with his mother. (SAC ¶ 127.) The plaintiffs oppose dismissal.

Mootness is another doctrine grounded in Article III's "case-or-controversy limitation on federal judicial authority." *Friends of the Earth*, 528 U.S. at 180. Unlike standing, which focuses on the status of a plaintiff at the time suit is initiated, the demands of mootness extend past the filing of the complaint, insisting on "an actual controversy . . . at all stages of review." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). The doctrine is "flexible," however, and subject to "several settled exceptions." *Jonathan R. II*, 41 F.4th at 325 (citations omitted).

The plaintiffs invoke two of these. One—the "capable of repetition yet evading review" exception—applies only when "there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (citing *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)

(cleaned up)); *see also Patton v. Fitzhug*h, 131 F.4th 383, 394 (6th Cir.) ("For an individual claim to come within the capable-of-repetition exception, . . . '[t]here must be a *reasonable* expectation that the *same parties* will be subjected to the same action again.'" (quoting *Wilson v. Gordon*, 822 F.3d 934, 941 (6th Cir. 2016)), *cert. denied*, 146 S. Ct. 821 (2025). This exception does not apply to the adopted plaintiffs, because there does not appear to be a reasonable likelihood that the adopted plaintiffs will return to state custody. Dewayne W.'s situation, however, is different, because, at least at the time the SAC was filed, he remained technically in DCS custody, and there is no guarantee that his reunification with his mother will be successful. Dewayne W.'s situation therefore appears to fall within the "capable of repetition yet evading review" exception.

Regardless, the plaintiffs also invoke the "inherently transitory" exception, which is "simply a strain of the capable-of-repetition doctrine as it is applied to a class-action claim." *Patton*, 131 F. 4th at 394. This exception applies when (1) the injury is "so transitory that it would likely evade review by becoming moot before the district court can rule on class certification"; and (2) when it is clear that "other class members are suffering the injury." *Unan v. Lyon*, 853 F.3d 279, 287 (6th Cir. 2017) (quoting *Wilson*, 822 F.3d at 945). The defendants do not dispute the second requirement; instead they argue that this exception does not apply because the Sixth Circuit has "only applied this rule" when the defendant "may quickly and unilaterally grant relief to an individual once litigation begins." (Doc. No. 57 at 10 (quoting *Unan*, 853 F.3d at 287).) The defendants contend that only a state court, not the defendants, has the power to release any of the plaintiffs from state custody and, in any event, because many of the plaintiffs remain in custody, "there is no need to apply the 'inherently transitory' exception." (*Id.*)

In *Unan*, however, the Sixth Circuit referenced situations in which a state may "quickly and unilaterally grant relief" as an *example* of when a claim may be transitory even though it might

"theoretically remain live for weeks" or even months. *Unan*, 853 F.3d at 287. This court does not construe *Unan* as limiting the exception to that situation; instead, the Sixth Circuit pointed to it as merely one situation in which the exception may apply. Other courts have recognized that the "inherently transitory" inquiry focuses less on how long the individual named plaintiffs' claims may remain live and more on the inherent uncertainty about how long the claims may remain live. *See Jonathan R. II*, 41 F.4th at 325–26 ("[W]hat matters most is that the lifespan of state guardianship 'cannot be ascertained at the outset,' that '[i]t is by no means certain that any given individual, named as plaintiff, would be in . . . custody long enough for a district judge to certify the class." (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)); *see also Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010) ("[T]he essence of the exception is uncertainty about whether a claim will remain alive for any given plaintiff long enough for a district court to certify the class.")

The court finds that the exception applies here. As the Fourth Circuit found in *Jonathan R. II*, "[f]oster-care placements are exceedingly unpredictable. Even if *some* children will spend a long-enough period in the system, requiring Plaintiffs to predict *which* child will asks too much." *Jonathan R. II*, 41 F.4th at 326. And, as in *Gerstein*, "the constant existence of a class of persons suffering the deprivation is certain" on the facts alleged. *Gerstein*, 420 U.S. at 110 n.11. The fact that other plaintiffs still have live claims is of relatively little importance in light of the inherently uncertain nature of the length of time any of them will remain in state custody.

Because the claims of the five C/H siblings and Dewayne W. are subject to the inherently transitory exception, their claims—and the claims of any named plaintiffs who may be adopted or otherwise no longer in DCS custody as this case proceeds—are not rendered moot.

### D. Abstention

#### 1. *Younger Abstention*

The *Younger* abstention doctrine "derives from a desire to prevent federal courts from interfering with the functions of state criminal prosecutions and to preserve equity and comity." *Doe v. Univ. of Ky.*, 860 F.3d 365, 368 (6th Cir. 2017) (citing *Younger v. Harris*, 401 U.S. 37, 44 (1971)). While the Supreme Court has extended the doctrine beyond criminal prosecutions, "such applications are narrow and exist only in a few exceptional circumstances." *Id.* at 369. Specifically, *Younger* abstention may apply to (1) "an ongoing state criminal prosecution"; (2) "civil enforcement proceedings" "akin to criminal prosecutions"; and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* (citations omitted).

*If* the court finds that the proceeding in question falls into one of these categories, *then* the court must "evaluate[] the proceeding using a three-factor test laid out in *Middlesex County Ethics Committee v. Garden State Bar [Association]*, 457 U.S. 423 (1982)." *Id.* (citing *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 81–82 (2013)). These factors are "(1) an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) . . . provide [s] an adequate opportunity to raise [federal] challenges." *Sprint Commc'ns*, , 571 U.S. at 81 (citation omitted).

Referencing *Moore v. Sims*, 442 U.S. 415, 418 (1979), which the Supreme Court cited in *Sprint* as an example of a civil enforcement proceeding to which *Younger* applies, the defendants contend that all foster children in Tennessee are subject to ongoing "juvenile court proceedings"—dependency and neglect proceedings or juvenile justice proceedings—that qualify as "civil enforcement proceedings" within the scope of the second *Younger* category. (*See* Doc. No. 37 at 29 ("Plaintiffs' claims would interfere with these ongoing juvenile court proceedings because juvenile courts oversee and issue orders relating to nearly all aspects of a child's experience in

care, including case planning and the provision of physical and behavioral health services[.]" (citations omitted)).)

In *Moore*, a family—consisting of a husband, wife, and three minor children who had been removed from their parents' custody in state abuse-and-neglect proceedings—brought suit in federal court, challenging the constitutionality of the state law governing removal petitions and seeking to enjoin their enforcement, while they also continued to litigate in state court. *Moore*, 442 U.S. at 418–22. The Supreme Court held that the district court should have abstained under *Younger*, and *Sprint* later characterized this decision as one involving "civil enforcement proceedings" "akin to a criminal prosecution" in "important respects." *Sprint Commc'ns*, 571 U.S. at 79. Some courts have relied on *Moore* to hold that federal proceedings challenging some aspects of state foster care systems qualify as the type of civil enforcement proceedings to which *Younger* abstention may apply. *See, e.g.*, *Ashley W. v. Holcomb*, 34 F.4th 588, 591 (7th Cir. 2022) ("We know from *Moore* . . . that *Younger* applies to state-initiated child-welfare litigation."); *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 610 (8th Cir. 2018) ("South Dakota's temporary custody proceedings are civil enforcement proceedings to which *Younger* principles apply."); *31 Foster Child. v. Bush*, 329 F.3d 1255, 1278 (11th Cir. 2003) (relying entirely on *Middlesex* to conclude that the district court did not abuse its discretion in abstaining from the foster children plaintiffs' constitutional challenges to the state's foster care system, based on *Younger*).

Other courts, including the Fourth Circuit in *Jonathan R. II*, disagree. Although the defendants maintain that *Jonathan R. II* was incorrectly decided, this court is persuaded by its analysis and finds that it applies here. The Fourth Circuit found that the quarterly state court hearings to review foster placements did not "fit any historical precedent applying the doctrine" and that abstention "would forward none of the comity interests our federalist system holds dear."

41 F.4th at 328. As the court explained, *Moore* concerned initial proceedings to terminate parental rights, making it "[n]o surprise, then, that the Court equated the initial child-removal proceeding with the public-nuisance adjudication in *[Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975)]." *Id.* at 329. On the other hand, the underlying proceedings to which the defendants pointed in *Jonathan R. II* were "ongoing individual hearings" that "serve[d] to protect the children who would be plaintiffs in federal court," and it would "turn decades of Supreme-Court jurisprudence—and logic—on its head to put these foster children in the shoes of the abusive parents in *Moore*." *Id.* at 330. *Accord Gary G.*, 2024 WL 4354697, at *6 ("There is no dispute that Plaintiffs' dependency proceedings are not punitive nor criminal, but rather are proceedings for their benefit and protection. Therefore, the Court does not find that their cases appropriately fall under the quasi-criminal category that *Younger* abstention appl[ies] to."); *Ocean S.*, 2024 WL 3973047, at *8 ("That an initial removal hearing necessarily precedes hearings in a juvenile court proceeding does not compel the conclusion that the entire dependency proceeding is a quasi-criminal action."); *Jeremiah M.*, 2023 WL 6316631, at *6 ("*Moore* and its progeny do not suggest that, if the initiation of a state proceeding is considered an act of civil enforcement, a state court's continuing oversight of one of the parties affected by that enforcement—here, the foster children—continues to bear the 'enforcement' label."); *Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1034 (D. Ariz. 2015) (holding that *Younger* abstention did not apply to "ongoing dependency proceedings" where the "animating purpose . . . is to plan for and monitor the development and well-being of children, not to investigate or penalize those who might have contributed to their dependency").

This court, for the same reasons cited by the Fourth Circuit and other opinions adopting it, finds that *Younger* abstention is not warranted in this case.

### 2. *O'Shea Abstention*

Next, the defendants argue that, even if *Younger* abstention does not apply, the court should still abstain under *O'Shea v. Littleton*, 414 U.S. 488 (1974). (Doc. No. 37 at 32.) The plaintiffs argue that *O'Shea* does not apply because they do not seek to interfere, directly or indirectly, with state court proceedings.

Aside from the situations in which *Younger* may apply, the Supreme Court has held that federal courts must abstain from exercising jurisdiction in a case where the failure to abstain would result in "an ongoing federal audit of state criminal proceedings." *O'Shea*, 414 U.S. at 500. In *O'Shea*, the plaintiffs sought to enjoin state court judges from carrying out allegedly unconstitutional policies and practices relating to bond setting, sentencing, and jury fees in criminal cases. *Id.* at 491–92. The Court held that "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials" would amount to "nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that [*Younger*] and related cases sought to prevent." *Id.* at 500.

Following *O'Shea*, courts have abstained when the plaintiffs in a federal lawsuit seek an injunction that would interfere with state judicial proceedings. *See, e.g.*, *Disability Rts. New York v. New York*, 916 F.3d 129, 136 (2d Cir. 2019) (applying *O'Shea* to bar a suit in which the "requested relief would effect a continuing, impermissible 'audit' of New York Surrogate's Court proceedings, which would offend the principles of comity and federalism."); *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1065–66 (7th Cir. 2018) (abstaining under *O'Shea* from enjoining the Clerk of the Circuit Court of Cook County to release newly filed complaints at the moment of receipt); *Oglala Sioux Tribe*, 904 F.3d at 612 (abstaining under *O'Shea* from enjoining allegedly unconstitutional child custody proceedings because "[t]he relief requested would interfere with the

state judicial proceedings by requiring the defendants to comply with numerous procedural requirements" and "failure to comply with the district court's injunction would subject state officials to potential sanctions"); *Miles v. Wesley*, 801 F.3d 1060, 1064, 1066 (9th Cir. 2015) (abstaining under *O'Shea* from enjoining the Los Angeles Supreme Court from reducing the number of courthouses used for unlawful detainer actions). Likewise, although the Sixth Circuit has not frequently invoked *O'Shea*, it has characterized it as establishing a rule of "near-absolute restraint" "where the relief sought would interfere with the day-to-day conduct of state trials." *Parker v. Turner*, 626 F.2d 1, 8 (6th Cir. 1980).

The court finds that the lawsuit in this case seeks to enjoin state officials, not state courts, and that *O'Shea* simply does not apply.

## III.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Having concluded that it may properly exercise subject matter jurisdiction, the court will proceed to address the defendants' motion under Rule 12(b)(6). As stated above, the SAC sets forth claims under § 1983 for violations of the plaintiffs' substantive due process rights and familial association rights under the Fourteenth Amendment, and for violations of their statutory rights under the Adoption Assistance and Child Welfare Act and Medicaid Act, as well as claims under the Americans with Disabilities Act and Rehabilitation Act. The defendants seek dismissal of all of these claims on the merits.

### A.   Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a

claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (2007). A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). At the same time, however, it has long been the rule that a court may consider not only the complaint and exhibits attached to it, but also exhibits attached to a defendant's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted). A court may also consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citation omitted).

**B.    Substantive Due Process Claims (First Cause of Action)**

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Sixth Circuit has construed this amendment to "protect both procedural and

substantive due process rights." *Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 604 (6th Cir. 2016) (citations omitted). The concept of substantive due process, at issue here, "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Mares v. Miami Valley Hosp.*, 96 F.4th 945, 955 (6th Cir. 2024) (quoting *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012)).

"The purpose of the Due Process Clause is 'to protect the people from the State, not to ensure that the State protect[s] them from each other.'" *Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 853 (6th Cir. 2016) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)). Thus, as a general rule, "the State has no obligation to protect the life, liberty, o[r] property of its citizens against invasion by private actors." *Id.* (citing *DeShaney*, 489 U.S. at 195). One exception to that rule, however, is the special relationship exception, which provides that, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199–200. "When the State asserts this type of custody over a person 'and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by . . . the Due Process clause.'" *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012) (alteration in *Henry A.*) (quoting *DeShaney*, 489 U.S. at 200). Courts have held that this exception applies to children in foster care. *Id.*; *see also Hubbard v. Okla. ex rel. Okla. Dep't of Hum. Servs.*, 759 F. App'x 693, 709 (10th Cir. 2018); *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 856 (5th Cir. 2012). When this exception exists and the plaintiff establishes the violation of a substantive right as a result of being in the state's custody, "it has consistently and uncontroversially been the rule that a constitutional claim arises where the injury

occurred as a result of the state's deliberate indifference to the risk of such an injury." *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 492 (6th Cir. 2002) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 870 (6th Cir. 1997)); *see also Reynolds v. Szczesniak*, No. 21-2732, 2022 WL 3500191, at *6 (6th Cir. Aug. 18, 2022) ("[T]he custodial exception requires that the state official(s) act with deliberate indifference to the risk of harm to the plaintiff.").

The defendants do not dispute the application of the "special relationship" exception; instead, they argue that substantive due process protections do not extend beyond the provision of "basic human needs" and that the additional "rights" enumerated in the SAC simply are not rights protected by the substantive due process clause. (*See* Doc. No. 37 at 42–43.) Second, they argue that the SAC fails to allege a violation of any of the enumerated rights.

The plaintiffs enumerate the specific substantive rights they contend have been violated by the state officials as follows:

> a. the right to freedom from maltreatment while in foster care;
>
> b. the right to protection from unnecessary intrusions into the child's emotional and psychological well-being while in government custody;
>
> c. the right to services necessary to prevent unreasonable and unnecessary intrusions into the child's emotional and psychological well-being while in government custody;
>
> d. the right to conditions and duration of foster care reasonably related to the purpose of government custody;
>
> e. the right to treatment and care consistent with the purpose and assumptions of government custody;
>
> f. the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody; and
>
> g. the right to receive a minimally adequate education.

(SAC ¶ 278.)

Other courts have held that rights similar (or identical) to those asserted in subparagraphs (a), (b), and (e) "fall on the basic needs end of the spectrum" and, accordingly, that they are protected by the Fourteenth Amendment. *See, e.g.*, *Jeremiah M.*, 695 F. Supp. 3d at 1092–93 (recognizing that substantive due process protects rights essentially identical to those asserted in subparagraphs (a), (b), and (e) (citing *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 251 (5th Cir. 2018) ("[E]gregious intrusions on a child's emotional well-being . . . are constitutionally cognizable"); *Jonathan R. v. Justice* ("*Jonathan R. III*"), No. 3:19-cv-00710, 2023 WL 184960, at *7 (S.D.W. Va. Jan. 13, 2023) (recognizing substantive due process rights to protection against physical maltreatment, as well as "protection from unnecessary intrusions into the child's emotional wellbeing while in State custody" and "treatment and care consistent with the purpose and assumptions of government custody."); *Wyatt B. by McAllister v. Brown*, No. 6:19-cv-00556-AA, 2021 WL 4434011, at *8 (D. Or. Sept. 27, 2021) (recognizing that "[t]he state must provide food, shelter, clothing, medical care, supervision and must, to the best of its ability under the circumstances, shield the children in their custody from physical and psychological harm" and that the "right to freedom from maltreatment while under the protective supervision of the state" falls "within the scope of that guarantee")). Based on this authority, the court is persuaded that those rights asserted in subparagraphs (a), (b), and (e) of paragraph 278 of the SAC fall within the scope of substantive rights protected by the Due Process Clause.

Conversely, the "weight of authority" is against finding that the rights asserted in subsections (c), (d), and (f) of paragraph 278 are protected by substantive due process. *Accord Jeremiah M.*, 695 F. Supp. 3d at 1093;[8] *see also M.D.*, 907 F.3d at 268 (stating that children in

---

[8] *Jeremiah M.* recognized that *Jonathan R. III* is somewhat of an outlier in finding to the contrary. *Jeremiah M.*, 695 F. Supp. 3d at 1093 n.192.

foster care "have no right to a stable environment or a right not to be moved from home to home, despite the significant literature which indicates a traumatic effect of such moves on young children" (internal quotation marks and citation omitted)); *Wyatt B.*, 2021 WL 4434011, at \*9 (finding that the right to substantive due process does not "extend to placement in an optimal or least-restrictive setting, or to the availability of an array of placement options"); *T.F. by Keller v. Hennepin Cnty.*, No. CV 17-1826 (PAM/BRT), 2018 WL 940621, at \*4 (D. Minn. Feb. 16, 2018) ("[T]here is no constitutional right to a permanent home."); *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428, at \*15 (D. Nev. May 14, 2007) ("Plaintiffs do not, however, have a substantive due process right to not be retained in custody longer than is necessary . . . , nor do Plaintiffs have a substantive due process right to be placed in the least restrictive placement based on the foster child's needs." (internal quotation marks and citation omitted)); *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 507 (D.N.J. 2000) (holding that foster children do not have a due process right to be free from unlimited custody or to be placed in the least restrictive housing possible).

Regarding the plaintiffs' claim to a "right to receive a minimally adequate education" in subsection (g), it has long been recognized that education "is not among the rights afforded explicit protection under [the] Federal Constitution. Nor [is there] any basis for saying it is implicitly so protected." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973); *accord Stanford v. Northmont City Sch. Dist.*, No. 3:19-cv-399, 2023 WL 1819117, at \*5 (S.D. Ohio Feb. 8, 2023) ("[T]here is no federal right to receive a public education."), *aff'd*, No. 23-3203, 2023 WL 6389624 (6th Cir. Oct. 2, 2023); *Gary B. v. Snyder*, 329 F. Supp. 3d 344, 366 (E.D. Mich. 2018) (holding

that there is no substantive due process right to a minimally adequate education).[9] In response to the Motion to Dismiss, the plaintiffs make no argument to defend their claimed right to an education as protected by due process. The court finds that the plaintiffs do not have a substantive due process right to a minimally adequate education.

That said, the plaintiffs have identified substantive due process rights that they claim have been violated by, or are at risk of being violated by, the defendants. The question, then, is whether they plausibly state a claim for which relief may be granted. In that regard, the SAC states that the "actions and inactions of Defendants" as alleged in the pleading

> constitute a policy, pattern, practice, or custom that is inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to Plaintiffs' constitutionally protected liberty, property, and privacy interests. As a result, Plaintiffs are presently suffering an ongoing constitutional deprivation of their substantive due process rights under the Fourteenth Amendment to the United States Constitution so long as they remain in state custody subject to statewide policies and practices that expose all foster children to a substantial risk of physical, psychological, mental, and emotional harm.

(SAC ¶ 277.)

With respect to the rights alleged in Paragraph 278, Subparagraphs (a), (b), and (e), the court finds that plaintiffs have plausibly alleged deliberate indifference in relation to those rights. Among other things, the plaintiffs allege that DCS is aware that Keira M. has been deprived of essential mental health treatment (SAC ¶¶ 35, 41); that Darnell H. has been deprived of access to basic hygiene and suitable clothing and remains in a placement where he feels unsafe (*id.* ¶¶ 56, 60); that Jasmine G. has been deprived of necessary mental health treatment while also being

---

[9] That holding in *Gary B.* was reversed and remanded *sub nom. Gary B. v. Whitmer*, 957 F.3d 616 (6th Cir. 2020), but that decision was vacated *en banc*, which had the effect of "restor[ing] the case on the docket as a pending appeal." *Gary B. v. Whitmer*, 958 F.3d 1216 (6th Cir. 2020). The appeal was later dismissed based on a settlement agreement. Order, *Gary B. v. Whitmer*, No. 18-1855 (6th Cir. June 10, 2020).

prescribed harmful and ineffective psychiatric medications as well as the right to participate in CFTMs that concern her own future (*id.* ¶¶ 71, 76); and that Thomas H. has been deprived of appropriate mental health treatment and remains in a placement where he has been abused (*id.* ¶¶ 155, 157). Generally, the plaintiffs allege that they are not receiving necessary medical or behavioral services, despite DCS's knowledge of their need for those services, and that DCS fails to notify foster parents of children's medical and behavioral needs. (*See, e.g.*, *id.* ¶¶ 41, 50, 66, 78, 84, 86–88, 92, 101, 106, 118, 128, 138, 145, 148, 157, 161, 164.) These allegations, taken as true, plausibly allege that DCS has violated and continues to violate the named plaintiffs' substantive due process rights to be free from mistreatment while in foster care, to be protected from unnecessary intrusions into their emotional and psychological well being while in foster care, and to receive treatment and care consistent with the purpose and assumptions of custody by DCS. (*Id.* ¶ 278(a), (b), and (e).

The defendants' Motion to Dismiss as to the First Cause of Action will therefore be denied with respect to the rights asserted in paragraph 278, subparagraphs (a), (b), and (e), and granted with respect to the rights asserted in paragraph 278, subparagraphs (c), (d), (f), and (g). The effect of this ruling on the plaintiffs' claims for injunctive relief is unclear, but the court leaves that issue to the parties to unravel.

### C.     Right to Familial Association (Second Cause of Action)

The plaintiffs next assert that the defendants' actions have deprived them of their right to "a permanent home and familial association derived from the First Amendment right of association, the Ninth Amendment reservation of rights to the people, and the Fourteenth Amendment substantive due process protections." (*Id.* ¶ 281.) They explain in their Response to the Motion to Dismiss that the defendants' actions and inactions

(1) impede parent-child reunification and visitation between children and their parents;

(2) unnecessarily separate siblings;

(3) fail to arrange for visitation between separated siblings;

(4) intrude upon Plaintiffs' fundamental rights to a permanent home by regularly placing children in inappropriate institutional settings devoid of familial relationships; and

(5) obstruct children's paths to permanent placements.

(Doc. No. 48 at 44 (formatting altered) (citations to the SAC omitted).)

The defendants seek dismissal of this claim on the grounds that no court has recognized a constitutional right to a permanent home or imposed an affirmative obligation on state child welfare systems to find foster children a permanent home and family. The defendants do not address the plaintiffs' claim of a right of siblings to maintain contact, other than by asserting that the plaintiffs have failed to allege that the defendants acted with deliberated indifference to their rights.

As set forth above, it is generally accepted that children in foster care do not have a substantive due process right to stability or permanent placements. *Accord, e.g.*, *M.D.*, 907 F.3d at 268 ("[C]hildren have no right to a stable environment or a right not to be moved from home to home, despite the significant literature which indicates a traumatic effect of such moves on young children." (quotation marks and citation omitted)).

As for the first three of the familial association rights the plaintiffs reference, the Supreme Court has recognized a right to familial integrity derived from the broad right to association under the First and Fourteenth Amendments and the Ninth Amendment's reservation of rights to the people. *Roberts v. United States Jaycees*, 468 U.S. 609, 617–20 (1984) (referencing First and Fourteenth Amendments); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (Fourteenth

Amendment); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The integrity of the family unit has found protection in the due process clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment." (internal citations omitted)). Federal courts disagree about whether the right to familial integrity is implicated when a state's foster care system inhibits interactions between children and members of their immediate family, including siblings. *See, e.g.*, *E.M. v. Brown*, 7:24-cv-288, 2024 WL 4697682, at *7 (W.D. Va. Nov. 6, 2024) (collecting cases standing for the propositions that the Constitution both does and does not protect sibling relationships in the foster care context); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 163–64 (D. Mass. 2011) (same). As the court found in *E.M.*, however, "the weight of authority from across the circuits supports protecting siblings' rights—at least to visitation with one another while placed in different households and to reunification when safe and appropriate." 2024 WL 4697682, at *7 (collecting cases).

In this case, none of the named plaintiffs alleges that DCS violated their right to familial association by impeding visitation between parents and children. While they allege that DCS impeded Dewayne W.'s reunification with his mother by failing to provide his *mother* adequate services, Dewayne W.'s birth mother is not a plaintiff, and Dewayne cannot base a claim on DCS's failure to provide his mother services that had an incidental effect on him. *See Chambers v. Sanders*, 63 F.4th 1092, 1101 (6th Cir. 2023) ("[A]s with any due process violation, stating a claim in this context requires that the state actor act with a culpable state of mind with respect to the plaintiffs themselves and their own alleged constitutional rights.").

The plaintiffs further allege, however, that siblings Amara G. and Zane G. have been denied sibling contact on an ongoing basis due to systemic failures in the system. (*See* SAC ¶¶ 79, 90.) The court therefore finds that the plaintiffs plausibly allege that at least two of the named

plaintiffs have been denied—and continue to be denied—meaningful contact with their siblings. The court finds that the allegations of systemic failures to afford sibling-sibling visitation are sufficient at this juncture to give rise to an inference of deliberate indifference on the part of the defendants to the plaintiffs' right of familial association—specifically sibling association. The motion to dismiss the familial association claim based on a right to maintain the sibling relationship will be denied, though, as always, further analysis may be warranted once discovery is completed.

### D. The Adoption Assistance and Child Welfare Act (Third Cause of Action) and Medicaid Act (Fifth Cause of Action)

#### 1. The Plaintiffs' Claims

For their third cause of action, the plaintiffs claim that they have been deprived of statutorily guaranteed rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997 ("AACWA"), which the plaintiffs assert entitles them to:

a. placement in a foster placement that conforms to nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

b. a written case plan that includes a plan to provide safe, appropriate and stable foster care placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

c. a written case plan that ensures that the child receives safe and proper care while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

d. a written case plan that ensures provision of services to parents, children and foster parents to facilitate reunification, or where that is not possible, the permanent placement of the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

e. a written case plan, where appropriate, that ensures the location of an adoptive or other permanent home for the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(E);

f. a written case plan that ensures the educational stability of the child while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

g. a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

    h. a case review system in which the status of the child is reviewed no less frequently than every six months by a court, or person responsible for case management, for purposes of determining the safety of the child, continuing necessity and appropriateness of the placement, extent of compliance with the permanency plan and projected date of permanency, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C); and

    i. receive quality services to protect each child's safety and health, 42 U.S.C. § 671(a)(22).

(SAC ¶ 284.) Although they do not expressly rely on 42 U.S.C. § 1983 as the medium through which they seek enforcement of the AACWA, the court presumes that they intended to bring this claim under § 1983.

In their Fifth Cause of Action, the plaintiffs assert a claim under the Medicaid Act, as amended by the Social Security Amendments of 1967, based on the defendants' actions and inactions that, according to the plaintiffs, have deprived them of statutorily guaranteed rights, including the rights to:

    a. Medical assistance, 42 U.S.C. §§ 1396a(a)(10), 1396d(a);

    b. Medical assistance with reasonable promptness, 42 U.S.C. § 1396a(a)(8);

    c. Timely early and periodic screening, diagnostic, and treatment services, 42 U.S.C. § 1396d(r);

    d. Early and periodic screening, diagnostic, and treatment services provided by or arranged for by Defendants, 42 U.S.C. § 1396a(a)(43)(B);

    e. Corrective treatment arranged by Defendants, 42 U.S.C. § 1396a(a)(43)(C); and

    f. Necessary healthcare, diagnostic services, treatment, and other measures to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, 42 U.S.C. § 1396d(r)(5).

(SAC ¶ 298.) Again, although the plaintiffs do not cite § 1983, their claims under the Medicaid Act depend upon the premise that the Medicaid Act creates rights that are privately enforceable through § 1983.

The defendants argue, first, that none of these statutory provisions is privately enforceable under 42 U.S.C. § 1983 and that, to the extent the Sixth Circuit held to the contrary regarding some of the Medicaid Act provisions at issue in *Waskul v. Washtenaw County Community Mental Health*, 979 F.3d 426 (6th Cir. 2020), that decision was superseded by *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357 (2025). The plaintiffs argue both that *Medina* does not compel the conclusion that the statutory AACWA and the Medicaid Act provisions at issue in this case are not privately enforceable and that, in any event, because *Waskul* "has not been 'expressly overruled,' courts in this district are 'bound to follow' it." (Doc. No. 48 at 36.) As explained below, the court finds that *Medina* inescapably compels the conclusion that the AACWA and Medicaid Act provisions on which the plaintiffs' claims are premised do not create privately enforceable rights.

### 2. The Legal Landscape

In *Waskul*, the Sixth Circuit was called upon to consider whether the plaintiffs had a private right of action under 42 U.S.C. § 1983 to enforce several provisions of the Medicaid Act, including 42 U.S.C. § 1396a(a)(8), (a)(10)(A) and (B), and § 1396n(c)(2)(A) and (C). *Waskul*, 979 F.3d at 435.

Under § 1396a(a), "[a] State plan for medical assistance" must, among other things, provide for making certain described categories of medical assistance available to qualified individuals. 42 U.S.C. § 1396a(a)(10)(A). Section 1396a(a)(10)(B), meanwhile, requires that "the medical assistance made available to any individual described . . . shall not be less in amount, duration, or scope than the medical assistance made available" to others under Medicaid. Section 1396a(a)(8) requires state plans to provide individuals with the opportunity to apply for this assistance and "that such assistance shall be furnished with reasonable promptness to all eligible individuals."

Applying the test supplied by the Supreme Court in *Blessing v. Freestone*, 520 U.S. 239 (1997), the Sixth Circuit determined that these provisions established individual rights enforceable under § 1983. The *Blessing* test asks:

> (1) whether Congress "intended that the provision in question benefit the plaintiff"; (2) whether "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) whether the statute "unambiguously impose[s] a binding obligation on the States" by couching its right "in mandatory, rather than precatory, terms."

*Waskul*, 979 F.3d at 447 (quoting *Blessing*, 520 U.S. at 340–41). Relying on its own holding in a prior opinion addressing a different provision of Medicaid, *Westside Mothers v. Olszewski* ("*Westside Mothers II*"), 454 F.3d 532, 540–41 (6th Cir. 2006), the Sixth Circuit also noted that the Supreme Court had "clarified" the first *Blessing* requirement in *Gonzaga University v. Doe*, 536 U.S. 273 (2002),

> "making clear that only unambiguously conferred rights, as distinguished from mere benefits or interests, are enforceable under § 1983." Thus, we must inquire "whether or not Congress intended to confer individual rights upon a class of beneficiaries," in particular looking to "whether the pertinent statute contains 'rights-creating' language that reveals congressional intent to create an individually enforceable right."

*Waskul*, 979 F.3d at 447 (quoting *Westside Mothers II*, 454 F.3d at 542).

Employing this framework with respect to the first *Blessing* factor, the court found that the statutory language "focus[es] on individual entitlements" and concluded that "[t]his is the kind of individually focused terminology that unambiguously confers an individual entitlement under the law." *Id.* (internal quotation marks and citations omitted). More specifically, the court pointed to the language "requiring that 'all individuals' have the opportunity to apply for medical assistance, that 'all eligible individuals[']' assistance be furnished reasonably promptly, and that assistance 'to any individual described' equal the assistance available to other Medicaid recipients." *Id.* (quoting 42 U.S.C. §§ 1396a(a)(8), (a)(10)). The court then proceeded through the other *Blessing*

factors, finding them all to point in favor of finding enforceable rights, and, further, that "Congress did not explicitly foreclose relief or provide a comprehensive remedial scheme." *Id.* at 448. The court therefore held that the plaintiffs had a "private right of action under both §§ 1396a(a)(8) and (a)(10)." *Id.*; *see also id.* at 447 n.8 (collecting cases holding, post-*Gonzaga*, that these same provisions create a private right of action).

Two years later, the Supreme Court was called upon to determine whether particular provisions in the Federal Nursing Home Reform Act ("FNHRA") created rights that were privately enforceable under 42 U.S.C. § 1983. *Health & Hospital Corp. v. Talevski*, 599 U.S. 166, 171 (2023). There, the Court reiterated that § 1983 "can presumptively be used to enforce unambiguously conferred federal individual rights, unless a private right of action under § 1983 would thwart any enforcement mechanism that the rights-creating statute contains for protection of the rights it has created." *Id.* at 172; *see also id.* at 178–80.

Having concluded that the FNHRA "*can* create § 1983-enforceable rights," the Court proceeded to determine whether the provisions at issue *did* create such rights. The Court, in reexamining the applicable standards for this analysis, observed that federal statutes ordinarily do not create rights enforceable under § 1983 and that, "[f]or Spending Clause legislation in particular," the "'the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.'" *Id.* at 183 (quoting *Gonzaga*, 536 U.S. at 280). The Court, applying the *Gonzaga* standard to the provisions before it, did not purport to plow new ground. Rather, it reiterated that *Gonzaga* "sets forth our established method" for ascertaining whether the statutory language at issue "'unambiguously confe[rs]' individual rights, making those rights 'presumptively enforceable' under § 1983." *Id.* (quoting *Gonzaga*, 536 U.S. at 283–84). The Court

noted that it had found this test satisfied "where the provision in question is 'phrased in terms of the persons benefited' and contains 'rights-creating,' individual-centric language with an 'unmistakable focus on the benefited class.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 284). On the other hand, the Court has "rejected § 1983 enforceability where the statutory provision 'contain[ed] no rights-creating language'; had 'an aggregate, not individual, focus'; and 'serve[d] primarily to direct the [Federal Government's] distribution of public funds.'" *Id.* at 184 (quoting *Gonzaga*, 536 U.S. at 290).

The Court found that the FNHRA provisions at issue satisfied this test, notably because they both resided in a subsection of the statute entitled "Requirements *relating to residents' rights.*" *See id.* at 184 (quoting 42 U.S.C. § 1396r(c)). In particular, under this subsection (c), the "unnecessary-restraint" and "pre-discharge notice" provisions contain additional references to nursing home residents' rights:

(c) Requirements relating to residents' *rights*

(1) General *rights*

(A) Specified *rights*

A nursing facility must protect and promote the *rights* of each resident, including each of the following *rights*:

. . .

(ii) Free from restraints

The *right* to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms. . . .

. . . .

(2) Transfer and discharge *rights*

(A) In general

> A nursing facility must permit each resident to remain in the facility and must not transfer or discharge the resident from the facility unless [one of the enumerated exceptions is satisfied].
>
> . . . .
>
> (B) Pre-transfer and pre-discharge notice
>
>> (i) In general
>>
>> Before effecting a transfer or discharge of a resident, a nursing facility must–
>>
>>> (I) notify the resident (and, if known, an immediate family member of the resident or legal representative) of the transfer or discharge and the reasons therefor . . . .

42 U.S.C. § 1396r(c)(1)(A)(ii) & (c)(2)(A) & (B)(i) (emphasis added).

The Court observed that the "framing" of the provisions in terms of residents' rights was "indicative of an individual 'rights-creating' focus" and, more importantly, that the text itself "unambiguously confers rights upon the residents of nursing-home facilities." *Talevski*, 599 U.S. at 184. That language, as set forth above, both refers specifically to rights and, even where it does not, "the statute's caveats remain focused on individual residents." *Id.* at 185. Because these provisions "use clear 'rights-creating language,' speak 'in terms of the persons benefited,' and have an 'unmistakable focus on the benefited class,'" the Court concluded that they created individually enforceable rights. *Id.* at 186 (quoting *Gonzaga*, 536 U.S. at 284, 287, 290). The Court also noted that this language stood in "stark contrast to the statutory provisions that failed *Gonzaga*'s test in *Gonzaga* itself," which "lacked 'rights-creating language,' primarily directed the Federal Government's 'distribution of public funds,' and had 'an aggregate, not individual, focus.'" *Id.* at 185–86 (quoting *Gonzaga*, 536 U.S. at 290).

Three years later, in 2025, the Court further clarified the test for whether a statute creates individually enforceable rights, this time in a case focused on a specific provision of the Medicaid

Act—the "qualified provider" provision in 42 U.S.C. § 1396a(a)(23)(A). *Medina*, 606 U.S. at 363. As the Court explained, this provision "requires States to ensure that 'any individual eligible for medical assistance . . . may obtain' it 'from any [provider] qualified to perform the service . . . who undertakes to provide' it." *Id.* at 364 (quoting 42 U.S.C. § 1396a(a)(23)(A)). "[I]f a State fails 'to comply substantially' with this (or any) congressionally specified condition, the Secretary may withhold some or all of the State's federal funding until he is 'satisfied that there will no longer be any such failure to comply.'" *Id.* (quoting 42 U.S.C. § 1396c).

Again invoking *Gonzaga*, the Court specifically held that, "[t]o prove that a statute secures an enforceable right . . . and does not just provide a benefit or protect an interest, a plaintiff must show that the law in question 'clear[ly] and unambiguous[ly]' uses 'rights-creating terms.'" *Id.* at 368 (quoting *Gonzaga*, 536 U.S. at 284, 290). The Court held that, *in addition* to the use of such "rights-creating terms," the statute at issue must *also* "display 'an unmistakable focus' on individuals like the plaintiff." *Id.* (first quoting *Gonzaga*, 536 U.S. at 284; and then citing *Talevski*, 599 U.S. at 183). And, even if these two requirements are satisfied, the statute still may not create individually enforceable rights "if Congress has displaced § 1983's general cause of action with a more specific remedy." *Id.* In other words, the Court set forth a new three-part test. For a court to find that a federal statute creates rights that are privately enforceable under § 1983, the statute must (1) clearly and unambiguously use rights-creating terms; (2) display an unmistakable focus on individuals; and (3) *not* provide a more specific remedy.

The Court also specifically distanced itself from prior holdings in which it had "[a]dmittedly" "briefly experimented with a different approach," one that "took an expansive view of [the Court's] power to imply private causes of action to enforce federal laws." *Id.* at 375 (citing *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990); *Wright v. Roanoke Redev. & Hous. Auth.*, 479

U.S. 418 (1987); and *Blessing v. Freestone*). The Court noted that it had long ago "repudiat[ed]" *Wright*'s and *Wilder*'s reasoning," *id.* at 377, and it expressly abandoned the three-factor test outlined in *Blessing*, which "buil[t] on the same ideas" developed in *Wilder* and *Wright*, stating:

> Some lower court judges . . . still consult *Wilder*, *Wright*, and *Blessing* when asking whether a spending-power statute creates an enforceable individual right.
>
> *They should not. Gonzaga* "reject[ed]" any reading of our prior cases that would "permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." 536 U.S. at 283. *Armstrong* [*v. Exceptional Child Center, Inc.*] "repudiate[d]" any other approach. 575 U.S. [320, 323 (2015)]. And *Talevski* reaffirmed that "*Gonzaga* sets forth our established method" for determining whether a spending-power statute confers individual rights. 599 U.S. at 183

*Id.* at 376 (emphasis added) (one internal citation omitted).

Turning to the statutory provision at issue in that case, the *Medina* Court reiterated that, as a threshold matter, the plaintiffs must show, "at a minimum," that the provision at issue "does not just seek to benefit them or serve their interests but 'clear[ly] and unambiguous[ly]' gives them individual federal rights." *Id.* at 376 (quoting *Gonzaga*, 536 U.S. at 290). It further noted that, because the rationale employed in *Wright* and *Wilder* had been repudiated, "the statutes at issue in *Talevski* supply the only reliable yardstick against which to measure whether spending-power legislation confers a privately enforceable right." *Id.*

And, against that yardstick, the Court firmly held that the Medicaid Act provision before it did not measure up. The Court quoted at length the FNHRA provisions at issue in *Talevski*, highlighting the repeated use of the term "rights" and emphasizing that this language established that Congress, when it chooses, "knows how to give a grantee clear and unambiguous notice that, if it accepts federal funds, it may face private suits asserting an individual right." *Id.* at 378. Conversely, it held that section 1396a(a)(23) contains no such rights-creating language:

> Section 1396a(a)(23)(A) indicates that state Medicaid plans must "provide that . . . any individual eligible for medical assistance (including drugs) may obtain such

> assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services."

*Id.* (quoting § 1396a(a)(23)).

"Expanding [its] view" to the "surrounding statutory context," the Court also found it important that, under the Medicaid Act, a state is only required to "comply substantially" with the any-qualified-provider mandate, as such a focus on "'aggregate' compliance suggests that a statute addresses a State's obligations to the federal government, not the rights 'of any particular person.'" *Id.* at 379 (quoting *Gonzaga*, 536 U.S. at 288). The Court indicated that this "weighty" evidence could only be overcome where the statutory language, like that in *Talevski*, employs "explicit and unmistakable 'rights-creating language.'" *Id.*

Similarly, the Court found it important that the provision at issue "appears in a subsection titled 'Contents'" that "outlines scores of things a state plan must include to qualify for federal funding," listing them in no "discernable order." *Id.* (quoting § 1396a(a)). The requirements are all "directed to the Secretary of Health and Human Services, who must 'approve any plan'" that meets them." *Id.* (quoting § 1396a(b)). While these facts, standing alone, would not be sufficient to establish that the provision is *not* individually enforceable under § 1983, they served to further underline the contrast between the FNHRA provisions at issue in *Talevski*, "where Congress set its rights-creating provisions apart from others and, in doing so, helped alert grantees that accepting federal funds comes with a duty to answer private suits." *Id.* at 380.

The Sixth Circuit has had few opportunities to consider the impact of *Medina* and has not addressed its impact on the validity of *Waskul*. The Fourth and Tenth Circuits, however, have held, under *Medina*, that §§ 1396a(a)(8) and (a)(10) of the Medicaid Act do not confer individual rights enforceable through § 1983. *Anderson v. Crouch*, 169 F.4th 474 (4th Cir. 2026) (addressing the

individual enforceability of § 1396a(a)(10)); *Lancaster ex rel. Green v. Cartmell*, 162 F.4th 1063, 1068–69 (10th Cir. 2025) (addressing § 1396a(a)(8)).

The Tenth Circuit studied *Medina* in some detail and observed that much of its analysis also applied to § 1396a(a)(8). The court held that, "[f]or the same reasons the *Medina* Court found that § 1396a(a)(23)(A) does not confer a private enforceable right, neither does § 1396a(a)(8)." *Lancaster*, 162 F.4th at 1068–69. It explained that the Third Circuit precedent on which the plaintiffs asked it to rely was no longer persuasive because, while that case "does rely on *Gonzaga University*, it did so by heavily leaning on the three Supreme Court cases disclaimed in *Medina*: *Wright*, *Wilder*, and *Blessing*." *Lancaster*, 162 F.4th at 1069 (citing *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180 (3d Cir. 2004)). Thus, because the framework applied in those cases was repudiated in *Medina*, "the analysis in *Sabree* cannot withstand scrutiny." *Id.*

Similarly, the Fourth Circuit explained that the Medicaid provisions at issue in that case, like the provision addressed in *Medina*, do not employ the "clear and unambiguous rights-creating language" necessary to confer a privately enforceable right and instead simply identify "what a State must do to participate in Medicaid' and to ensure it does not 'lose federal funding.'" *Anderson*, 169 F.4th at 496 (quoting *Medina*, 606 U.S. at 377); *see also Lancaster*, 162 F.4th at 1068–69. It found that the "broader statutory context 'only serves to confirm [its] conclusion,'" largely because the provisions at issue "share the *same* statutory context described in *Medina*," noting the focus on "aggregate compliance" and the placement of the provision in the midst of a list of "scores of things a state plan must include to qualify for federal funding." *Anderson*, 169 F.4th at 496 (quoting *Medina*, 606 U.S. at 378, 379); *see also Lancaster*, 162 F.4th at 1068–69.

### 3. Medina *Applies in this Case*

First, regarding the question of whether *Waskul* continues to be binding on this court, as the plaintiff argues, the general rule is that,"[i]f . . . [an] intervening decision neither expressly nor

implicitly overrules the prior Sixth Circuit decision, [a district court] must be extremely careful in concluding that circuit precedent is no longer good law, and should only deviate from such authority where it is powerfully convinced that the circuit will overrule itself at the next available opportunity." *Advanced Rehab & Med., P.C. v. Amedisys Holding, LLC*, No. 1:17-cv-01149-JDB-jay, 2019 WL 4145239, at *3 n.4 (W.D. Tenn. Aug. 30, 2019) (quoting *United States v. Wehunt*, 230 F. Supp. 3d 838, 846 (E.D. Tenn. 2017) (internal quotation marks and citations omitted)).

This court, in short, is "powerfully convinced" that *Medina* would require the Sixth Circuit to reconsider and overrule its holding in *Waskul*. As the Fourth Circuit found in *Anderson*, prior to *Medina*, "panel precedent dictated that a cause of action [under § 1396a(a)(10)] existed. But . . . *Medina* places the absence of a cause of action here beyond any doubt." *Anderson*, 169 F.4th at 495. In *Waskul*, the court expressly relied on *Blessing*. While it filtered its analysis of the three *Blessing* factors through its view of the holding in *Gonzaga*, the court noted that the language in question "focus[es] on individual entitlements" and found that this "individually focused terminology" was sufficient to "unambiguously confer[] an individual entitlement under the law." *Waskul*, 979 F.3d at 447. Notably absent from the court's analysis is any consideration of whether the language "'clear[ly] and unambiguous[ly]' uses 'rights-creating terms.'" *Medina*, 606 U.S. at 368 (quoting *Gonzaga*, 536 U.S. at 284, 290). This court, therefore, must conduct that analysis.

    4.    *The Medicaid Act Provisions on Which Plaintiffs Rely Do Not Create a Private Right of Action*

The plaintiffs seek to bring a private cause of action to enforce specific provisions of the Medicaid Act, including 42 U.S.C. §§ 1396a(a)(8), (a)(10), (a)(43)(B) & (C), and 1396d(a) and (r)(5).

This court finds, for all the same reasons set forth in *Anderson*, under *Medina*, that §§ 1396a(a)(8) and (a)(10) do not create privately enforceable rights. These provisions do not

satisfy the first element of *Medina*'s test: they do not "'clear[ly] and unambiguous[ly]' use[] 'rights-creating terms.'" *Medina*, 606 U.S. at 368 (quoting *Gonzaga*, 536 U.S. at 284, 290). Without such "explicit and unmistakable 'rights-creating language,'" *id.* at 379, the court has no need even to consider the second and third factors identified in *Medina*: whether the statute also "display[s] 'an unmistakable focus' on individuals like the plaintiff," and whether Congress "displaced § 1983's general cause of action with a more specific remedy," *id.* at 368.

The other provisions on which the plaintiffs rely fare no better. Subsection 1396a(a)(43)(A) requires state plans to provide for notice to eligible individuals under age 21 of the availability of "early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases." Subsections (B) and (C), which the plaintiffs seek to enforce, require the State plan to "provide for . . . providing or arranging for the provision of" the screening services identified in subsection (a)(43)(A)" and arranging for corrective treatment of conditions identified through the screening services. 42 U.S.C. §§ 1396a(a)(43)(B), (C). These provisions contain no explicit rights-creating terms. In addition, subsection (a)(43) falls under the same heading and within the same context as subsections 1396a(a)(8) and (10), meaning that it, too, is just one item on a list of "scores of things a state plan must include to qualify for federal funding," and that list is "'directed to the Secretary of Health and Human Services,' not to individuals." *Anderson*, 169 F.4th at 496 (quoting *Medina*, 606 U.S. at 379).

Section 1396d(r), incorporated by reference in subsection 1396a(a)(43), falls within a statute entitled "Definitions." Subsection 1396d(r) defines the "early and periodic screening, diagnostic, and treatment services" required by § 1396a(a)(43). Definitions, by definition, are unlikely to create rights, and this subsection is no exception. It contains no rights-creating

terminology and simply explains what services are covered by (a)(43).

Under *Medina*, the court finds that the Medicaid Act provisions on which the plaintiffs rely are not individually enforceable under § 1983. The plaintiffs' Fifth Claim for Relief will be dismissed for failure to state a claim for which relief may be granted.

    5.  *The AACWA Does Not Create a Private Right of Action*

The plaintiffs also bring a claim to enforce certain provisions of the AACWA, including 42 U.S.C. §§ 671(a)(10), (16), and (22), 675(1), and 675(5). DCS insists that these provisions, like the analogous Medicaid Act provisions addressed above, are not privately enforceable. The court agrees.

The AACWA was enacted for the purpose of "enabling each State to provide" services and programs to benefit children in foster care through the provision of federal funding to the states. 42 U.S.C. § 671. To that end, the statute requires the states to adopt plans and to provide certain services as set forth in the Act. *See id.* ¶¶ 672–697c. Although the question of whether the AACWA is privately enforceable presents a closer call than the Medicaid Act—because the language of the AACWA so clearly focuses on the benefits to be accorded individual children in the State's foster care system—the statute simply does not incorporate the type of rights-creating language required by *Medina*, unlike the FNHRA. Rather, the statute is quite similar in structure and language to the Medicaid Act.

For instance, section 671(a), like § 1396a(a), requires each state to put in place a "plan approved by the Secretary" and outlines numerous (thirty-seven) features that must be included in each such plan. Among those features, each plan must "provide[] . . . for the establishment . . . of a State authority . . . that shall be responsible for establishing and maintaining standards for foster family homes and child care institutions." 42 U.S.C. § 671(a)(10). In addition, each state plan must "provide[] for the development of a case plan . . . for each child receiving foster care maintenance

payments . . . and provide[] for a case review system which meets the requirements described in sections 675(5) and 675a." *Id.* § 671(a)(16). Under subsection (a)(22), each state plan must require the "develop[ment] and implement[ation of] standards to ensure that children in foster care placements . . . are provided quality services that protect the safety and health of the children." *Id.* § 671(a)(22).

Section 675, entitled "Definitions," as relevant here, defines the term "case plan" and specifies what must be included in each foster child's case plan. *Id.* § 675(1). It also defines "case review system" and specifically requires that "each child ha[ve] a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." *Id.* § 675(5)(A); *see also id.* § 675a.

Of all of these provisions, the only one that mentions the "rights" of foster children (as opposed to parental rights implicated in termination proceedings) is § 675a. This provision requires that, for any child in state foster care who is fourteen years old or older, the child's case plan must include:

> (1) a document that describes the rights of the child with respect to education, health, visitation, and court participation, the right to be provided with the documents specified in section 675(5)(I) of this title in accordance with that section, and the right to stay safe and avoid exploitation; and

> (2) a signed acknowledgment by the child that the child has been provided with a copy of the document and that the rights contained in the document have been explained to the child in an age-appropriate way.

*Id.* § 675a(b).

Section 671(b) directs the Secretary to approve any plan that complies with § 671(a). Another provision provides for payments to states that have "a plan approved under this part." *Id.* § 674(a). These payments are in the form of reimbursements, or matching funds, to the states of

some percentage of the amounts the states already expended during a given fiscal period for adoption subsidies, foster care maintenance, and administrative training to support families adopting children with special needs, ranging from 50 to 80% of adoption assistance payments and 50% of administrative costs. *See generally id.* § 674(a)(1)–(7). Notably, the statute provides for the reduction in payments to states found to have violated § 671(a)(18) or (23) and expressly provides that "[a]ny individual who is aggrieved by a violation of *section 671(a)(18)* of this title by a State or other entity may bring an action seeking relief from the State or other entity in any United States district court." *Id.* § 674(d)(1), (3)(A). It does not identify any other provision for which a private right of action is created.

It appears that only two district courts have addressed the question of whether, following *Medina*, the AACWA creates privately enforceable rights, and they have reached different conclusions. In the first, a California district court addressed a motion to reconsider its prior denial of a motion for judgment on the pleadings, in support of which the defendants argued that, following *Medina*, the plaintiff could not longer bring a private cause of action to enforce "the case planning provisions" of the AACWA. *Gatlin v. Contra Costa Cnty.*, 796 F. Supp. 3d 622, 624 (N.D. Cal. 2025). As relevant there, prior to *Medina*, the Ninth Circuit (along with a majority of circuit courts) had already expressly held that the AACWA's case plan provisions and case review system provisions, codified at 42 U.S.C. §§ 671(a)(16), 675(1), and 675(5)(D), were privately enforceable. *See Henry A. v. Willden*, 678 F.3d 991, 1008 (9th Cir. 2012)). Although the question presented a "close call," the district court in *Gatlin* found that *Henry A.* was neither "effectively overruled" by, nor "clearly irreconcilable" with, *Medina*. *Id.* at 626. The court recognized that *Henry A.* had relied on *Blessing* to reach its conclusion, but, according to the district court, *Henry A.* "also integrated *Gonzaga* into its analysis." *Id.* Although there was obviously "'some tension'

between the *Henry A.* reasoning and *Medina*," the court found that such "tension" did not make the former "clearly irreconcilable" with the latter. *Id.* Thus, finding itself still bound to follow the precedent established by *Henry A.*, the court denied the defendants' motion to reconsider. *Id.*

Conversely, and more recently, the U.S. District Court for the District of Maryland, reached a contrary conclusion. It stated: "Considering the *Gonzaga* factors, *Medina*'s strong admonition related to same, and the Fourth Circuit's subsequent analysis applying *Medina* [in *Anderson v. Crouch*], the court is not persuaded that the AACWA provisions at issue unambiguously confer individual rights to Plaintiffs." *B.F. ex rel. Faulk v. López*, No. 1:23-cv-00109-JRR, 2026 WL 696753, at *28 (D. Md. Mar. 12, 2026). And, even before *Medina*, the Southern District of West Virginia District Court had reached the same conclusion: "Since Congress has not 'spok[en] with a clear voice' and 'manifest[ed] an "unambiguous" intent to confer [an] individual right[],' the Court finds that § 671(a)(16) is not privately enforceable." *Jonathan R. III*, 2023 WL 184960, at *17.

In our case, unlike in the Ninth Circuit, there is no Sixth Circuit precedent standing in the way of concluding that the AACWA is not privately enforceable.[10] And, in the absence of any such authority, this court is persuaded by the text of the statute and the analysis of both *B.F.* and *Jonathan R. III* that the AACWA does not create a private right of action. First, it does not use rights-creating language. As the West Virginia court stated:

> Section 671(a)(16) stands in stark contrast to statutes that do use rights-creating language. Take Title VI for instance. It provides that "[n]o person . . . shall, on the ground of race, color, or national origin . . . be subjected to discrimination." 42 U.S.C. § 2000d. Title IX uses near-identical language: "No person . . . shall, on the basis of sex . . . be subjected to discrimination." 20 U.S.C. § 1681(a). Congress

---

[10] To the contrary, the Sixth Circuit "easily concluded" in 2010—in *dicta* and without analysis—that the AACWA's "case plan" and "case review system" provisions in 42 U.S.C. §§ 671(a)(16), 675(1), and 675(5) "do[] not create enforceable rights. *John B. v. Goetz*, 626 F.3d 356, 363 (6th Cir. 2010).

could have easily written § 671(a)(16) in a similar fashion, using an individual focus. Congress could have said, for example, that "each child shall have a case plan and a case review system." Such "individually focused terminology," "phrased in terms of the person[] benefitted," would have shown congressional intent to create an individual right. *Gonzaga*, 536 U.S. at 284, 287. But Congress chose not to focus on the individual. And since Congress "knows how to . . . expressly" "create a private cause of action" when it wants, *Carey v. Throwe*, 957 F.3d 468, 479 (4th Cir. 2020), § 671(a)(16)'s focus on the person regulated is telling.

*Id.* at *16.

The plaintiffs attempt to avoid this conclusion by pointing to § 675a, which requires case plans for children over age 14 to include a document describing each child's "*rights*" "with respect to education, health, visitation, and court participation . . . and the *right* to stay safe and avoid exploitation," with a signed acknowledgement from the child of "the *rights* contained in the document." (Doc. No. 48 at 35 (quoting 42 U.S.C. § 675a(b)).) But even here, the *statute* does not unambiguously contain rights-creating language. It refers to documentation that must be provided to foster children that refers to rights. Moreover, as in *Medina*, the context in which the case review provisions appear weighs against any suggestion of the creation of a right, and the fact that Congress *expressly* provided a cause of action for violations of subsection 671(a)(18) further establishes that it knew how to create a private cause of action and did not do so for the remaining provisions of the statute.

To conclude, the court finds, based on *Medina*, that the AACWA provisions on which the plaintiffs' claims rest do not contain unambiguous rights-creating language and, therefore, are not privately enforceable under § 1983. The plaintiffs' "Third Claim for Relief" will be dismissed for failure to state a claim for which relief may be granted.

### E. ADA and RA Claims (Fourth Cause of Action)

Several of the named plaintiffs allege that they are disabled, and they seek to bring a claim on behalf of themselves and a subclass of disabled plaintiffs under Title II of the ADA ("Title II")

and the mirroring provisions of Section 504 of the RA ("Section 504"). The plaintiffs' claims are based on their ongoing placements in overly restrictive institutionalized settings or being at risk of placement in overly restrictive settings. (SAC ¶ 296.)

Title II establishes that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under long established Supreme Court precedent, one form of discrimination prohibited by Title II is the "unjustified institutional isolation of persons with disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999); *see also* 42 U.S.C. § 12101(a)(2) (stating Congressional finding that, "historically, society has tended to isolate and segregate individuals with disabilities, and . . . such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"). To implement § 12132, the Attorney General promulgated a regulation known as the "integration mandate," which provides that public entities "shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also Waskul*, 979 F.3d at 459. "The 'most integrated setting' is one 'that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.'" *Waskul*, 979 F.3d at 459 (quoting *Olmstead*, 527 U.S. at 592).

The plaintiffs also bring clams under Section 504, 29 U.S.C. § 794, which "mirrors 42 U.S.C. § 12132 and is interpreted in parallel with it." *Id.* And a regulation implementing Section 504 states that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

As in *Waskul*, the plaintiffs' Title II and Section 504 claims are "'essentially one claim,' and [the court] thus consider[s] them in tandem." *Waskul*, 979 F.3d at 460.

The defendants raise two arguments in support of dismissal of the plaintiffs' disability discrimination claims: (1) that the statutes "do not prohibit 'risk of' placement in segregated settings"; and (2) that the plaintiffs have not alleged facts showing that the defendants caused any named plaintiff to experience "unjustified institutionalization" or serious risk of such institutionalization. (Doc. No. 37 at 47.) The court, in short, is not persuaded.

### 1. *"Risk of" Institutional Setting*

In *Waskul*, one of the plaintiffs' two theories of disability discrimination was that the defendants' "implementation of the current budget methodology places all of the individual Plaintiffs at serious risk of institutionalization," which violated the "integration mandate." *Waskul*, 979 F.3d at 460. The Sixth Circuit held that the district court had erred in dismissing this claim, noting, first, that "courts have widely accepted that plaintiffs can state a claim for violation of the integration mandate by showing that they have been placed at serious risk of institutionalization or segregation," holding unequivocally that "[p]laintiffs may . . . state a claim by sufficiently alleging that they are at serious risk of institutionalization. *Id.* at 461. The court explained that the Department of Justice had put out guidance in 2011 clarifying that "'[i]ndividuals need not wait until the harm of institutionalization or segregation occurs or is imminent' in order to bring a claim for violation of the integration mandate." *Id.* at 460 (quoting U.S. Dep't of Justice ("DOJ"), Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C. (last updated Feb. 25, 2020) (now located at https://archive.ada.gov/olmstead/q&a_olmstead.htm)). The court acknowledged that such guidance from the DOJ is not binding or even authoritative and instead warrants only "respect." *Id.* In addition, however, the court also concluded that it had no need to decide whether

the "integration mandate" in the statute, as interpreted by *Olmstead*, is "'genuinely ambiguous' as to whether it protects those at serious risk of institutionalization such that the Department of Justice's interpretation of that regulation is entitled to deference" under *Auer v. Robbins*, 519 U.S. 452 (1997), or *Kisor v. Wilkie*, 588 U.S. 558 (2019). *Id.* at 461. No such analysis was required because, aside from the fact that the defendants did not contest the DOJ's interpretation of *Olmstead*, "a contrary interpretation is unreasonable because the integration mandate's 'protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation.'" *Id.* at 461 (quoting *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003)).

The defendants argue that *Waskul* is not binding on this court because it is inconsistent with *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), in which the Supreme Court held that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," thus overruling *Chevron, U.S.A, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Loper*, 603 U.S. at 412. In *Waskul*, however, the Sixth Circuit did not defer either to the regulations or to the 2011 guidance, and it certainly did not engage in so-called *Chevron* deference to the regulations. As a result, the court's decision in *Waskul* was not called into question by *Loper-Bright*.[11] *Waskul* remains binding on this point, and

---

[11] Moreover, as the plaintiffs point out, the *Loper* Court further stated that, in abandoning *Chevron* deference, it did not

> call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology. Mere reliance on *Chevron* cannot constitute a "special justification" for overruling such a holding, because to say a precedent relied on *Chevron* is, at best, just an argument that the precedent was wrongly decided. That is not enough to justify overruling a statutory precedent.

the defendants' first argument for dismissing the plaintiffs' disability discrimination claims is without merit.

### 2. The Plaintiffs State Colorable Claims

The defendants also argue that the SAC fails to state colorable disability discrimination claims. As the defendants frame it, to state a colorable claim for violation of the integration mandate, under *Olmstead*, the plaintiffs must plausibly allege that the defendants' refusal to pay for community-based services caused one or more named plaintiffs to remain institutionalized or placed them at serious risk of being institutionalized; (2) the named plaintiff's guardian prefers the child to be placed in the community; (3) "the State's treatment professionals" have concluded that placement in the community is appropriate for the plaintiff; (4) and community placement for that plaintiff can be "reasonably accommodated." (*See* Doc. No. 37 at 53.) *See also Olmstead*, 527 U.S. at 607.

The defendants contend that the plaintiffs cannot establish the first element, because they cannot show that DCS is refusing to pay for services in the community. Rather, DCS says, when the failure to place a child in residential treatment is due to the "lack of third-party providers willing to serve the child in the community," DCS did not cause the child's institutionalization. (Doc. No. 37 at 54.) Here, however, the plaintiffs specifically allege with respect to plaintiff Keira M., for example, that the reason Keira M. was institutionalized in the first place was because DCS "failed to follow its Family Crisis Intervention Program guidelines or offer stabilization services" to her adoptive family that would have preserved the adoptive placement. (SAC ¶ 34.) More importantly, for purposes of her claim of entitlement to prospective relief (for purposes of standing

---

603 U.S. at 412 (internal quotation marks and citations omitted).

to seek relief against the state official defendants), the plaintiffs allege that a foster family is willing and ready to take in Keira M., but DCS has inexplicably delayed approval, thus unnecessarily—and without justification—extending Keira's institutionalization. (*Id.* ¶ 37.) The plaintiffs adequately allege a causal connection here.

Similarly, the plaintiffs allege that Darnell H. has suffered and continues to suffer unnecessary institutionalization, that his former GAL is ready and willing to foster him, but DCS has done nothing to facilitate that placement, thus unnecessarily extending Darnell's institutionalization. (*Id.* ¶¶ 42, 45, 57, 53.) Jasmine G. is in a similar situation. (*Id.* ¶¶ 77–78.) The plaintiffs allege that Zander M. has been inappropriately institutionalized in the past and, due to DCS's failure to provide the necessary supportive services, remains at serious risk of being reinstitutionalized unnecessarily in the future. (*Id.* ¶¶ 115–18.) More generally, the plaintiffs allege that the defendants have implemented systemic, widespread policies and practices that "deprive foster children of necessary services in the community and [that] force children into unjustified institutionalization." (Doc. No. 48 at 53 (citing SAC ¶¶ 203, 231–33, 235.)

The plaintiffs have adequately alleged that several named plaintiffs are currently experiencing unjustified institutionalization or are at risk of unjustified institutionalization caused by the defendants' failure to pay for services that would permit community placement.

The defendants also assert that the plaintiffs have failed to allege facts showing that the legal guardians of any of the five named plaintiffs in residential treatment (Darnell H., Max W., Thomas H., Keira M., and Jasmine G.) would prefer those children to be placed in the community or showing that "the State's treatment professionals" have determined that community-based placement is appropriate for three of the five (Keira, Jasmine, and Max). (Doc. No. 37 at 54 (referring first to.) Similarly, the defendants assert that the plaintiffs do not allege facts showing

that three of the five children in institutional placements (Darnell, Max, and Thomas) can be "reasonably accommodated" in the community. (*Id.*)

As an initial matter, the court notes that the plaintiffs have no obligation to plead facts showing that every named plaintiff has personally stated each claim set forth in the SAC. Instead, if just one plaintiff states a colorable claim, then dismissal is not appropriate. *Accord Hardy v. Fischer*, 701 F. Supp. 2d 605, 611 n.5 (S.D.N.Y. 2010) ("In order for the [putative class action] complaint to survive this motion to dismiss, the allegations of at least one named plaintiff must state a claim for relief." (citing *Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994))); *Pruell v. Caritas Christi*, No. 09-11466-GAO, 2010 WL 3789318, at *4 (D. Mass. Sept. 27, 2010) ("To survive a motion to dismiss [in a putative class action], the allegations of at least one named plaintiff must state a claim for relief." (citing *O'Shea*, 414 U.S. at 494).

Second, the defendants are largely incorrect on the facts. The plaintiffs allege that DCS has not produced documentation establishing that Keira M.'s Level 4 institutional setting is necessary, leaving her GAL unequipped to contest it. (SAC ¶ 36.) This allegation gives rise to the reasonable inference that the setting is not appropriate and that the GAL would oppose it if she could. The SAC also alleges that a prospective family is willing to foster her, but DCS has not facilitated the placement. Similar allegations regarding Darnell H. and Jasmine G. support the inference that these children have been inappropriately institutionalized, and the court finds that the SAC plausibly states a disability discrimination claim on behalf of these plaintiffs. And it plausibly alleges that other named plaintiffs are at risk of institutionalization due to DCS's failure to provide necessary services, as discussed above.

In sum, the plaintiffs have sufficiently alleged that the defendants have caused specific named plaintiffs to experience unjustified institutionalization—-or placed them at serious risk

thereof—in violation of Title II and Section 504. The Motion to Dismiss will be denied as to these claims.

    **F.**    **Failure to Exhaust First and Fourth Causes of Action Through the Individuals with Disabilities Education Act's Administrative Process**

Finally, the defendants assert that the plaintiffs have failed to exhaust their education-related claims through the administrative process required by the Individuals with Disabilities Education Act ("IDEA"). (Doc. No. 37 at 55.) The plaintiffs respond that their disability discrimination claims do not arise under the IDEA and are not subject to exhaustion. (Doc. No. 48 at 54.)[12]

The IDEA protects only children with disabilities and "requires a state that wants IDEA-related funding to make '[a] free appropriate public education' 'available to all children with disabilities residing in the State between the ages of 3 and 21.'" *Doe ex rel. K.M. v. Knox Cnty. Bd. of Educ.*, 56 F.4th 1076, 1080 (6th Cir. 2023) (quoting 20 U.S.C. § 1412(a)(1)(A)). As the Sixth Circuit explained in *Doe*,

> To deliver the required education to a qualifying child, school officials and parents must cooperatively develop an "individualized education program" unique to the child (what Congress itself shortened to the acronym "IEP" in the law's text). If parents believe that their child's IEP falls short of providing a "free appropriate public education," they may raise their concerns in an administrative complaint, proceed through an administrative hearing, and appeal to a state educational agency. Under the IDEA, parents may turn to the courts only after seeking relief through this process.

*Id.* (first quoting 20 U.S.C. § 1414(d)(1)(A); and then quoting *id.* § 1415(b)(6), (f)–(g); and then citing *id.* § 1415(i)(2)(A)). In other words, before filing suit in federal court to enforce their

---

[12] Insofar as this argument targets the plaintiffs' First Claim for Relief, for violation of their substantive due process rights, the court has found that the plaintiffs' do not have a substantive due process right to an education, thus rendering moot the defendants' IDEA defense to the First Claim for Relief.

disabled child's right to a free appropriate education, parents must first exhaust their administrative remedies under the IDEA. In addition, parents may also "pursue overlapping claims under the ADA or Rehabilitation Act, but they must complete the IDEA's administrative process if they are 'seeking relief that is also available under' that law." *Id.* (citing 20 U.S.C. § 1415(l)).

As the court recognized in *Doe*, it is not always easy to determine whether "a suit under the ADA or Rehabilitation Act seek[s] 'relief' that the IDEA also makes 'available'" *Id.* at 1081. In attempting to elucidate Supreme Court precedent on this issue, the Sixth Circuit explained that, in *Fry v. Napoleon Community Schools*, 580 U.S. 154 (2017), the Supreme Court stated that the IDEA "allows parents to seek relief only for one injury: the denial of a 'free appropriate public education.'" *Doe*, 56 F.4th at 1081 (citing *Fry*, 580 U.S. at 166–69). Thus, the IDEA's exhaustion requirement is not implicated if the parents are seeking something other than a free appropriate education. The Sixth Circuit explained that parents are seeking "'relief' that is 'available' under the IDEA only if a child needs an *instructional change*, not just a *non-instructional accommodation* to some school rule or policy." *Id.* at 1082 (citing 20 U.S.C. § 1415(l)).

The plaintiffs, citing *Doe*, contend that their claims are based on the defendants' failure to provide enrollment in school and transportation to school while the plaintiffs have been repeatedly moved and confined to placement where they do not have access to teachers or instruction. (Doc. No. 48 at 55.) That assertion is disingenuous at best. Most of the education-related allegations in the SAC are related to the denial of an appropriate IEP and the failure to provide a free appropriate public education. For instance, the plaintiffs specifically allege that Darnell has "not received adequate educational support," that DCS has not "advocated for appropriate testing, an accurate [IEP] from his school, nor ensured that he was offered appropriate educational services," and he remains without an appropriate IEP that identifies necessary remedial services "to help catch him

up to his grade level." (SAC ¶ 49; *see also id.* ¶¶ 50, 52, 54, 64 ("An impediment to stability for Darnell continues to be his lack of educational services."), 65.) Similarly, the plaintiffs allege that Zander does not have an accurate and appropriate IEP. (*Id.* ¶ 116.) Moreover, to the extent the plaintiffs allege a lack of *access* to education, these claims appear to sound in due process (rather than disability discrimination), but, as discussed above, the plaintiffs do not have a substantive due process right to an appropriate education.

In short, none of the plaintiffs' education-based claims can proceed. They do not allege disability-related access-to-education claims. Their claims relating to the failure to provide an appropriate IEP and a free appropriate education arise under the IDEA and must be dismissed without prejudice for failure to exhaust. The education-related substantive due process claims, as discussed above, will be dismissed for failure to state a claim for which relief may be granted.

## IV.     CONCLUSION

For the reasons set forth herein, the defendants' Motion to Dismiss will be granted in part and denied in part. More specifically, the plaintiffs' Title II and Section 504 claims may proceed; their substantive due process claim will be dismissed in part but may proceed in part; and their claims under the AACWA and the Medicaid Act will be dismissed in their entirety.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge